JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| John Doe | University of Maryland, College Park |

| (b) County of Residence of First Listed Plaintiff **Carroll**<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant **Prince George's**<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
|---|---|

| (c) Attorneys *(Firm Name, Address, and Telephone Number)*<br><br>See attachment | Attorneys *(If Known)* |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government<br>Plaintiff | ☒ 3 Federal Question<br>*(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government<br>Defendant | ☐ 4 Diversity<br>*(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place<br>of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure<br>of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury -<br>Product Liability | ☐ 690 Other | ☐ 423 Withdrawal<br>28 USC 157 | ☐ 376 Qui Tam (31 USC<br>3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product<br>Liability | ☐ 367 Health Care/<br>Pharmaceutical | | **INTELLECTUAL<br>PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel &<br>Slander | Personal Injury<br>Product Liability | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment<br>& Enforcement of Judgment | ☐ 330 Federal Employers'<br>Liability | ☐ 368 Asbestos Personal<br>Injury Product | | ☐ 830 Patent<br>☐ 835 Patent - Abbreviated | ☐ 430 Banks and Banking<br>☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted<br>Student Loans<br>(Excludes Veterans) | ☐ 345 Marine Product<br>Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark<br>☐ 880 Defend Trade Secrets<br>Act of 2016 | ☐ 470 Racketeer Influenced and<br>Corrupt Organizations |
| ☐ 153 Recovery of Overpayment<br>of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud<br>☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards<br>Act | | ☐ 480 Consumer Credit<br>(15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle<br>Product Liability | ☐ 380 Other Personal<br>Property Damage | ☐ 720 Labor/Management<br>Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer<br>Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal<br>Injury | ☐ 385 Property Damage<br>Product Liability | ☐ 740 Railway Labor Act<br>☐ 751 Family and Medical | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - | | Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/<br>Exchange |
| ☐ 196 Franchise | Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement<br>Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information<br>Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate<br>Sentence | | or Defendant)<br>☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/<br>Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities -<br>Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | Act/Review or Appeal of<br>Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities -<br>Other | **Other:**<br>☐ 540 Mandamus & Other | ☐ 462 Naturalization Application<br>☐ 465 Other Immigration | | ☐ 950 Constitutionality of<br>State Statutes |
| | ☒ 448 Education | ☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>Conditions of<br>Confinement | Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>Another District<br>*(specify)* | ☐ 6 Multidistrict<br>Litigation -<br>Transfer | ☐ 8 Multidistrict<br>Litigation -<br>Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
20 U.S.C § 1681 et seq.

Brief description of cause:
Plaintiff seeks damages and injunctive relief under Title IX of the Education Amendments of 1972

| VII. REQUESTED IN<br>COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION<br>UNDER RULE 23, F.R.Cv.P. | DEMAND $<br>TBD ( > $75,000) | CHECK YES only if demanded in complaint:<br>JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S)<br>IF ANY | *(See instructions):*<br>JUDGE | DOCKET NUMBER |
|---|---|---|

| DATE<br>December 27, 2023 | SIGNATURE OF ATTORNEY OF RECORD<br>/s/ Patrick R. Seidel |
|---|---|

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

CIVIL COVER SHEET ATTACHMENT
*John Doe v. University of Maryland, College Park*

I.(c). Attorneys of Plaintiff

Patrick R. Seidel, Esq. (#21801)
William N. Sinclair, Esq. (#28833)
Todd W. Hesel, Esq. (#21466)
Silverman Thompson Slutkin & White, LLC
400 East Pratt Street, Suite 900, Baltimore, MD 21202

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JOHN DOE,** | * |
| *Plaintiff,* | * |
| v. | *   Civil Action No. _____ |
| **UNIVERSITY OF MARYLAND, COLLEGE PARK** | * |
| 1101 Main Administration Building | * |
| 7901 Regents Drive | |
| College Park, Maryland 20742 | * |
|     Serve On: Office of the Attorney General | |
|     Civil Litigation Division | * |
|     200 Saint Paul Place | |
|     Baltimore, Maryland 21202 | * |
| *Defendant.* | * |

## VERIFIED CIVIL COMPLAINT AND REQUEST FOR JURY TRIAL

Plaintiff John Doe ("Doe"),[1] though undersigned counsel, brings this Verified Complaint against the University of Maryland, College Park ("College Park") and states as follows:

## INTRODUCTION

1. In February 2022, Doe and Jane Roe ("Roe") attended a fraternity party together and then went back to Doe's room, where they had consensual sex.

2. Nearly a year later, Roe filed a complaint with Doe's university alleging that Doe sexually assaulted her by separately engaging in nonconsensual intercourse that same night, at an unspecified time *after the consensual sex*, while they were lying in bed together and Roe was asleep.

---

[1] Contemporaneously with the filing of this complaint, Doe is filing a Motion for Leave to Proceed Under a Pseudonym that sets forth the factual and legal basis for proceeding under a pseudonym.

3.  At the conclusion of a flawed and biased university disciplinary proceeding, Doe was found "responsible" for sexual assault and expelled from the university with only one semester left until graduation.

4.  Doe's appeal of the "responsible" finding was denied, but his sanction was reduced to a one-year suspension.

5.  Because this erroneous outcome was the result of gender bias by the university, the hearing officer, the investigators, and other university officials, Doe is entitled to damages and injunctive relief under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681 *et seq.*, including immediate reinstatement as a student.

## PARTIES AND RELEVANT PERSONS

6.  Plaintiff Doe is a natural person who is domiciled in and a citizen of Maryland.

7.  Defendant College Park is a public university and state government entity, with its principal place of business located in Maryland. College Park is a recipient of federal funds and therefore subject to Title IX.

8.  Roe is a non-party to this action. She is Doe's accuser and the complainant in the underlying disciplinary proceedings brought by College Park.

9.  Angela Nastase ("Nastase") is a non-party to this action. She is and was at times relevant to this complaint College Park's Title IX Coordinator and the Director of its Office of Civil Rights and Sexual Misconduct ("OCRSM").

10. Jamie Brennan ("Brennan") is a non-party to this action. She is the Assistant Director of OCRSM and was an investigator for College Park in the underlying disciplinary proceedings.

11. Rosanne Stafiej ("Stafiej") is a non-party to this action. She was an investigator for College Park in the underlying disciplinary proceedings. Stafiej and Brennan are referred to

2

collectively as the "Investigators."

12. Alyssa-Rae McGinn ("McGinn") is a non-party to this action. College Park retained her to act as the hearing officer in the underlying disciplinary proceedings.

13. Ursula Gorham-Oscilowski ("Gorham-Oscilowski") is a non-party to this action. She is the associate director for faculty initiatives in the Office of Faculty Affairs at College Park and was an appellate hearing officer in the underlying disciplinary proceedings.

14. Chris Hanson ("Hanson") is a non-party to this action. He is a professor at College Park and was an appellate hearing officer in the underlying disciplinary proceedings.

15. Gideon Mark ("Mark") is a non-party to this action. He is an assistant professor at College Park and was an appellate hearing officer in the underlying disciplinary proceedings.

## JURISDICTION AND VENUE

16. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because the claim arises under the laws of the United States.

17. This Court has personal jurisdiction over Defendant as it is organized under the laws of and maintains its principal place of business in this District.

18. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Doe's claims occurred in this District.

## FACTS

**I.    DOE AND ROE ATTENDED A FRATERNITY PARTY TOGETHER AND THEN HAD CONSENSUAL SEX IN DOE'S ROOM; ROE LATER CLAIMED THAT *AFTER* THE CONSENSUAL SEX, SHE WAS ALSO SEXUALLY ASSAULTED.**

19. Doe is a senior at College Park with one semester of classes left until graduation. He is a dean's list student with no prior history of any disciplinary action.

20. Roe is a student at another university in Maryland who has previously attended social events hosted by Doe's fraternity.

3

21. For one such event on February 19, 2022, Roe agreed to be Doe's "date." The two had attended at least one other fraternity event prior to this "date."

22. The date was arranged through a mutual friend, referred to in the disciplinary proceedings and here as "Witness-1." Witness-1 is a student at College Park and a member of Doe's fraternity.

23. Roe was driven to College Park by her friend, referred to in the disciplinary proceedings and here as "Witness-3." Witness-3 was Witness-1's "date" for the event. Witness-3 is a student at Roe's university.

24. Roe and Witness-3 first went to Witness-1's dormitory, where they got dressed for the event and began drinking alcohol. According to Roe, "it was a fancy event" and she wore a "fancy black dress."

25. Roe, Witness-1, and Witness-3 went from Witness-1's dormitory to a second location, the address of which is unknown. At this second location, Roe, Witness-1, and Witness-3 continued to "pre-party" (*i.e.*, drink alcohol) before eventually walking to the event. The event was held at an "off-site" location, meaning that it did not occur at the fraternity house.

26. Doe walked from his fraternity house to the off-site location where he met Roe. Although Roe was Doe's "date," they spent little time together at the event. Both Doe and Roe drank alcohol at the event.

27. At some point in the night, Doe and Roe voluntarily left the event together. Witness-1 and Witness-3 remained at the event and eventually returned to Witness-1's dormitory.

28. Doe and Roe walked back to Doe's off-campus fraternity house and went to Doe's room.

29. Once there, Doe and Roe engaged in consensual, vaginal sex.

4

30. Roe spent the night with Doe and slept in his bed with him.

31. Roe had her cell phone with her in Doe's room and used it throughout the night and morning to communicate with friends.

32. The communications make no mention of non-consensual activity, a sexual assault, or rape. To the contrary, in several text messages, Roe joked with Witness-3 about Doe's snoring as he slept, writing: "He's snoring so loud 😭" and "Ya lol. He woke up b4 but now sleeping."

33. Roe also had pepper spray with her in Doe's room but never used it.

34. By Roe's own account, at some point in the night, after both the consensual sex and the alleged sexual assault, she left Doe's room to use the bathroom, returned to Doe's room and went back to sleep in his bed with him.

35. Roe stayed with Doe until the next day, sometime around noon, when Witness-3 picked her up. Roe said nothing to Witness-3 about any non-consensual activity, a sexual assault, or rape.

36. In the days and weeks following Doe and Roe's "date," Roe told several friends that she "hooked up" with Doe but she did not characterize the interaction as non-consensual, a sexual assault, or rape.

37. Nearly two months later, on May 17, 2022, Roe messaged Doe demanding to speak with him in person, without specifying the reason for the meeting. That same day, she traveled to Doe's fraternity house and was joined by a College Park student and friend identified in the disciplinary proceedings and here as "Witness-2." The two met Doe on a bench outside, where Roe asked Doe if he remembered what happened the night she slept over. Doe recalled that they "hooked up," but Roe claimed that after they "hooked up" she fell asleep and awoke to Doe "raping" her. Doe was shocked and told Roe that was not how he recalled the night transpiring. Roe insisted that she "remembered every detail."

5

38. Doe and Roe did not speak again, and Doe heard nothing further about the sexual assault allegation until months later, in Fall 2022, when Roe reported the alleged sexual assault to Doe's fraternity.

39. Roe did not report the alleged sexual assault to law enforcement authorities until February 2023, nearly a year after her date with Doe.

## II.    THE FORMAL COMPLAINT, FLAWED INVESTIGATION AND HEARING, AND ERRONEOUS FINDING OF "RESPONSIBLE"

40. Sometime around February 2023, Roe emailed College Park to request that Doe be removed from the dean's list. That request was denied. It is unknown if Roe referred to any non-consensual activity, a sexual assault, or rape in that email because a copy was never provided to Doe.

41. On February 1, 2023, Roe electronically submitted an Initial Reporting Form to College Park's OCRSM, alleging in pertinent part, "[a] little while (about 2 hours or so) after" falling asleep, following the consensual sex, "I woke up to his penis inside of me." Roe continued by stating that "[Doe] being kicked out [of his fraternity] was not enough. I think his name should be removed from the link I attached below."

42. The "link" referred to in the report was an internet link to the dean's list for College Park students. As Roe later told investigators, the motivation for submitting the Initial Reporting Form was that she "Googled" Doe's name, saw that he was on the dean's list at College Park, and "thought that his name on the list made him look good, and she did not like that."

43. On February 22, 2023, after meeting with an OCRSM intake coordinator, Roe submitted a Formal Complaint Form containing a slightly more detailed narrative. She explained the significant delay in reporting by claiming that she "didn't realize that this was rape until months later."

6

44. On the same day that Roe filed the Formal Complaint Form with College Park, Roe also reported the alleged sexual assault to Baltimore County Police. She was later referred to authorities in Prince George's County, where the alleged incident occurred.

45. Roe filed criminal charges against Doe in Prince George's County on February 26, 2023. That same day, she also sought a protective order against Doe in Prince George's County. Both filings include nearly identical handwritten narratives.

46. Doe learned of Roe's application for criminal charges in early March 2023 and immediately surrendered to authorities in Prince George's County. Doe was jailed without bail for three days before he was released on bond.

47. Roe's application for a protective order was denied a few weeks later because there was no statutory basis for relief, and, by May 2023, the criminal charges were entered *nolle prosequi* in their entirety.

48. Meanwhile, on March 3, 2023, OCRSM served notice of the Formal Complaint upon Doe and initiated its Sexual Misconduct Investigation process.

49. During the investigation and subsequent disciplinary proceedings, Doe was permitted to have an "advisor" and "support person" (as was Roe). Doe retained an attorney as his advisor and his mother acted as his support person.

A.    **Witness Interviews**

50. Between April and June 2023, the Investigators interviewed Roe and three "witnesses"—all of whom were, at the time, "close friends" with Roe. The Investigators chose not to record any of the interviews and any notes they took were not shared with Doe. The only record of the interviews are the summaries included in the draft and final investigative reports prepared

7

by the Investigators. The statements of each witness, as reflected in the Final Investigative Report, are summarized below.

*Witness 1*

51. Witness-1, Roe's "best friend" and the member of Doe's fraternity who arranged the date between Roe and Doe, said that "nothing out of the ordinary" occurred during the social event and that at the end of the event, he returned to his room with Witness-3 while Roe went with Doe to Doe's room.

52. Witness-1 further claimed that *the morning after* the social event, he met Roe for breakfast. After breakfast, according to Witness-1, Roe said that she had sex with Doe, that the sex was "bad," and that she then fell asleep and later awoke to Doe "actively trying to 'get inside' of her." Witness-1 characterized the account as a "drama story" and "brushed it off" because Roe did not say "she was assaulted or raped or anything was bad or that she was hurt or taken advantage of or anything like that."

53. Roe later ended her relationship with Witness-1.

54. Witness-1 also provided Investigators with text messages from Doe about the incident, to which Witness-1 claimed he never responded. However, the screenshots, which were cropped by Witness-1, clearly show a text bubble indicating that Witness-1 did in fact respond. The Investigators never sought clarification from Witness-1 about this false statement nor did they ever attempt to collect the remainder of the conversations.

*Witness 2*

55. Witness-2, a College Park student who was not at the fraternity event but was close friends with Roe at the time, said that Roe told her about the alleged sexual assault in a phone call but failed to mention anything about the consensual sexual activity. Witness-2 said that this phone

8

call occurred during the fall semester 2021, which was months *before* the February 2022 fraternity event.

56. Witness-2 later accompanied Roe for the May 17, 2022, confrontation with Doe at College Park, as previously described. After the confrontation, Witness-2 and Roe went for pizza.

57. Roe later terminated her relationship with Witness-2 after she learned that Witness-2 had spoken to Witness-1 about Roe's confrontation with Doe.

*Witness 3*

58. Witness-3 attends the same university as Roe, was friends with her on the night of the fraternity event and was her roommate at the time she was interviewed by Investigators.

59. During the fraternity event, Witness-3's date, Witness-1, "was very drunk," so Witness-3 had to "take of care him." Witness-3 had not met Doe before and "kept forgetting" who he was. She recalled that Doe did not "hang[] out" with Roe most of the night.

60. Witness-3 could not remember when Roe left the fraternity event, but she provided text messages between her and Roe discussing what time they would meet up the following morning.

61. Roe texted Witness-3 at 2:10 a.m. to report that she "[m]ade it back" to Doe's room. Later, at 3:23 a.m., Roe texted Witness-3 to ask when she should be ready in the morning. Witness-3 replied, "around 9:40."

62. Later that morning, Witness-3 got delayed. Roe told her, "Ya no rush." She then sent text messages joking about Doe's snoring (as quoted above in paragraph 32).

63. After Witness-3 picked up Roe, Roe "did not say anything about the incident" and "[t]here was not really any conversation." The two then drove to Starbucks.

64. Roe disclosed the consensual sexual activity to Witness-3, "very close [in time] . . . very likely that it was that following day."

9

65. Roe did not tell Witness-3 about the alleged sexual assault until April 2022. Witness-3 was invited to join Witness-1 for an "away weekend" with his fraternity in Ocean City, Maryland. Roe was not invited. Upon learning that Witness-3 had been invited, Roe told Witness-3 that she was upset with Witness-1 and that Witness-3 should not go on the trip because she had suffered a "negative experience." As a result, Witness-3 declined the invitation to the "away weekend" event.

*Roe*

66. In Roe's account to investigators, after she had consensual sex with Doe, they both fell asleep in Doe's bed. Roe said she was dressed in a "big, baggy t-shirt with black soft pajama pants from Target." Although not mentioned in the Final Investigation Report, Roe alleged during the hearing that she brought a bag full of personal items—including the pajamas—to the fraternity party.  During the hearing, "a bag" later evolved into "bags."

67. Roe claimed that she next remembered waking up and feeling "something push, something hard inside her." She then realized Doe's penis was in her vagina. During the hearing, Roe described Doe's penis as "so hard." This portion of the account is materially contradicted by Roe's subsequent hearing statements—elicited *after* Doe's testimony—that Doe was "able to get a little erect [during the consensual sex]" but there were "some difficulties" and "It does make sense that [Doe] could have had some struggle at staying hard."

68. Roe also told the College Park Investigators that she was "sleeping in the fetal position with her back toward Doe" and her pants "were pulled down underneath her butt, just enough so that [Doe] could push himself inside of her." This portion of the account materially contradicted Roe's report to Baltimore County Police, in which she stated that her pants were pulled "down to approximately her knees."

69. Roe further told the Investigators that she said to Doe, "I'm sleeping" and pushed him off her body by putting her hand on his chest and shoulders. Doe allowed her to "guide him off." In her Petition for Protective Order, Roe reported that Doe has "blue eyes" and a "possible tattoo on [his]chest"—he has neither.

70. Roe told the Investigators that the incident occurred at around 3:00 a.m. but told Baltimore County Police that the incident occurred at 4:00 a.m.

71. After the encounter, Roe repeatedly maintained that she was "confused" and "did not realize it was 'actual rape'" until much later. However, during the hearing, Roe admitted that at the time of the alleged incident, she was aware of the definitions of consent, sexual assault, and rape and that she did not apply those definitions to this interaction. In fact, in stark contradiction to her statements to the Investigators, Roe testified in the hearing that she "immediately" knew this incident was a sexual assault.

72. The first person Roe told about the alleged sexual assault was Witness-1, but according to Roe that conversation occurred on March 30, 2022, not the day after the incident, as Witness-1 told the Investigators.

73. According to Roe, Witness-1 responded to her allegation in a "nonchalant manner."

74. Roe tried to talk Witness-1 about the incident again later and Witness-1 told her, "[Doe] wouldn't do that; he's a nice guy. He didn't mean it. He doesn't remember. He's my brother."

75. Roe told other friends she "hooked up" with Doe at the party and that "*the sex* was bad." "Over time," Roe realized that she was sexually assaulted and told a few friends, some identified and some not, about the incident at "different unknown times."

11

*Doe*

76. Doe met with the Investigators, but did not provide a statement, other than to deny the allegations. At the time, although the criminal charges had been dropped, Doe had been told by the State's Attorney's Office that he remained under investigation. Doe's attorney-advisor thus advised him not to speak to the Investigators.

77. The investigation concluded on July 25, 2023, when a Final Investigation Report (revised) and Appendices (revised) was distributed to the parties.[2]

### B.    <u>Investigative Failures</u>

78. College Park's investigation was marked by numerous deficiencies.

79. College Park's policy and procedures dictate that "the burden of gathering evidence sufficient to reach a determination regarding responsibility remain[s] with the University and not with the Parties."

80. A training presented at College Park by Dan Schorr, LLC in September 2023, entitled "Title IX Investigators Training (Dan Schorr, LLC)" identified certain witness who should be interviewed by investigators. Those witnesses include the complainant, the respondent, anyone who was present for and observed a relevant incident, other witnesses with relevant information, "outcry" witnesses (*i.e.* individuals to whom the allegation is first conveyed), people with whom the respondent has spoken about alleged incidents, and people who the investigators have been asked to interview.

81. At a minimum, the Investigators in this case failed to interview any other members of Doe's fraternity to whom Roe had spoken about the alleged sexual assault besides Witness-1 and

---

[2] The Final Investigation Report was originally issued July 11, 2023. The investigation was reopened to receive the Baltimore County Police report that Investigators never bothered to obtain.

outcry witness K.R.[3]

82. According to that same training, investigators are supposed to "identify discrepancies" in the stories and "ask the hard questions."

83. As previously mentioned, in this case there were several discrepancies in this case for which there was no follow-up and certainly no "hard questions."

84. According to that same training, investigators are supposed to collect evidence such as text messages, social media, emails, memos or other documents, photographs, receipts, device logs, surveillance video, building access records, Wi-Fi connection records, and other sources.

85. In this case, the Investigators were aware of additional text messages, social media, memos, photographs, receipts, and other sources, such as police paperwork, body camera video recording(s), and 911 call(s), but made no attempt to secure any of this evidence.

86. Records from the police reports filed by Roe were included in the investigative file only because Doe's attorney-advisor obtained them and submitted them to the Investigators.

87. Indeed, in Brennan's hearing testimony, which lasted just 25 minutes, she conceded that the Investigators *never* made any attempts to secure any objective documentation about this allegation. Nor did they ever attempt to rectify the incomplete or inconsistent evidence provided by the witnesses—all of whom were friends of Roe. Nor did they ever attempt to obtain additional evidence—specifically additional photographs and text messages—that the witnesses have since admitted still exist.

88. When asked to explain her conduct, Brennan retorted, "that was not something we sought to obtain."

---

[3] K.R. is known to the parties. During the hearing, Roe disclosed for the first time—and in direct contradiction to her statements to McGinn—that K.R. was among the first persons to whom she made a disclosure about the allegations.

89. According to a training presented at College Park by Husch Blackwell in December 2022, entitled, "Title IX Training for Coordinators, Deputies, Investigators, and Senior Administrators," "Note-taking and audio recording are both appropriate methods of making a record of the interview." Similarly, a training presented by the Association of Title IX Administrators ("ATIXA") in June 2022, entitled "Civil Rights Investigator Two" indicated that "recording is becoming more common."

90. None of the interviews in this case were recorded, which is significant because every witness in the hearing either added to or altered their testimony as compared to the information contained in the Final Investigation Report.

## C.   The Biased Hearing and Decision

91. Dan Schorr—a licensed attorney with more than 20 years of legal and investigative experience—was originally hired to be the hearing officer. But before the hearing, OCRSM replaced him with Alyssa-Rae McGinn, a second-year law student.

92. On August 7, 2023, McGinn conducted a pre-hearing meeting via Zoom with Roe, her advisor, and her support person, K.R. It is unknown if this meeting was recorded, despite Doe's inquiry to Nastase. During this meeting, McGinn conducted an *ex parte* interview of Roe, seeking "clarification" about Roe's conduct after the alleged incident. The details of this interview—which included new, exculpatory information from Roe—were not disclosed until August 28, 2023, after Doe requested the information directly from McGinn.

93. On August 18, 2023, McGinn conducted a pre-hearing meeting via Zoom with Doe, his advisor, and his support person. It is unknown if this meeting was recorded, despite Doe's inquiry to Nastase. During this meeting, Doe requested that the hearing be conducted in-person instead of

14

by videoconference, citing the importance of a live hearing when testing the credibility of an accuser.

94. McGinn impermissibly delegated the decision whether to hold an in-person hearing to Nastase, who selected the videoconference format for no other reason than it was "the University's usual practice."

95. That same day, McGinn circulated a Pre-Hearing Meetings Summary to both parties via email. The summary incorrectly minimized Doe's request for a live hearing—calling it nothing more than a simple "inquiry"—and incorrectly concluded that "the investigators had collected all available evidence relevant to [Roe's communication with friends after the alleged incident]."

96. The hearing was conducted via Zoom on August 22 and 28, 2023, and lasted nearly thirteen hours.

97. At the hearing, Doe provided a detailed account of his night with Roe. As to what happened after they had consensual sex, Doe explained that he fell asleep, naked, in his bed "spooning" Roe. Sometime later, he woke up to Roe "grinding" her buttocks on him. Doe reciprocated the activity by touching Roe's body with his hands. However, according to Doe, there was no penetration and no further sexual activity. Afterwards, they both went to sleep.

98. Roe's testimony included numerous inaccuracies, material inconsistencies and contradictions between her statements to the Investigators and police, and material internal inconsistencies. For example:

    a. Roe explicitly *denied* ever meeting Doe prior to this fraternity party. On cross-examination, she conceded she may have met him before. Yet in the interview with Baltimore County police—which was only obtained after the hearing—Roe admitted, "I've met him before cause I've been to some of the fraternity things . . ."

b.  Roe told the Investigators that she "did not feel the effects of alcohol." During the hearing, she first stated that she only had a "sip a shot of something . . . I only drank maybe a shot worth." She later stated that she may have been "tipsy." But in the Baltimore County police report, Roe stated that she was "under [the] influence of alcohol."

c.  Roe repeatedly changed the date and time of the alleged incident, fluctuating between February 18, 19, and 20, and from 3:00 a.m., to 4:00 a.m., to "I don't remember" when confronted with contradictory text message.

d.  Roe said that Doe was drinking either a bottle of liquor or a bottle of wine and that she took shots with him. Doe stated that he was drinking beer at the party, not liquor or wine.

e.  Roe reported both that "she did not know if she was staying at Witness-1 or [Doe's] house" and that "prior to the event, it was arranged that [she] would spend the night in [Doe's] room, instead of Witness-1's room."

f.  Roe incorrectly described the location and contents of Doe's room, saying that it was on the second floor at the end of the hall when it was in fact on the third floor in the middle of the hall. Roe was also unable to accurately describe certain details of the room, such as furniture, bedding, and lighting, until *after* Doe testified to those details.

g.  Roe testified that there may have been a third person in Doe's room at some point during the night—something she had never mentioned before, and which Doe expressly denied.

h.  Roe stated that the consensual sex ended when she said, "I wanna go to sleep. Is it ok if we stop?" On day two of the hearing, Roe was asked by the hearing officer about the statement "we can stop" and she responded, "I didn't say 'we can stop.' I said, 'I want to go to sleep, can we stop?'" Less than an hour later, on cross-examination, Roe denied making this statement, instead changing it to, "I want to stop. Can we go to sleep?" In the Final Investigation Report, Roe told investigators that she did not say "stop" or "no" at any point during the night.

i.  Roe testified during the hearing that she knew "immediately" that what had allegedly transpired was a sexual assault. But in the formal complaint, Roe alleged that she "didn't realize that this was rape until months later."

j.  Roe first testified in the hearing that after the alleged sexual assault, she never left Doe's room. On cross-examination, she admitted that she left Doe's room to walk to the bathroom, and later returned to Doe's room to go to sleep in his bed with him. This fact was never mentioned in any prior documentation or interviews.

k.  Roe testified that after the alleged sexual assault she was "scared to get up . . . didn't feel safe moving . . . didn't feel safe even picking up my phone to text someone or write something down" Yet Roe texted several individuals from Doe's bedroom, in Doe's bed, while Doe was sleeping next to her. And, again, she got up to go to the bathroom and returned to the bed.

l.  Roe initially reported that she left Doe's room first thing in the morning, around 9:40am because she was "ready to leave." However, upon reviewing text messages—that were never disclosed—she agreed that she didn't actually leave Doe's room until around noon.

m.  Roe originally said that she drove straight home with Witness-3 the next day. She later corrected this testimony to include that she went to Starbucks with Witness-3 and was taking selfies on the way—none of which were disclosed.

n.  Roe reported, under oath, that she "remembered every detail" of the alleged sexual assault, told the Investigators that she had flashbacks every day, and initially testified, "every single day there's probably two full minutes every day where I'm not thinking about that night . . . everyday it's taken over." However, when pressed for those details during the hearing, particularly on cross examination, Roe responded with "I don't remember / I don't recall / I don't know" *more than fifty times*.

o.  Roe submitted photographs to investigators that were purportedly from the fraternity party. During cross examination, she admitted that one of the photographs was taken in her room in Baltimore County.

p.  Roe was questioned on cross-examination about writing notes about this allegation and relying upon them due to her lack of memory. She explicitly denied having any notes. However, when confronted by the hearing officer ten minutes later, Roe admitted that she did have notes and used them during the reporting of this allegation. The notes were never provided to anyone.

99. Most striking, at the start of the second day of the hearing, Roe's advisor announced: "It's come to our attention that after Tuesday's hearing there's some information that [Roe] testified to that *is not one hundred percent accurate* and we will need to correct the record . . . ."

100.    Roe then proceeded to change her follow-up testimony to conform with certain parts of Doe's testimony. Some notable examples include:

18

a. Roe initially testified that during the fraternity event, Doe spent "most of the night on the couch" while she spent most of the night with Witness-1 and Witness-3 in the basement. However, after Doe testified that that information was false, and that Roe spent most of the night on the couch, Roe changed her version, stating, "I don't necessarily recall saying I wasn't feeling well. If I did mention that, then it was most likely due to the fact that I was really hungry, which is why I was mostly on the couch that night."

b. Roe initially testified that Doe's penis was erect and "so hard." But after Doe testified that he had difficulty maintaining an erection because of the effects of the alcohol he consumed, Roe altered her testimony and agreed that was true. When asked why Roe kept changing her story she said "Because I believed what you said about him having difficulties. And when I thought about it more it made sense that he was having difficulties."

c. Roe was initially unable to describe the details of Doe's room (furniture, layout, lighting) until Doe testified. After Doe testified, Roe agreed with the truth of Doe's description.

101. Throughout the hearing, McGinn acted in a manner reflecting a bias against Doe and in favor of Roe. Indicators of McGinn's bias include the following examples:

a. McGinn never acknowledged Doe's presumption of innocence.[4]

---

[4] Section VI(C)(1) of College Park's procedure directs that "Respondents are presumed not responsible for any and all allegations until the conclusion of the investigation and adjudication process." As an aside, the presumption of innocence was also not referenced in the investigative reports, the pre-hearing meeting summary, or the written determination.

b. McGinn, without explanation, permitted Roe's support person, K.R., to sit with Roe during the hearing, despite McGinn's own explicit instructions at the Pre-hearing meeting that, "[d]uring the hearing, no one other than a party's identified advisor should be in the same physical space as the party."

c. McGinn insisted, inconsistent with policy guidelines, that during the Hearing *she* would be interviewing all Parties and witnesses, at length, before the advisors were permitted to conduct cross-examination.[5] McGinn used this authority to ask leading questions reflecting a bias towards Roe, for example, "Did you feel like you were in any danger staying in the same bed with him [Doe]?"

d. Despite glaring deficiencies with the thoroughness of the investigation, McGinn questioned Brennan about her conduct and findings for less than three minutes.

e. McGinn repeatedly instructed Roe and the Witnesses that it was "ok if they don't remember" and it was "ok if they don't know." But when questioning Doe, she insisted that he "speculate" about information that he repeatedly stated was outside his personal knowledge, including Roe's motive to fabricate. McGinn later held Doe's forced speculation about Roe's motive against him, writing in her decision that "[n]one of these explanations [for Roe's motive] . . . are supported by the available evidence."

f. Without explanation or justification, McGinn permitted Roe and the Witnesses to repeatedly add new information to their stories and later relied upon that new

---

[5] Section VI(D)(6)(e) of College Park's procedures reads, in pertinent part, "Questioning will be conducted directly, orally, and in real time *by the Party's Advisor only*." (emphasis added).

information in making her decision, to the detriment of Doe.[6]

102.    On August 31, 2023, both Doe and Roe submitted Impact Statements to McGinn. Nastase at first refused to provide Doe with a copy of Roe's statement, claiming it was not "in accordance with our policy," even though there is no provision in the policy the precludes disclosure. Nastase eventually relented and provided Doe with a copy on September 21, 2023, after a decision had already been rendered by McGinn. The Impact Statement revealed new, exculpatory information from Roe.  For example:

    a.  Roe commented that she now feels discomfort in her own skin and cannot touch people anymore. Numerous pictures posted on social media accounts after the alleged incident show otherwise.

    b.  Roe claimed that *as a result of this incident*, she had been "negatively effected [*sic*] mentally, emotionally, and physically." She claimed that this incident caused her to go to therapy, have panic attacks and even be diagnosed with OCD. But in a blog post—dated *two years* before the alleged sexual assault—Roe wrote, "I have battled depression, anxiety, PTSD, OCD, and ADHD for much of my life. My first diagnoses [*sic*] came in the ninth grade in the form of PTSD, mild social anxiety, and severe depression. I knew I needed help . . .."

    c.  Roe said this incident caused her to suffer flashbacks, but in a social media post predating the allegation, she claimed to already suffer from "nightmares and flashbacks."

---

[6] College Park's procedures clearly and repeatedly direct that "Any and all information for consideration by the Hearing Officer must be provided to the Investigator during the investigation phase of the process and otherwise will not be allowed during the Hearing."

      d. Roe said that she does not "trust people the way I used to . . .. I don't have a safe space. I don't feel safe anywhere anymore . . .." However, the day after the alleged incident, a video entitled "Hottest model alert" was posted on social media depicting Roe at a photoshoot (presumably that same day), to which Roe commented "THESE ARE SO GOOD" and "😍 😍 😍"

103.    On September 8, 2023, McGinn conferred with Nastase about the decision and sanction. This information was not provided until September 23, 2023, after Doe's specific inquiry of Nastase. The details of this conversation have never been disclosed to Doe.

104.    On September 11, 2023, more than two hundred days after the investigation began, McGinn filed her Written Notice of Determination (the "Determination").[7] In the Determination, McGinn found Doe responsible for violating College Park's policy and directed College Park to impose a sanction of expulsion.

105.    McGinn's rationale for the decision is rife with flaws reflecting her bias against Doe and in favor of Roe:

      a. McGinn characterized Roe's account as "largely consistent" despite devoting several paragraphs of the decision to explaining and minimizing the significance of Roe's inconsistent statements. McGinn specifically referenced just *four* topics for which Roe provided inconsistent testimony.[8] McGinn also failed to mention that during the follow-up questioning of the parties, she spent nearly an hour with Roe

---

[7] According to their policy, College Park seeks to take appropriate action, including investigation and resolution of Formal Complaints, generally within one hundred twenty (120) days from when the formal complaint is filed, by balancing principles of thoroughness and fundamental fairness.

[8] In his appeal of that decision within the framework allowed by College Park, Doe identified approximately *fifty* inconsistencies.

seeking explanations for her inconsistencies, discrepancies, and omissions. By contrast, McGinn asked Doe just 3 minutes of follow-up questions.

b. McGinn asserted that Roe was able to provide "many specific details" despite commenting, *in the preceding paragraph*, that "some details were omitted from [Roe's] earlier descriptions of the incident." McGinn failed to cite a single example of Roe's "many specific details" and made no mention of the fact that Roe responded with "I don't remember / I don't recall / I don't know" more than fifty times during the Hearing.

c. McGinn devoted several paragraphs towards explaining why Roe's failure to report these allegations in a timely fashion constituted nothing more than a "measured approach to pursuing action against [Doe]." McGinn later acknowledged that "[Roe's] credibility may be undermined by her delay in disclosing the alleged sexual assault to anyone" and that it "raises some doubts about the veracity of [Roe's] description." However, McGinn concluded that it's just not "enough."

d. McGinn claimed that Roe did not have "any motive to harm [Doe] by making false allegations" despite specifically referencing at least three proffered and plausible motives.[9]

e. McGinn found that Roe did not even "characterize her experience as a sexual assault until sometime after it occurred" but still concluded that it "does not detract from her overall credibility in recounting the event itself."

---

[9] In his appeal, Doe has suggested several additional possible motives to harm, not referenced in the Determination.

f.  By contrast, McGinn found that Doe's account was "less credible" because he provided "a less detailed account." Yet, McGinn failed to cite a single example in support of this position. In fact, at one point during the hearing McGinn stated to Doe, "I think, you know that, in terms of how things got started that sounded fairly similar to what we heard from [Roe]. So, I don't think we need to go into that in a lot of detail."

g.  McGinn also failed to mention that initially Roe was unable to provide such basic details to her story as the lighting in the room, the furniture, the bed, the bedding, or even the general layout of the room; it was only after receiving "clarification" from Doe's testimony that Roe was able to "refresh" her memory and adopt the details of *his recollection* as true in her follow-up testimony.

h.  McGinn shifted the burden on to Doe when she concluded that Doe was unable to explain "[Roe's] motivation to harm [Doe]" and later that Doe failed to explain his version of events in a timely fashion, "even though it could have reasonably explained the conduct [Roe] was alleging."[10]

i.  McGinn went so far as to speculate that Doe must have been intoxicated "to the point of memory loss" even though there was no evidence of this presented by either party and both parties denied intoxication to the point of memory loss.

j.  In fashioning an appropriate sanction, McGinn adopted and incorporated several of the comments from Roe's Impact Statement; not a single word of Doe's response

---

[10] College Park's Procedures dictate that "The burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility remain with the University and not with the Parties." Section VI(C)(5).

was mentioned.

k. McGinn imposed the harshest possible sanction—expulsion—because Doe purportedly committed a "violent act" and because there was a "likelihood that he may engage in similar conduct toward others at the University." There was no evidence of any violence committed by Doe against Roe, nor was there any evidence that Doe was likely to reoffend.

106. On September 25, Doe filed a timely appeal. The arguments set forth in Doe's appeal are summarized as follows:

a. There were significant procedural irregularities in this matter, including unnecessary delay, grossly inadequate investigative measures, issues with the format of the hearing and issues with the conduct of the hearing officer, including strong evidence of bias on the part of McGinn.

b. There are at least a *dozen* examples of material information relied upon by McGinn in support of the Determination that were not previously disclosed to investigators, as required by College Park's policies and procedures.

c. There are at least *nine* examples of omissions, inconsistencies, and discrepancies in Roe's version of events, which would constitute exculpatory information, that were acknowledged by McGinn but disregarded in the Determination.

d. There are at least *twenty-three* material discrepancies in Roe's version of events, that would constitute exculpatory information, which are not accurately reflected by McGinn in the Determination.

    e.  There are at least *half a dozen* material discrepancies in Roe's version of events, that would constitute exculpatory information, which are not even acknowledged by McGinn in the Determination.

    f.  There is an abundance of new, exculpatory evidence, including text messages, photographs, and notes that Roe and the Witnesses withheld from the investigation.

107.    On October 3, 2023, Roe filed a response to Doe's appeal. OCRSM failed to notify Doe about this filing. The response contains new, exculpatory information from Roe. For example, Roe wrote, "Unbeknownst to the Respondent, I was asked several follow-up questions regarding the inconsistencies that the Respondent refers to." None of the questioning to which Roe referred appears in the Final Investigation Report nor was it disclosed during Brennan's testimony.

108.    On October 25, 2023, OCRSM identified the panel of Appellate Hearing Officers (the "Panel") to review Doe's appeal, consisting of three faculty members: Gorham-Oscilowski, Hanson, and Mark.

109.    After repeated extensions of the decision deadline for further deliberations, the Panel issued its decision on December 21, 2023, the day before College Park closed for winter break.

110.    Without reviewing the video recording of the hearing or a transcript, the Panel affirmed McGinn's "responsible" finding.

111.    But the Panel determined that expulsion was a "substantially disproportionate" sanction and reduced it to a one-year suspension, during which time Doe is "barred from University premises" and participation in University activities.

112.    Underscoring McGinn's bias, the Panel reasoned that she "did not address all of the factors" relevant to determining a sanction, *"particularly factors that . . . weigh[ed] in favor of the*

*Respondent.*" (Emphasis added.) The Panel also rejected McGinn's description of the incident as "violent," and did "not see evidence of a likelihood to reoffend," noting that there was "no prior relevant misconduct by [Doe]" and that Doe had agreed to stop sexual activity during both the consensual encounter and the alleged non-consensual encounters.

113.    The appellate decision is the final step in the administrative process at College Park. No further appeals are available to Doe.

## III.    THE ERRONEOUS OUTCOME WAS THE RESULT OF GENDER BIAS.

114.    The erroneous finding against Doe is the result of gender bias by the investigators and the hearing officer and occurred against the backdrop of increasing pressure on College Park to "crackdown" on campus sexual assault.

115.    The Maryland Higher Education Commission (MHEC) publishes a biennial report (the "Report") concerning the scope and nature of sexual assault allegations across *all* Maryland Colleges and Universities, including College Park. The most recent study was published in September of 2022.

116.    According to the Report, the gender demographics of the undergraduate student body at College Park are split evenly at 50.4% male to 49.6% female. However, upon information and belief, in virtually all cases of alleged sexual assault handled by OCRSM, the complainant is a female, and the respondent is a male.

117.    Over the past several years, there has been increasing concern about sexual assault occurring at College Park. According to the Report, there was a significant change in response to the polling statement "sexual assault is a problem at [College Park]." In 2020, only 38.9% of the student body agreed with that statement but by 2022, more than 60% of the student body agreed.

118.    Similarly, from 2020 to 2022, student perception of College Park's response to reports of sexual assault has declined. According to the Report, decreases were seen in the

percentage of students who believed that College Park would conduct a "fair, prompt, and impartial investigation" (48.4% to 41.6%), that College Park would handle the report "fairly" (53.6% to 42.2%), and that College Park would take the report "seriously" (63.9% to 53.6%).

119.    In August of 2022, just a month prior to the publication of the Report, Nastase was named College Park's interim Title IX coordinator and director for OCRSM. According to Georgina Dodge, Vice President for Diversity and Inclusion at College Park, Nastase had—contrary to the data—helped to "improve documentation processes and revitalize campus outreach and educational programming."[11]

120.    Similarly, in August of 2020, Dodge and then College Park president Darryll Pines wrote to students in response to new federal regulations governing Title IX proceedings, "We had significant concerns about how these regulations would impact our campus community and *sexual assault survivors* when they were proposed over a year ago. . . ."[12] (emphasis added)

121.    According to data published by OCRSM, since 2015 there have been more than 1600 reported allegations of sexual misconduct at College Park.[13] During that same time, there were 24 instances where a report alleging "sexual assault-1"—now classified as "sexual assault, non-consensual penetration"—resulted in a complaint, investigation, hearing and finding of responsible. The data reveals significant disparity in the implementation of sanctions in those 24 cases, ranging from probation to expulsion, with the majority (nearly 60%) of "responsible" students receiving some form of suspension.

---

[11] https://today.umd.edu/briefs/university-names-interim-title-ix-administrator.

[12] https://president.umd.edu/articles/new-interim-title-ix-policy.

[13] https://ocrsm.umd.edu/sexual-misconduct#annual-reports.

122.     These disparities—and the resulting distrust in College Park's handling of sexual assault allegations—were noted in an article published by the Baltimore Sun on March 22, 2019, Richman, Talia, *University of Maryland receives record number of sexual misconduct reports, conducts few investigations*. In that article, Ever Hanna, the campus policy manager for End Rape on Campus, commented, "I would like to see the numbers be more closely matched. To see that only 16 [allegations during the 2017-2018 school year] were taken seriously enough to have an investigation is really disappointing."

123.     College Park's perceived failure in investigating sexual assaults on campus has prompted repeated protests by students. As reported by College Park's student newspaper, *The Diamondback*, in October 2021, "dozens" of students took part in "the Reclaim the Red: Rally for Respect, a march led by the Student Government Association that called for the university to do more to address sexual assault on campus." Sexual assault "perpetrated within Greek life" was a particular focus of the march, which ended on fraternity row.[14]

124.     The march coincided with remarks by then-President Pines that College Park did not "have a big [sexual assault] problem here in Greek life," which drew sharp criticism in *The Diamondback* as not "only out of touch or insensitive," but also "dangerous."[15]

125.     A student group, Preventing Sexual Assault, also hosts an annual "Occupy McKeldin" event, the reported purpose of which is "to show the student body that we stand up to rape culture, and we are here for the education and awareness of the prevalence of sexual assault

---

[14] https://dbknews.com/2021/10/09/umd-sga-rally-red-zone-sexual-assault/.

[15] https://dbknews.com/2021/10/15/umd-darryll-pines-comments-sexual-assault-college-campuses/.

on campus." The event "is always the group's largest of the year," according to *The Diamondback*.[16]

126.    College Park is not just under pressure from its students. The university is presently under investigation by the Department of Education, Office for Civil Rights, for allegations of Title IX discrimination in at least five cases—the most of any educational institution in the State of Maryland.[17] Four of the pending investigations specifically involve allegations of sexual violence discrimination.

127.    When College Park has chosen to investigate sexual assaults, it has a long, documented history of bias in favor of *female* complainants and against *male* respondents. For example, an article published January 26, 2016, noted how College Park's then Title IX coordinator, Catherine Carroll, "publicly criticized its president, a former law professor who has argued for better treatment of students accused of sexual offenses." Lamb, Matt, *Top Title IX candidate at University of Oregon wrote the book on favoring rape accusers*. According to Carroll, "[C]ounsel for the victim should argue that permitting a student accused of rape to freely question *his* victim exceeds the scope of the assailant's due process rights . . ." (Emphasis added.)

128.    OCRSM maintains a publicly visible Facebook page which frequently posts content in favor of *female* complainants and opposed to *male* respondents. For example, in a still visible post, dated April 3, 2017, OCRSM advertised the "3rd annual Walk a Mile in Her Shoes" event while commenting, in pertinent part, "Don't forget about UMD's favorite event...Walk a Mile in Her Shoes! Come raise awareness about *men's sexualized violence against women* and its devasting impact!!" (Emphasis added.)

---

[16] https://dbknews.com/2022/04/25/psa-occupy-mckeldin-2022/.

[17] https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open-investigations/.

30

129.     On February 22, 2018, OCRSM sponsored a lecture by Nancy Chi Cantalupo entitled, "#MeToo & the Civil Rights Approach to Gender-Based Violence." Support for this event was also posted on OCRSM's Facebook page. Upon information and belief, there is not a single reference on OCRSM's Facebook page addressing a male respondent's rights.

130.     OCRSM's current Director, Nastase, is presently a defendant in a civil action pending in the United States District Court for the District of Maryland (Southern Division). In that matter, Nastase is accused of exhibiting gender bias, specifically supporting an investigation against a male respondent based on unfounded allegations while declining to investigate subsequent allegations involving the female accuser as a respondent. According to the complaint, Nastase characterized the proceeding against the male student as made in "good faith" even after a hearing officer concluded the female accuser's credibility was "significantly undermined" and her allegations were "significantly contradicted" by the physical evidence.

131.     The evidence of gender bias extends to other members of OCRSM involved in this case. One of the Investigators, Brennan, maintains a publicly visible Facebook account. On March 10, 2018, Brennan updated the cover photo of her Facebook page to display a meme entitled "#happynationalwomensday" with the quote from Nobel-Prize winning author William Golding, "I think women are foolish to pretend they are equal to men, they are far superior and always have been." Upon information and belief, there is not a single reference on Brennan's Facebook page addressing male respondent's rights.

132.     Brennan also maintains a publicly visible LinkedIn page. On October 11, 2023, Brennan posted on her LinkedIn page comments by Keith E. Edwards, which read:

> Thanks to ATIXA for inviting me to talk this morning about Unmasking and how to engage men to understand with empathy, reach with compassion, hold accountable more effectively, and help them let go of who they feel they have to be and discover and live their authentic masculinity.

31

Brennan's comment in response to this post was, "Great session, Keith E. Edwards! Can't wait to read your book. Understanding about 'man in a box' was fascinating."

133.    On that same LinkedIn post, Nastase also commented, "Agreed!"[18]

134.    According to Edwards, the "Man in a box" activity presumes that "traditional" society pressures men to be hegemonic, misogynistic, and homophobic.[19] Upon information and belief, there is not a single reference on Brennan's or Nastase's LinkedIn page addressing male respondent's rights.

135.    Most significantly, the hearing officer, McGinn, has also exhibited gender bias. McGinn served as Interim Title IX Coordinator for Pitzer College from December of 2021 until May of 2023. In an article published December 2, 2022, McGinn commented, "I think we've seen reporting [of sexual misconduct] generally increasing as societal awareness increases, and that is always going to make the numbers look higher." McGinn continued, "In the Title IX world, *high numbers are often a good thing—it means survivors are feeling empowered to speak up*, and that has not been the case historically." Ferrantino, John Paul, *Despite less time on campus, 2021 reports show uptick in sexual misconduct cases* (emphasis added).

136.    McGinn provides content for a bi-weekly podcast entitled "The Title IX and Civil Rights Podcast" which has been active since at least February 3, 2021.[20] This podcast is *heavily*

---

[18] Since identifying this post, Nastase's LinkedIn profile appears to no longer exist publicly.

[19]   https://keithedwards.com/2012/10/10/man-in-a-box-the-traditional-hegemonic-definition-of-masculinity/.

[20] The first seven episodes of this podcast are unavailable on any streaming platforms. It is alleged and believed that among the topics discussed on the podcasts that are no longer available are "Title IX reform", "cross-examination at a live Title IX hearing," and "the admissibility of respondent confessions."

geared towards victim's rights advocacy and noticeably devoid of content pertaining to respondent's rights, particularly the presumption of innocence. McGinn conflates women with "victims" and men with "respondents" as evidenced, for example, by her comments on April 30, 2021, "It's a really big role to have to essentially represent someone in a hearing when maybe you joined the advisor pool at your school because you wanted to support people, maybe you're coming from a victim's advocate standpoint, maybe you're coming from the *perspective of respondent education, or men's education* . . . ."

137.   McGinn also participates in a monthly Title IX and civil rights webinar series. The series claims to explore a wide variety of topics related to Title IX and Civil Rights investigations, policies and procedures, regulatory compliance, and other aspects of this important, challenging, and evolving field. Like the podcast, the webinar series is *heavily* geared towards victim's rights advocacy and noticeably devoid of content pertaining to male respondent's rights, particularly the presumption of innocence. For example, on April 13, 2023, McGinn's co-presenter commented, in direct contradiction to the presumption of innocence:

> As I said earlier, there's no doubt that Alyssa-Rae and I have seen *complainants that we think are credible* have decided not to go forward with their complaints because of the hearing process. That it's intimidating, it's burdensome and they don't want to do that. And that is a problem. On the flip side, I've definitely seen at hearings where *respondents with an effective advisor have been able to show that they are not responsible for the accused conduct* and maybe they would have had a harder time doing that without a hearing. April 13, 2023, *Partnering with Student Affairs on Title IX.*

138.   McGinn has maintained a Twitter account since at least October 2019. Many of her tweets reflect viewpoints in favor of complainants and opposed to respondents. For example, on December 28, 2019, McGinn tweeted, "It's time to reverse these popular rape myths that cause *survivors to doubt and invalidate themselves.*" (emphasis added; the link is no longer public). On November 28, 2022, McGinn tweeted how she was invited "to speak about stalking, how the law

33

responds in the U.S. and South Korea, and measures to help stalking *victims* around the world."[21] (emphasis added) Upon information and belief, there is not a single tweet addressing male respondent's rights or the presumption of innocence.

139.   McGinn contributes content for a variety of training materials for College Park and other institutions. The training materials are also *heavily* geared towards victim's rights advocacy and noticeably devoid of any references to respondent's rights or the presumption of innocence. McGinn's training materials specifically warn College Park's actors to "be aware of stereotypes"; that they "cannot evaluate [allegations] through [the lens] 'that wouldn't bother me;" that they should "beware of sexual assault myths;" and that "it is not unusual for a *complainant* to . . . ." Absent from the materials is any consideration (or mention) for the role of the respondent and his rights.

140.   McGinn's podcasts, social media, training seminars and training materials repeatedly reference the impact and guiding influence of the #metoo movement[22] on her professional work. For example, on February 3, 2021, McGinn tweeted a link to her podcast that "discussed reporting and recounting sexual violence, compounded trauma, *#MeToo*…" (Emphasis added.)

---

[21] The tweet contains a link to McGinn's interview on YouTube, which is no longer publicly available.

[22] The #MeToo movement is a global, survivor-led, movement against sexual violence, originally founded by activist Tarana Burke in 2006 to aid "young Black women and girls from low wealth communities." It gained widespread popularity in 2017 and now expands the term "survivors" to include "young people, queer, trans, the disabled, Black women and girls, and all communities of color."

141.    Similarly, on October 24, 2022, McGinn explained on her podcast how she combined her "activism" background with her "investigations" work just as the "#MeToo movement" was bringing more attention to "these issues:

> I really came to this work by marrying two different passions. I began my career in investigations that were more a little more focused on corporate due diligence, asset tracing, fraud investigations, legal investigations, things in that realm. But I in my free time spent a lot of time doing anti-discrimination *activism* work. So I did a lot of work with the New York City anti-violence project which is an organization that provides resources for the LGBTQI community in New York, a lot of safe sex training, anti-discrimination work, just the creation of safe spaces for people to come and be themselves. I learned a lot doing work with them. I also was doing some different work with online groups to combat racism. And then I had the opportunity to join that with my investigations and my professional life when the *#MeToo movement* started happening and suddenly everyone was paying a lot more attention to these issues. And there was a chance for me to be an outside investigator but working in this area of anti-discrimination and *combating sex and gender violence.*

142.    In April 2022, McGinn again publicly referred to her "background of activism" when discussing her work as Title IX investigator:[23]

> *Women* had previously been actually and effectively barred from fully engaging in educational spaces, and Title IX paved the way for those women to demand equal access to the opportunities afforded by education. Nowadays, many people think of Title IX as associated only with sexual violence, but it's important to recognize that the reason we handle sexual violence under Title IX is because sexual violence is a form of gender discrimination that impacts how a person can experience and engage in their education. I came to work in a Title IX from a *background of activism* fighting against identity-based violence and discrimination. And I do this work because I really do believe we need to ensure all students, teachers, and educational staff are not only protected from identity-based discrimination but affirmed and welcomed in their schools and workplaces.

---

[23] My Title IX Story – Alyssa-Rae McGinn, YOUTUBE (Apr. 28, 2023) https://www.youtube.com/watch?v=oRUCH6n7-gM.

143.     The National Sexual Violence Resource Center (NSVRC) is the leading nonprofit in providing information and tools to prevent and respond to sexual violence. According to a 2009 study referenced by NSVRC, the rate of false reporting for sexual assault is in the range of 2-8%.[24] A second study also cited by NSVRC, published just two years later, suggested that rate may be higher at between 2-10%.[25]

144.     Upon information and belief, there is not a single reference in *any* of McGinn's materials—trainings, podcasts, social media—that acknowledges that men may be falsely accused of sexual assault.

<u>**COUNT I**</u>

**GENDER DISCRIMINATION IN VIOLATION OF TITLE IX**
**OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681 *ET SEQ.***

145.     Plaintiff incorporates by reference and realleges each of the above paragraphs as if fully set forth here.

146.     Title IX of the Education Amendments Act of 1972 provides, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

147.     A federally funded educational institution violates Title IX by discriminating against a student based on gender.

148.     In the context of a student disciplinary proceeding, an education institution violates

---

[24]     https://www.nsvrc.org/publications/articles/false-reports-moving-beyond-issue-successfully-investigate-and-prosecute-non-s.

[25]     https://www.nsvrc.org/resource/false-allegations-sexual-assault-analysis-ten-years-reported-cases.

Title IX if it reaches an erroneous outcome, and the student's gender is a but-for cause of that erroneous outcome.

149.    College Park is a recipient of federal funding and is therefore subject to the requirements of Title IX.

150.    As set forth above, College Park reached an erroneous outcome in the disciplinary proceeding against Doe by, among other things: failing to collect relevant, material evidence and failing interview or sufficiently follow up with material witnesses; conducting the disciplinary hearing in a bias manner that favored Roe and disadvantage Doe; and assigning credibility to Roe's allegation and finding Doe responsible despite numerous inaccuracies, inconsistencies, and contradictions in Roe's statements as well as undisputed evidence indicating her allegation was false.

151.    As also further set forth above, gender bias was a but-for cause of the erroneous outcome, as reflected by: the unexplained failure by investigators to collect important evidence; McGinn's illogical decision crediting Roe and her "substantially disproportionate" sanction; statements of key individuals involved in the investigation and hearing revealing their bias toward woman, including McGinn, Brennan, and Nastase; statements issued by OCRSM reflecting its bias toward woman; and an environment in which College Park was under pressure to hold accountable male students accused of sexual assault.

152.    College Park's unlawful discrimination in violation of Title IX has caused and will continue to cause John Doe to sustain substantial and irreparable injury, damage, and loss, including without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

153.    As a result, John Doe is entitled to injunctive relief, specific performance, and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court grant the following relief and judgment from Defendant:

a.    The issuance of a temporary restraining order and preliminary and permanent injunction ordering Defendant to reverse the suspension and allow John Doe to resume university activities, including attending classes and participating in extracurricular activities;

b.    An award of compensatory damages in an amount exceeding $75,000 to be determined at trial;

c.    An award of the costs and expenses of suit;

d.    An award of attorneys' fees; and

e.    Such other and further relief as the Court deems just, equitable, and proper.

## **JURY DEMAND**

Plaintiff hereby demands a jury on all issues so triable.

**<u>VERIFICATION</u>**

The undersigned hereby swears under penalty of perjury that the facts stated in the foregoing Verified Complaint are true and accurate to the best of his knowledge.

/s/ John Doe
John Doe

Dated: December 27, 2023                    Respectfully Submitted,

/s/ Patrick R. Seidel
Patrick R. Seidel, Esq. (#21801)
pseidel@silvermanthompson.com
William N. Sinclair, Esq. (#28833)
bsinclair@silvermanthompson.com
Todd W. Hesel, Esq. (#21466)
thesel@silvermanthompson.com
Silverman Thompson Slutkin & White, LLC
400 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 385-2225
(410) 547-2432 (F)

*Attorneys for Plaintiff*

39