**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **JOHN DOE,** | * |
| *Plaintiff*, | * |
| v. | *   Civil Action No. _____ |
| **UNIVERSITY OF MARYLAND, COLLEGE PARK** | * |
| | * |
| *Defendant*. | * |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF JOHN DOE'S EMERGENCY MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## **TABLE OF CONTENTS**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

III.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

IV.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

        A.  John Doe is Likely to Succeed on the Merits of His Title IX Claim . . . . . . . . . . . . . .3

            1.  The Outcome of the Disciplinary Proceeding was Erroneous . . . . . . . . . . . . . . 5

            2.  The Erroneous Outcome was the Result of Gender Bias . . . . . . . . . . . . . . . . . .10

        B.  John Doe Will Suffer Irreparable Harm Without Immediate Injunctive Relief . . . . . . 17

        C.  John Doe's Injury Outweighs any Potential Harm to College Park . . . . . . . . . . . . . .19

        D.  An Injunction is in the Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.      REQUEST TO WAIVE BOND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

*Coreas v. Bounds*, 458 F. Supp. 3d 352 (D. Md. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508 (E.D. Va. 2019) . . . . . . . . . . . . . . . . . . . . . .12

*Doe v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598 (E.D. Va. 2019) . . . . . . . . . . . . . . . . . . . . . . .5

*Doe v. Loyola Univ.*, No. ELH-20-1227, 2021 WL 1174707 (D. Md. Mar. 29, 2021) . . . .3, 4, 5, 10

*Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018) . . . . . . . . . . . . . . . . . . . . .10, 11, 15

*Doe v. Middlebury Coll.*,
    No. 1:15-CV-192-JGM, 2015 WL 5488109 (D. Vt. Sept. 16, 2015) . . . . . . . . . . . . . .18, 20

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Doe v. Siena Coll.*,
    No. 122-cv-1115(BKS/TWD), 2023 WL 197461 (N.D.N.Y. Jan. 17, 2023) . . . . . . . . . . .19

*Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78 (N.D. Tex. 2022) . . . . . . . . . . . 13, 14, 17, 20, 21

*Doe v. Univ. of Chicago*,
    No. 1:22-CV-06105, 2022 WL 16744310 (N.D. Ill. Nov. 7, 2022) . . . . . . . . . . . . . . . . . 20

*Doe v. Univ. of Connecticut*,
    No. 3:20CV92 (MPS), 2020 WL 406356 (D. Conn. Jan. 23, 2020) . . . . . . . . . . 17, 18, 20

*Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821 (E.D. Mich. 2018) . . . . . . . . . . . . . . . . . . . . 18, 19

*Doe v. Wake Forest Univ.*,
    No. 1:23-cv-00114, 2023 WL 2239475 (M.D.N.C. Feb. 27, 2023) . . . . . . . . . . . . . . . . . .5

*Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961 (S.D. Oh. 2018) . . . . . . . . . . . . . . . . . . . . . .11

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411 (4th Cir. 1999) . . . . . . . . . . . . . . . . 2

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691 (4th Cir. 1994) . . . . . . .17

*Jennings v. Univ. of N. Carolina*, 482 F.3d 686 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*King v. DePauw Univ.*,
    No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014) . . . . . . . .18, 20

*Litman v. George Mason Univ.*, 186 F.3d 544 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*,
    581 F. Supp. 3d 736 (D. Md. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Maages Auditorium v. Prince George's Cty*, 4 F. Supp. 3d 752 (D. Md. 2014) . . . . . . . . . . . . . . .2

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342 (4th Cir. 2009) . . . . . . . .2

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230 (4th Cir. 2021) . . . . . . . . . . . . . . . 3, 4

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

## Rules

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Statutes

20 U.S.C. § 1681(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

## Other Authorities

Bethany A. Corbin,
    *Riding the Wave or Drowning?: An Analysis of Gender Bias and*
    Twombly/Iqbal *in Title IX Accused Student Lawsuits,*
    85 Fordham L. Rev. 2665, 2673 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 16

Plaintiff John Doe ("Plaintiff" or "Doe"), through undersigned counsel, submits this memorandum of law in support of his Emergency Motion for Temporary Restraining Order and Preliminary Injunction, and in support states as follows:

## I.  **INTRODUCTION**

Doe is one semester away from obtaining his undergraduate degree from the University of Maryland, College Park ("College Park"). But that milestone achievement will now be significantly delayed because one year after having consensual sex with a student from another college, she falsely told the police and College Park that Doe sexually assaulted her. The criminal charges were dropped (after Doe spent a weekend in jail) but the College Park disciplinary proceeding moved forward. At the end of a flawed and gender-biased investigation and hearing, Doe was found "responsible" for the alleged sexual assault. Because that erroneous outcome would not have occurred but for Doe's gender, the College Park proceeding violated Title IX's prohibition on sex-based discrimination in educational programs.

Doe now seeks immediate reinstatement so he can obtain his degree and graduate on time. As discussed below in more detail, all the factors necessary to establish a temporary restraining order favor Doe's requested relief. He therefore asks that the Court simply permit him one more semester at College Park so he can graduate and begin the next stage of his life.

## II.  **FACTUAL BACKGROUND**

Doe hereby expressly incorporates the factual allegations in paragraphs 6 through 15 and 19 through 144 of his Verified Complaint,[1] filed herewith, and highlights in the Argument below

---

[1] Out of an abundance of caution, Doe has filed herewith a Motion to Exceed Page Limit for Memoranda requesting leave of Court to file a legal memorandum not to exceed 55 pages, which is the approximate length of this Memorandum accounting for the incorporated-by-reference portions of the Verified Complaint.

the most pertinent of those allegations, with references to supporting exhibits and declarations where applicable.

### III.   <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 65 allows a court to grant a temporary restraining order or preliminary injunction. "A preliminary injunction preserves the status quo pending a final trial on the merits," while "a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). The notice requirements for the two forms of relief differ, *see id.*, but the same substantive standard applies to both. *See Maages Auditorium v. Prince George's Cty.*, 4 F. Supp. 3d 752, 760, n.1 (D. Md. 2014).

To obtain a temporary restraining order or preliminary injunction, a plaintiff must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). The injunctive relief issued by a district court should "meet the exigencies of the particular case" and be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *See Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (citations and internal quotation marks omitted).

### IV.   <u>ARGUMENT</u>

The facts alleged in John Doe's Verified Complaint and contained in the exhibits in support of his motion for injunctive relief show he is likely to succeed on his claim for gender discrimination under Title IX and that he will suffer irreparable harm if he is not immediately

reinstated as a College Park student. The balance of equities also favor that result, as the lack of injunctive relief will cause far more harm to Doe than the imposition of injunctive relief will cause to College Park. And it is in the public interest to ensure that College Park complies with Title IX in student disciplinary proceedings. All the requirements for injunctive relief have therefore been met.

### A.  John Doe is Likely to Succeed on the Merits of His Title IX Claim.

Title IX of the Education Amendments of 1972 prohibits gender discrimination in universities that receive federal funding. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). This prohibition is enforceable through an implied private right of action for monetary or injunctive relief and is thus "understood to bar[] the imposition of university discipline where gender is a motivating factor in the decision to discipline."[2] *Doe v. Loyola Univ.*, No. ELH-20-1227, 2021 WL 1174707, at *21 (D. Md. Mar. 29, 2021) (citation and internal quotation marks omitted); *see also Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 235 (4th Cir. 2021).

Some circuits have divided claims alleging gender bias in university disciplinary proceedings into two categories: (1) erroneous outcome and (2) selective enforcement. *See Sheppard*, 993 F.3d at 235. "[U]nder the 'erroneous outcome' theory, a plaintiff may claim that he or she is innocent and, on the basis of gender bias, was 'wrongly found to have committed an offense.'" *Loyola*, 2021 WL 1174707 at *21 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d. Cir. 1994)). "[U]nder the 'selective enforcement' theory, 'regardless of the student's guilt or

---

[2] A state university waives Eleventh Amendment immunity by accepting Title IX funds. *See Litman v. George Mason Univ.*, 186 F.3d 544, 557 (4th Cir. 1999).

innocence,' a plaintiff can argue that 'the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.'" *Id.* (quoting *Yusuf*, 35 F.3d at 715).

In the pleading context, the Fourth Circuit has adopted a more unified approach that asks simply whether "the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] on the basis of sex?'" *Sheppard*, 993 F.3d at 235 (quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019)). While viewing this approach as "more closely track[ing]" the text of Title IX, the Fourth Circuit has found "no inherent problems with the erroneous outcome and selective enforcement theories." *Id.* at 235–36. Either theory "may suffice to state a plausible claim" if it is supported by "a causal link between the student's sex and the university's challenged disciplinary proceeding." *Id.* at 236. The phrase "on the basis of sex" as used in Title IX means that a plaintiff must show "but-for" causation. *Id.* at 236–37.

This is not an onerous burden. As the Supreme Court has explained in the context of Title VII, "the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was *one* but-for cause of that decision, that is enough to trigger the law." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020) (second emphasis added); *see Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

Here, Doe is likely to prove that College Park reached an erroneous outcome because of his sex. To prevail, Doe must prove (1) that the disciplinary proceeding was erroneous and (2) that his "sex" was the but-for cause of the error. *See Doe v. Wake Forest Univ.*, No. 1:23-cv-00114, 2023 WL 2239475, at *6 (M.D.N.C. Feb. 27, 2023). Proof of each element is addressed in turn.

4

1.   *The Outcome of the Disciplinary Proceeding was Erroneous.*

"The first element of the erroneous outcome inquiry can be satisfied by (1) pointing to procedural flaws in the investigatory and adjudicative process, (2) identifying inconsistencies or errors in the findings, or (3) challenging the overall sufficiency and reliability of the evidence." *Loyola*, 2021 WL 1174707, at *22 (quoting *Doe v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 607 (E.D. Va. 2019), *aff'd*, 832 F. App'x 802 (4th Cir. 2020)). Doe addresses all three avenues of proof.

Starting with the sufficiency and reliability of the evidence, the undisputed facts alone provide ample reason to disbelieve Roe's allegation. Roe, after supposedly being sexually assaulted around 3:00 am, continued to sleep in Doe's bed and stayed in his room until nearly noon. *See* Verified Complaint (cited hereinafter as "Compl.") ¶¶ 35, 98(l). At no point was she restrained or prevented from calling for help.  On the contrary, she testified at the hearing that she left Doe's room to use the bathroom and then *returned and got back into bed with him*. *Id.* at ¶¶ 34, 98(j). She also remained in possession of her cell phone and used it to communicate with friends after the supposed sexual assault. *Id.* at ¶¶ 31, 32; *see also* **Exhibit A** at 52–53 (Appendices to Final Investigative Report (Revised)); Declaration of Patrick R. Seidel ¶ 3 (hereinafter "Seidel Decl."). Those communications make no mention of sexual assault. Instead, they include jokes about Doe's snoring, and include comments that Roe was in "no rush" to be picked up from Doe's room. Ex. A at 53. Roe also initially told friends that she had "hooked up" with Doe," Compl. ¶ 36; *see also* **Exhibit B** at 7:11 (Final Investigative Report (Revised)); Seidel Decl. ¶ 4, and she did not formally report the alleged sexual assault until a year after her night with Doe. Ex. A at 5.

The inconsistencies and contradictions in Roe's story that emerged during the investigation cast further doubt on her allegation. *See* Compl. ¶ 98. To highlight just a few examples, Roe first testified at the hearing that she knew "immediately" that she had been sexually assaulted, but her formal complaint stated that she "didn't realize that this was rape until months later." Compl. 98(i);

Ex A at 5. Roe also initially testified at the hearing that she never left Doe's room during the night and was "scared to get up" and "didn't feel safe moving," but she later disclosed for the first time on cross-examination that she had left the room to go to the bathroom and then returned to Doe's bed (as noted above). Compl. ¶¶ 98(j), (k). Roe further claimed that she "didn't feel safe" picking up her phone to text someone, but in fact she did text several friends from Doe's room during the night and into the morning. Compl. ¶ 98(k); Ex. A at 52–53. Roe also filed a sworn court document claiming she "remembered every detail" of the alleged sexual assault but then later *repeatedly* claimed lack of memory during the disciplinary hearing. Compl. ¶ 98(n); Ex. A at 27. In addition, Roe at first denied that she had information about the night written down, but later admitted she had notes (which were never provided to anyone). Compl. ¶ 98(p); **Exhibit C** at  31–32 (Respondent's Notice of Appeal); *see also* Seidel Decl. ¶ 5. Finally, and most striking, on the second day of the hearing, Roe's advisor *admitted* that Roe had not been "one hundred percent accurate" in her previous testimony that she would "need to correct the record." Compl. ¶ 99; Ex. C at 9. Roe then proceeded to change her testimony to conform with certain parts of Doe's testimony, including details about their sexual encounter, such as Doe's ability to maintain an erection. Compl. ¶ 100(b); Ex C at 22.

Turning to the other modes of proof—showing procedural flaws in the investigatory and adjudicative processes, and inconsistencies or errors in the findings—Roe's inconsistent and contradictory statements were brushed aside by the hearing officer, McGinn, who went out of her way to assist Roe during the hearing, and then rendered an illogical decision in which, despite all evidence, she found Roe's account "credible."

At the hearing, McGinn deviated from policy guidelines by extensively questioning the witnesses at length. *See* **Exhibit D** at 30 (University of Maryland Policies and Procedures on

Sexual Harassment and Other Sexual Misconduct) ("Questioning will be conducted directly, orally, and in real time by the Party's Advisor only."); *see also* Seidel Decl. ¶ 6. She exercised that prerogative to the benefit of Roe and the detriment of Doe. McGinn asked Roe leading questions, such as "Did you feel like you were in danger staying in the same bed with [Doe]?" which prompted the predictable response, "Yes." Ex C. at 29. McGinn also prompted Roe to fill in holes in her testimony, asking Roe, for example, "since reviewing the other documentation that was not provided to the Investigator, what if anything do you now remember about the lighting situation?" prompting Roe to responded, "I now remember that he did have LED lights and they were set to the red color." *Id.* at 30. In total, McGinn asked Roe nearly an hour of follow-up questions on the first day of the hearing to assist her in explaining away inconsistencies, discrepancies, and omissions. Compl. ¶ 100; Ex. C at 42. Conversely, Doe was asked just a few minutes of follow-up questions and—remarkably—was at one point told by McGinn that additional detail was not needed because Doe's testimony "sounded fairly similar to what we heard from [Roe]." Compl. 105(f); Ex. C at 42.

Contrary to the evidence, but consistent with the way McGinn conducted the hearing, her written decision deemed Roe's account to "to be more credible," and thus found Doe responsible for the alleged conduct. **Exhibit E** at 12 (Written Notice of Determination); *see also* Seidel Decl. ¶ 7. The illogic in McGinn's decision is readily apparent. She first explained that Roe's account was "largely consistent," *id.*, but as detailed above, it was not. As to the inconsistencies acknowledged by McGinn, including "the date and time, what [Doe] was drinking at the party, when [Roe] used the bathroom during the night, and what time she was picked up from [Doe's] home," McGinn credited Roe's explanation that "her memory had faded over time and that she had deliberately avoided thinking about that night." *Id.* This explanation, according to McGinn,

"appeared logical and credible considering all available evidence." *Id.* "[A]ll available evidence," however, included Roe's sworn statement, submitted around the time she filed her disciplinary complaint, that she "remembered every detail," Ex. A at 27, and her statement to College Park investigators that she "get[s] flashbacks every single day from the incident," Ex. B at 9:41. In other words, the available evidence showed that Roe claimed to have clear memory of what occurred. Exactly the opposite of what McGinn found.

McGinn also offered an unsupported rationale for Roe's lack of detail in her statements to investigators. According to McGinn, "it [was] credible that [Roe] was not asked questions that elicited those omitted details during the investigation," Ex. E at 12, except McGinn had no idea what Roe was asked because the interviews were not recorded and the questions were not reflected in the final investigative report, *see* Ex. B. Moreover, McGinn credited Roe for providing "many specific details" during the hearing, Ex. E at 12, while failing to mention that a number of those important details were supplied on the second day of the hearing, when Roe "corrected" her testimony *to conform with Doe's account*, Compl. ¶ 100; Ex. C at 9. Yet Doe's account was "less credible," according to McGinn, because he provided "less detail[]," Ex. E at 14, even though McGinn herself at one point told Roe, "I don't think we need to go into that in a lot of detail." Ex. C at 42. McGinn thus penalized Doe for not providing the very detail she told him was not needed.

McGinn further contradicted herself in explaining why Roe's delay in reporting did not "undermine[] [her] credibility enough." Ex. E at 14. On the one hand, Roe "did not want to accuse [Doe], or anyone, of an act as severe as sexual assault without being certain of her own understanding and feelings about the incident." *Id.* at 13. On the other hand, however, Roe "felt negatively about the incident shortly after it had occurred" but offered an unspecified "logical and reasonable explanation" (a favorite stock phrase used by McGinn in reference to Roe) as to why

8

she did not immediately tell trusted friends and family about the sexual assault despite these "negative" feelings. *Id.* at 14. McGinn also "found it reasonable"—without explanation—that even though Roe "understood the definitions of consent and sexual assault at the time of the incident, she did not immediately apply those definitions to her experience nor accept that the definitions may have fit her experience." *Id.*

Finally, McGinn justified imposition of the harshest penalty—expulsion—by reasoning that Doe had performed a "violent act" and that there was a "likelihood that he may engage in similar conduct toward others at the University. *Id.* at 15–16. These justifications had no factual basis. Roe's own account did not describe any "violent act" perpetrated against her, and there was not a shred of evidence that Doe was likely to reoffend or that he "present[ed] a potential safety risk to others." Indeed, that was the conclusion of College Park's own "Ad Hoc Appellate Board," which took the rare step of declaring the sanction "substantially disproportionate to the offense" and modifying it to a one-year suspension. *See* **Exhibit T** at 9 (Ad Hoc Appellate Board Decision); *see also* Seidel Aff. ¶ 22. As the Board explained, McGinn "did not address all of the factors, *particularly factors that the Board finds weigh in favor of [Doe]*." *Id.* The Board also rejected McGinn's unfounded description of the incident as "violent," and did "not see evidence of likelihood to reoffend," noting that Doe had agreed to stop sexual activity with Roe during both the consensual and allegedly non-consensual encounters. *Id.*

Though McGinn was the worst offender, she was not the only College Park official stacking the deck against Doe. The investigators, Brennan and Stafiej, failed to perform a diligent investigation by not, among other things: interviewing relevant witnesses, including members of Doe's fraternity to whom Roe had reported the alleged sexual assault, and "outcry" witness K.R.; following up on clear discrepancies in witness testimony; and collecting relevant evidence

including text messages, social media, memos, photographs, receipts, police paperwork, body camera video recordings, and 911 recordings. Compl. ¶¶ 78–90. At the hearing, Brennan brushed these shortcomings aside, explaining that the missing evidence "was not something we sought to obtain." Compl. ¶ 88.

In sum, weak evidence, a faulty investigation, and a biased hearing officer individually and collectively led to an erroneous responsible finding against Doe.

### 2. *The Erroneous Outcome was the Result of Gender Bias.*

The factual allegations in the Verified Complaint and facts identified in the supporting exhibits further show that gender bias was a but-for cause of the erroneous outcome. Proof of gender bias can include "statistical evidence of gender bias in the University's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias." *See Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585 (E.D. Va. 2018) (referring to pleading burden); *see also Loyola*, 2021 WL 1174707 at *22 ("Sufficiently particularized allegations of gender discrimination 'might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'") (quoting *Yusuf*, 35 F.3d at 715). A federal government investigation of a university for potential Title IX violations is also a relevant allegation suggesting that the university might be pressured to discriminate against males in disciplinary hearings for alleged sexual assault. *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 972–73 (S.D. Oh. 2018).

Any evidence of gender bias by the "adjudicator" and person "ultimately responsible for determining . . . guilt or innocence" is "particularly probative" because that person's views will "have naturally infected the outcome of [the] . . . disciplinary proceedings." *Marymount Univ.*, 297 F. Supp. 3d at 586.

10

Here, McGinn's gender bias is reflected in her public statements, social media posts, and the podcast to which she regularly contributes. In a December 2022 article published while McGinn was Interim Title IX coordinator for Pitzer College, she was quoted as praising increased sexual misconduct complaints, stating that "high numbers are often a good thing—it means survivors are feeling empowered to speak up." **Exhibit F** at 4 (John Paul Ferrantino, *Despite less time on campus, 2021 report show uptick in sexual misconduct cases*, The Student Life, Dec. 2, 2022); *see also* Seidel Decl. ¶ 8. While no reasonable person would take issue with victim empowerment, McGinn's use of the term "survivor" and her belief that a report alone is a "good thing" presupposes that reports are true and that misconduct has occurred—a stance that it is incompatible with the presumption of innocence McGinn was required to apply as the neutral decision maker in this case.

Further underscoring the point, McGinn's biweekly podcast, "The Title IX and Civil Rights Podcast," focuses predominantly on victim's rights advocacy, as does her webinar series and the training materials she produces for College Park and other educational institutions. Compl. ¶¶ 135–140. McGinn's comments also make clear that she equates "victims" with women and "respondents" with men. Compl. ¶ 136. In an April 30, 2021, podcast episode on the role of Title IX advisors, McGinn commented about advisors, "It's a really big role to have to essentially represent someone in a hearing when maybe you joined the advisor pool at your school because you wanted to support people, maybe you're coming from a victim's advocate standpoint, maybe you're coming from the *perspective of respondent education, or men's education* . . . ." Compl. ¶ 136; *see also* Seidel Decl. ¶ 23 (emphasis added). McGinn's view of respondents as men is especially significant here because it shows that her bias is not just against respondents as such, but against *male* respondents. *Cf. Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 519 (E.D. Va.

2019) ("Courts have widely held that vigilance in enforcing Title IX, even when it results in bias in favor of victims and against those accused of misconduct, is not evidence of anti-male bias.").

McGinn's podcasts, social media, training seminars and training materials also reflect the influence of her "activist" background and the "#metoo movement" on her work. On February 3, 2021, McGinn tweeted a link to her podcast that "discussed reporting and recounting sexual violence, compounded trauma, *#MeToo* . . ." **Exhibit G** (McGinn Tweet, Feb. 3, 2021); *see also* Seidel Decl. ¶ 9. In an October 2022 podcast, McGinn explained how she had "join[ed]" her background in "anti-discrimination activism" work with her work as an investigator "when the #metoo movement started happening and suddenly everyone was paying a lot more attention to these issues." *See* Seidel Decl. ¶ 24. This timing gave McGinn "a chance . . . to be an outside investigator but working in this area of anti-discrimination and combating sex and gender violence." *Id.* In a video posted on YouTube, McGinn again explained how she had "c[o]me work in a Title IX from a background of activism" after discussing how Title IX had "paved the way for those women to demand equal access to the opportunities afforded by education." *Id.* at ¶ 25.

McGinn's activism and vocal support for the #metoo movement are not themselves problematic, but they became a problem when she assumed the role of a neutral decision-maker in this sexual assault case. The statements by McGinn, combined with the one-sided way she conducted the hearing, the illogical reasoning in her decision, and the "substantially disproportionate" sanction based on non-existent evidence and a disregard of the factors favoring Doe, is enough to show an erroneous outcome based on gender bias that warrants immediate injunctive relief. *See Texas Christian Univ.*, 601 F. Supp. 3d at 88 (granting TRO based in part on "procedural irregularities" in disciplinary proceeding and "irrationality of the panel's decision"); *see also Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) ("When the evidence substantially

favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias.").

Looking beyond McGinn, gender bias can also be shown through statements and action of individuals who, though not acting as an adjudicator, "had significant influence, perhaps even determinative influence, over the [u]niversity's decision." *Columbia Univ.*, 831 F.3d at 58. That evidence exists here too.

Brennan, one of the investigators in this case and the Assistant Director at College Park's Office Civil Rights and Sexual Misconduct ("OCRSM"), maintains public social media accounts on which she has posted content reflecting her bias toward woman. In March 2018, for example, Brennan posted a "meme" on her Facebook account promoting National Women's Day that included that quote, "I think women are foolish to pretend they are equal to men, they are far superior and always have been." **Exhibit H** (Brennan Facebook Post, Mar. 10, 2018); *see also* Seidel Decl. ¶ 10. More recently, in October 2023, Angela Nastase ("Nastase"), College Park's Title IX Coordinator and OCRSM Director, posted on her LinkedIn page comments by speaker Keith E. Edwards thanking  "ATIXA" (Association of Title IX Administrators) for inviting him to a talk "about Unmasking and how to engage men to understand with empathy, reach with compassion, hold accountable more effectively, and help them let go of who they feel they have to be and discover and live their authentic masculinity." **Exhibit I** (Nastase LinkedIn page, Nov. 15, 2023); *see also* Seidel Decl. ¶ 11. Brennan commented on the post, "Great session, Keith E. Edwards! Can't wait to read your book. Understanding about 'man in a box' was fascinating." Ex. I at 1.  Nastase, who oversaw the investigation and conferred with McGinn on her decision, also commented that she "Agreed!" with Brennan's views. *Id.* at 2.

The "man in a box" that Brennan and Nastase found "fascinating" is, according to Edwards's website, an activity that is used to "illustrate the social expectations on men" and demonstrate how the "Traditional Hegemonic Definition of Masculinity," is "reinforced" primarily "through misogyny and homophobia." **Exhibit J** (https://keithedwards.com/2012/10/10/man-in-a-box-the-traditional-hegemonic-definition-of-masculinity/ (last visited Dec. 15, 2023)); *see also* Seidel Decl. ¶ 12.

Nastase is also being accused of gender bias in a civil action pending in this Court, *John Doe v. The University of Maryland, College Park*, No. 8:22-cv-00872-GLS. The operative complaint alleges that Nastase viewed a female student's report of sexual assault as having been made in "good faith" even though the allegations proved to be unfounded, yet she refused to even investigate complaints by the exonerated male respondent. ECF No. 33 at 15, ¶¶ 89–91.

Further evidence points to an institutional bias at College Park against men. *See Texas Christian Univ.*, 601 F. Supp. 3d at 93 (finding evidence of bias where "institutional messaging, both implicit and explicit, resonate[d] more closely with female gender norms" (internal quotation marks omitted). For example, in April 2017, College Park advertised on its Facebook page the "3rd annual Walk a Mile in Her Shoes" event and commented, "Don't forget about UMD's favorite event . . . Walk a Mile in Her Shoes! Come raise awareness about men's sexualized violence against women and its devasting impact!!" **Exhibit K** (OCRSM Facebook post, Apr. 3, 2017); *see also* Seidel Decl. ¶ 13. College Park also sponsored a lecture in February 2018 titled, "#MeToo & the Civil Rights Approach to Gender-Based Violence." **Exhibit L** (OCRSM Facebook post, Feb. 12, 2018); *see also* Seidel Decl. ¶ 14. College Park's former Title IX Coordinator was also quoted in January 2016 criticizing an advocate for expanded rights for students accused of sexual assault, whom she equated with men. According to the former College Park administrator, "[c]ounsel for

14

the victim should argue that permitting a student accused of rape to freely question *his* victim exceeds the scope of the assailant's due process rights." **Exhibit M** at 2 (Matt Lamb, *Top Title IX candidate at University of Oregon wrote the book on favoring rape accusers*, The College Fix, Jan. 26, 2016) (emphasis added); *see also* Seidel Decl. ¶ 15.

Finally, "[e]vidence of political pressure to convict respondents in sexual assault cases—respondents who are almost invariably male," is also evidence of gender bias. *Marymount Univ*, 297 F. Supp. 3d at 587. Initially, the College Park student body is split evenly between males and females. *See* **Exhibit N** at 3 (Maryland Higher Education Commission, Report on Campus Climate and Sexual Violence at Maryland Colleges and Universities (Sept. 2022))[3]; *see also* Seidel Decl. ¶ 16. But Doe expects discovery will show that all or nearly all the sexual assault cases handled by College Park involve a female complaint and male respondent (the gender breakdown is not publicly available). *See* Bethany A. Corbin, *Riding the Wave or Drowning?: An Analysis of Gender Bias and* Twombly/Iqbal *in Title IX Accused Student Lawsuits,* 85 Fordham L. Rev. 2665, 2673 (2017) ("Universities rarely (if ever) receive complaints of sexual assault involving female perpetrators.") (footnote omitted). Evidence indicates that College Park is under pressure to find more of those male respondents responsible. Between 2020 and 2022 the percentage of the student body who agreed with the statement "sexual assault is a problem at [College Park]" increased from 38.9% to 60.3%. Ex. N at 4. During that same two-year period, the student body's perceptions of College Park's response to reports of sexual assault declined. The percentage of students who believed that College Park would conduct a "fair, prompt, and impartial investigation" fell from 48.4% to 41.6%, and the percentage who believed that College Park would handle the report "fairly" dropped from 53.6% to 42.2%. *Id.* at 5. College Park also received public scrutiny in a

---

[3] The exhibit is an excerpt from the relevant section of the report.

2019 *Baltimore Sun* article that noted a disparity between the high number of reports of sexual misconduct and the low number of investigations conducted. *See* **Exhibit O** at 1 (Talia Richman, *University of Maryland receives record numbers of sexual misconduct reports, conducts few investigations*, Mar. 22, 2019); *see also* Seidel Decl. ¶ 17. College Park's perceived failure to address sexual assault on campus has also prompted repeated student protests. *See* **Exhibit P** (Parker Leipzig, *UMD students gather on McKeldin Mall to raise awareness of sexual assault*, The Diamondback, Apr. 25, 2022); **Exhibit Q** (Clara Niel & Ryan White, *'We demand change': UMD students rally for more action against sexual assault on campus*, The Diamondback, Oct. 9, 2021); *see also* Seidel Decl. ¶¶ 18–19. In addition, College Park is currently under investigation by the Department of Education's Office for Civil Rights for allegations of Title IX discrimination in at least five cases—the most of any educational institution in the State of Maryland. Four of those cases involve allegations of sexual violence discrimination. *See* **Exhibit R** (*Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools as of December 15, 2023 7:30am Search*, OFFICE OF CIVIL RIGHTS, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open-investigations/tix.html?queries%5Bstate%5D=MD&page=2&offset=20 (last visited Dec. 15, 2023)); *see also* Seidel Decl. ¶ 20.

Based on the above evidence, Doe is likely to succeed in proving not just that the outcome was erroneous, but also that gender bias "was *one* but-for cause of that decision." *Bostock*, 140 S. Ct. at 1739.

### B. John Doe Will Suffer Irreparable Harm Without Immediate Injunctive Relief.

John Doe will suffer irreparable harm to his future educational and career prospects if the court does not award injunctive relief. Harm is considered irreparable when it cannot be remedied by money damages at the time of judgment. *See Hughes Network Sys., Inc. v. InterDigital*

16

*Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). Numerous district courts have found that the resume "gap" created by a university suspension or expulsion causes irreparable harm because the student will inevitably be required to explain the gap to future educational institutions and employers, "and a truthful explanation would seriously hinder [the student's] prospects." *Doe v. Univ. of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020); *Texas Christian Univ.*, 601 F. Supp. 3d at 94.

> As one district court has explained:
>
> [The plaintiff] will forever have either a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by [the university]. Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. Money damages would not provide an adequate remedy at that point; [the university's] disciplinary finding—even if determined to have been arbitrary or made in bad faith—would continue to affect him in a very concrete way, likely for years to come.

*King v. DePauw Univ.*, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014).

Other district courts have echoed this sentiment. *See, e.g.*, *Univ. of Connecticut*, 2020 WL 406356, at *2 ("For a college student poised to graduate in a few months, it is highly likely that a two-year suspension and a sanction for sexual assault would indeed 'forever change[ ]' the trajectory of his education and career."); *Doe v. Univ. of Michigan*, 325 F. Supp. 3d 821, 829 (E.D. Mich. 2018) ("Plaintiff faces an immediate threat of expulsion, a penalty that could drastically curtail future educational and employment opportunities. Money damages cannot compensate Plaintiff for the reputational harm he has already suffered and will continue to suffer as a consequence of sexual assault allegations." (citation omitted)); *Doe v. Middlebury Coll.*, No. 1:15-CV-192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) ("While Plaintiff may recover

money damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career in July 2016 with this particular employment. Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap.") (footnote omitted).

Doe's suspension from College Park will have the same life-altering consequences faced by the students in the above cases. *See* Declaration of John Doe (hereinafter "Doe Decl."). He is a senior on the verge of completing his next-to-last semester before graduation. Doe Decl. ¶ 2. To this point, he has maintained an unblemished disciplinary record and a 3.582 GPA. *Id*. at ¶¶ 3, 7. In April 2023, Doe sat for the LSAT, scoring a 170. *Id*. at ¶ 6. Doe has a written offer of employment to work for one of the largest global medical technology companies in the world, which is set to commence upon his graduation. *Id.* at ¶ 8.

These achievements will be overshadowed, if not rendered inconsequential, by Doe's suspension and the resulting gap in his undergraduate record. Even if Doe succeeds in overturning the decision, he will have missed his final semester and failed to graduate as scheduled. When Doe is compelled to give a truthful explanation for the time missed, he will be obligated to explain that he was found responsible for a sexual assault, which will "drastically curtail future educational and employment opportunities." *Univ. of Michigan*, 325 F. Supp. 3d at 829. The harm to the "trajectory of his education and career," *id.*, will be incalculable and therefore incurable by money damages.

### C.  John Doe's Injury Outweighs any Potential Harm to College Park.

The balance of equities also weighs decidedly in favor of injunctive relief for Doe. This factor requires the Court to "weigh the harm to the moving party if the injunction is not granted

against the harm to the non-moving party if the injunction is granted." *Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*, 581 F. Supp. 3d 736, 751 (D. Md. 2022) (citation and internal quotation marks dismissed). As just discussed, absent immediate injunctive relief, Doe will "face[] significant [and permanent] hardships by having his educational and professional paths disrupted." *See Doe v. Siena Coll.*, No. 122-cv-1115(BKS/TWD), 2023 WL 197461, at *20 (N.D.N.Y. Jan. 17, 2023). College Park, however, will suffer only temporary "interference with its process and sanction if the Court grants the motion." *Id.* That harm can be undone because if College Park prevails on the merits, "it can revoke Plaintiff's diploma and maintain Plaintiff's disciplinary record in its files," thus restoring the integrity of its disciplinary process and sanction. *See id.* (alterations, citation, and internal quotation marks omitted).

As to any concern College Park may raise about Doe's presence on campus, Doe has remained on campus without restriction or incident since the allegation was first reported on February 1, 2023. This "lack of restriction on Plaintiff's conduct while on campus[] indicates" that College Park "does not view Plaintiff as a threat to the [College Park] community." *See Middlebury Coll.*, 2015 WL 5488109, at *4; *see also Univ. of Connecticut*, 2020 WL 406356, at *5 (noting that lack of "interim measures" instituted by university showed it was not concerned about plaintiff's presence on campus). Indeed, while the appeal was pending, College Park assured Doe that, regardless of the decision, they would "work with [him] to ensure that [he was] able to finish [his] classes" during the just-completed semester. **Exhibit S** (Email from A. Nastase, Nov. 16, 2023); *see also* Seidel Decl. ¶ 21.

Any legitimate safety concern raised by College Park can be addressed by tailoring the injunctive relief "to remedy the specific harm caused by not allowing Doe to finish his courses" and graduate. Potential on-campus contact between Doe and Roe also is not a serious concern

because Roe is not a College Park student and the revised sanction includes a no-contact order. *Cf. Doe v. Univ. of Chicago*, No. 1:22-CV-06105, 2022 WL 16744310, at *5 (N.D. Ill. Nov. 7, 2022) (noting that "effectiveness of the no-contact directive . . . tip[ped] the equitable scales in favor of allowing John Doe to temporarily remain in his on-campus housing"); *Texas Christian Univ.*, 601 F. Supp. 3d at 95 (noting that university could "mitigate any hardship to itself or Roe by instituting another 'no-contact' order on Doe.").

In short, any harm College Park will suffer if Doe is allowed to complete his studies and graduate is minimal and temporary, whereas Doe will suffer significant, permanent harm without injunctive relief even if he ultimately prevails. *See, e.g.*, *DePauw Univ.*, 2014 WL 4197507, at *14. The balance of equities therefore tip decidedly in Doe's favor.

### D.  An Injunction is in the Public Interest

Finally, the public interest will be served by injunctive relief. The public has an interest in seeing that institutions of higher education, and especially taxpayer-funded state schools like College Park, comply with federal law on gender discrimination. *See Texas Christian Univ.*, 601 F. Supp. 3d at 95. To be sure, the public also has an interest in addressing campus sexual violence, *see id.*, but granting injunctive relief will not prevent College Park from addressing that interest. Rather, the only aim here is ensure that allegations of sexual assault are fairly adjudicated. All four factors therefore support injunctive relief for Doe.

## V.   <u>REQUEST TO WAIVE BOND</u>

Rule 65(c) provides that a court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Because there is no risk of monetary loss to College Park from an injunction, and requiring Doe to post a security bond would impose a significant financial hardship, *see* Doe Decl. ¶¶ 14–16, Doe requests that the Court waive the bond requirement. *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement."); *see also Coreas v. Bounds*, 458 F. Supp. 3d 352, 362 (D. Md. 2020) ("Where Petitioners have asserted that a bond would impose significant financial hardship upon them, Respondents have not disputed that claim, and the financial impact to Respondents of an improperly imposed injunction is limited and would not create any significant hardship, the Court will waive the security requirement.").

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Doe respectfully requests that this Court grant the Emergency Motion and, pending a decision on Doe's request for a preliminary injunction, enter an order restraining and enjoining Defendant from suspending Doe.

Dated: December 27, 2023

Respectfully Submitted,

*/s/ Patrick R. Seidel*
Patrick R. Seidel, Esq. (#21801)
William N. Sinclair, Esq. (#28833)
Todd Hesel, Esq. (#21466)
Silverman Thompson Slutkin & White, LLC
400 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 385-2225
pseidel@silvermanthompson.com
wsinclair@silvermanthompson.com
thesel@silvermanthompson.com

*Attorneys for Plaintiff*