**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JOHN DOE,                                                  *

        *Plaintiff*,                                 *

          v.                                       *          No. 1:23-cv-03507-RDB

                                *

UNIVERSITY OF MARYLAND,
COLLEGE PARK,                                          *

        *Defendant*.

    *     *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ariel Lichterman
_____

ARIEL LICHTERMAN
Federal Bar No. 20850
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 17th Floor
Baltimore, Maryland  21202
alichterman@oag.state.md.us
(410) 576-6459
(410) 576-6437 (facsimile)

January 9, 2024                          Attorneys for Defendant University of
                                         Maryland, College Park

# TABLE OF CONTENTS

Page

**INTRODUCTION** ................................................................................................ 1

**STATEMENT OF FACTS** ................................................................................. 2

    **Ms. Roe's Version of the Non-Consensual Conduct** ................................. 3

    **Mr. Doe's Version of the Non-Consensual Conduct** ................................. 4

    **Ms. Roe's Reports of the Non-Consensual Conduct** ............................... 4

    **Ms. Roe Files a Formal Complaint with the University** ............................ 5

    **The University's Investigation** ................................................................ 6

    **The Disciplinary Proceeding** ................................................................. 7

    **Mr. Doe's Appeal of the Decision** .......................................................... 10

**LEGAL STANDARD** ........................................................................................ 12

**ARGUMENT** ...................................................................................................... 12

**I.**    **PLAINTIFF HAS FAILED TO ESTABLISH THE LIKELIHOOD OF SUCCESS ON THE MERITS.** ................................................................. 12

    **A.**    **The Disciplinary Proceeding Was Not Flawed and Did Not Result in an Erroneous Outcome.** ........................................................... 16

    **B.**    **The Disciplinary Proceeding and Outcome Were Not Motivated by Gender Bias.** ............................................................................... 19

**II.**    **THE BALANCE OF EQUITIES WEIGHS AGAINST AN INJUNCTION.** ............... 28

**III.**    **PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.** ............................................................. 28

**IV.**    **GRANTING AN INJUNCTION IS AGAINST THE PUBLIC INTEREST.** ............... 29

**CONCLUSION** ................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Atria v. Vanderbilt Univ.*,
    142 F. App'x 246 (6th Cir. 2005) ................................................................ 15

*Davis v. Monroe County Bd. of Educ.*,
    526 U.S. 629 (1999) ..................................................................................... 13

*Dewhurst v. Century Aluminum Co.*,
    649 F.3d 287 (4th Cir. 2011) ....................................................................... 12

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ....................................................................... 29

*Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*,
    384 F. Supp. 3d 598 (E.D. Va. 2019) .......................................................... 15

*Doe v. Baum*,
    903 F.3d 575 (6th Cir. 2018) ....................................................................... 25

*Doe v. Bd of Trustees of Whitman Coll.*,
    No. 4:23-CV-05051-MKD, 2023 WL 3316893 (E.D. Wash. Apr. 25, 2023) ............ 29

*Doe v. Brown Univ.*,
    166 F. Supp. 3d 177 (D.R.I. 2016) .................................................. 15, 19, 26

*Doe v. Columbia Univ.*,
    831 F.3d 46 (2d Cir. 2016) .......................................................................... 23

*Doe v. Fairfax Cnty. Sch. Bd.*,
    403 F. Supp. 3d 508 (E.D. Va. 2019) ............................................. 21, 24, 25

*Doe v. Maryland*,
    No. CV ELH-20-1227, 2021 WL 1174707 (D. Md. Mar. 29, 2021) ......... 14, 15, 20, 23

*Doe v. Miami Univ.*,
    882 F.3d 579 (6th Cir. 2018) .................................................................. 22, 25

*Doe v. Purdue Univ.*,
    928 F.3d 652 (7th Cir. 2019) ....................................................................... 14

*Doe v. Salisbury Univ.*,
   123 F. Supp. 3d 748 (D. Md. 2015) ................................................................ 14, 15, 23

*Doe v. Wake Forest Univ.*,
   No. 1:23-cv-001114, 2023 WL 2239475 (M.D.N.C. Feb. 27, 2023) ........ 13, 15, 28, 29

*Frierson v. Shaw Univ.*,
   No. 5:21-CV-45-D, 2023 WL 3571924 (E.D.N.C. May 19, 2023) ............................ 14

*Gebser v. Lago Vista Independent School Dist.*,
   524 U.S. 274 (1998) ........................................................................................... 13

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ........................................................................................... 13

*Haley v. Virginia Com. Univ.*,
   948 F. Supp. 573 (E.D. Va. 1996) ...................................................................... 20

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
   174 F.3d 411 (4th Cir. 1999) .............................................................................. 12

*Ikpeazu v. Univ. of Nebraska*,
   775 F.2d 250 (8th Cir. 1985) .............................................................................. 15

*Kashdan v. George Mason Univ.*,
   70 F.4th 694 (4th Cir. 2023) ............................................................................... 26

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ........................................................................................... 12

*Rossley v. Drake Univ.*,
   342 F. Supp. 3d 904 (S.D. Iowa 2018) ............................................................... 24

*Sampson v. Murray*,
   415 U.S. 61 (1974) ............................................................................................. 29

*Sheppard v. Visitors of Virginia State Univ.*,
   993 F.3d 230 (4th Cir. 2021) ........................................................................ 13, 14

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................... 12

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
   553 F.3d 292 (4th Cir. 2009) .............................................................................. 12

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) ..................................................... passim

**Statutes**

20 U.S.C. § 1681 ........................................................................................... 13

**Rules**

Federal Rule of Civil Procedure 65(a)............................................................. 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOHN DOE,                                        *

        *Plaintiff*,                             *

          v.                                    *       No. 1:23-cv-03507-RDB

                                                 *

UNIVERSITY OF MARYLAND,
COLLEGE PARK,                                    *

        *Defendant*.

   *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

The motion for preliminary injunction filed by plaintiff John Doe should be denied because plaintiff has not demonstrated that he can satisfy all four factors required to obtain preliminary injunctive relief.   Accordingly, Defendant University of Maryland, College Park (the "University"), by its undersigned attorneys, respectfully requests that the Court deny plaintiff's motion for preliminary injunction.

## INTRODUCTION

This case arises out of a disciplinary proceeding under the University's policy on Sexual Harassment and Other Sexual Misconduct in which plaintiff John Doe, a student at the University, was held responsible for committing a sexual assault.  In February of 2023, a complaint was filed with the University's Office of Civil Rights and Sexual Misconduct alleging that Mr. Doe sexually assaulted Jane Roe after a fraternity party in February of 2022.  Following its procedures, the University conducted an investigation of the complaint and held a hearing to determine whether Mr. Doe was responsible for the alleged conduct.  During the two-day hearing, which involved

extensive cross-examination, including by Mr. Doe's attorney, and review of records, photographs, and communications, the hearing officer concluded that the evidence supported a finding, based upon a preponderance of the evidence, that Mr. Doe committed the alleged assault, and sanctioned him to expulsion from the University.  Mr. Doe appealed this decision through the University's appeal process, and the University's appellate review board agreed that the evidence established that Mr. Doe committed the sexual assault.  Based upon an analysis of the potential threat posed by Mr. Doe, the appellate board reduced the sanction to a one-year suspension.

Mr. Doe now brings suit alleging that the investigation, hearing, and ultimate decision were the result of anti-male gender bias in violation of Title IX of the Education Amendments of 1972. Mr. Doe has only one semester of credits remaining to complete his degree requirements and has therefore moved this Court for injunctive relief to allow him to complete those credits and obtain his degree.  Mr. Doe is not entitled to the extraordinary relief of an injunction because he cannot establish that he is likely to succeed on the merits of his Title IX claim.  In particular, there is no evidence to demonstrate that the investigation, hearing, and decision were flawed and erroneous, and more importantly, that they were caused by anti-male bias.  To the contrary, evidence demonstrates that the University, and those involved in the University's disciplinary process, are not biased against men.  In addition, Mr. Doe has not shown that he will suffer irreparable harm without an injunction, that the balance of equities tips in his favor, and that an injunction would be in the public interest.  As a result, this Court should deny Mr. Doe's motion for a preliminary injunction.

## STATEMENT OF FACTS

Mr. Doe is a student at the University, currently in his final year of his degree program. Compl. ¶ 19.  On February 19, 2022, Mr. Doe attended an event hosted by the fraternity to which

he belongs.  Compl. ¶ 21.  Mr. Doe took as his date to this event Jane Roe, a student at another university in Maryland.  Compl. ¶¶ 20, 21.  This date was arranged by Mr. Doe's fraternity brother, Witness-1, who was also friends with Ms. Roe.  Compl. ¶ 22.  Witness-1 took as his date to the event Witness-3, who was friends with Ms. Roe from her university.  Compl. ¶ 23.  During the event, both Mr. Doe and Ms. Roe drank alcohol.  Compl. ¶ 26.  After the event, Ms. Roe voluntarily went with Mr. Doe to his room in his off-campus fraternity house and Ms. Roe and Mr. Doe engaged in consensual sex and then went to sleep.  Compl. ¶¶ 27-29.  Ms. Roe and Mr. Doe both state that there was some sexual contact sometime later that night or early the next morning, but they disagree about the nature of that contact.  It is this contact that serves as the underlying basis for what occurred thereafter.  Compl. ¶¶ 1-2, 76.

### Ms. Roe's Version of the Non-Consensual Conduct

Ms. Roe states that while she was sleeping in the bed with Mr. Doe, laying in the fetal position with Mr. Doe behind her, she awoke to the feeling of Mr. Doe penetrating her vagina.  (ECF Nos. 2, 6, Ex. E, at 1, 5).  Ms. Roe stated that she heard Mr. Doe grunting, felt his arms against her shoulder and back, and when she turned her face, saw that he was right behind her.  (ECF Nos. 2, 6, Ex. E, at 5).  Ms. Roe told Mr. Doe she was sleeping to get him to stop, but he did not stop until she repeated that she was sleeping and pushed him away.  (ECF Nos. 2, 6, Ex. E, at 5).  Ms. Roe stated that Mr. Doe had a blank look on his face, he was mumbling, and did not appear as if "anything was going through his head."  (ECF Nos. 2, 6, Ex. E, at 5).

Ms. Roe described feeling confused after this incident, was trying to process it, but did not know what to do.  (ECF Nos. 2, 6, Ex. E, at 6).  At some point thereafter, Ms. Roe left Mr. Doe's room to use the bathroom, but returned thereafter.  (ECF Nos. 2, 6, Ex. E, at 6).  She remained in his room until approximately 11:45 a.m. the next morning, when Witness-3 arrived to pick her up.

(ECF Nos. 2, 6, Ex. E, at 7-8).  Mr. Doe remained sleeping until Ms. Roe left and the two did not converse.  (ECF Nos. 2, 6, Ex. E, at 8).  Ms. Roe did not tell Witness-3 about this incident during their ride home.  (ECF Nos. 2, 6, Ex. E, at 8).

### Mr. Doe's Version of the Non-Consensual Conduct

Mr. Doe denies that there was non-consensual conduct or that he penetrated Ms. Roe.  (ECF Nos. 2, 6, Ex. E, at 6).  He stated that after he and Ms. Roe had consensual sex and fell asleep, he awoke some time later and felt Ms. Roe's buttocks against his penis.  (ECF Nos. 2, 6, Ex. E, at 6).  He stated that he felt her buttocks move against his penis and thought this was intentional and meant she was awake, but he still felt the effects of the alcohol at this time and could not see if her eyes were open.  (ECF Nos. 2, 6, Ex. E, at 6-7).  Mr. Doe stated he placed his hand on Ms. Roe's side and moved his penis against Ms. Roe's buttocks.  (ECF Nos. 2, 6, Ex. E, at 7).  He stated that because of their positioning, his penis "probably" made contact with Ms. Roe's vagina, but he stated he did not penetrate her.  (ECF Nos. 2, 6, Ex. E, at 7).  Mr. Doe stated that after several minutes, Ms. Roe lifted her head and stated that she was going to sleep, to which he responded "okay," and then removed his hand from her and returned to sleep.  (ECF Nos. 2, 6, Ex. E, at 7).

### Ms. Roe's Reports of the Non-Consensual Conduct

The first person Ms. Roe reported the assault to was Witness-1, on March 30, 2022, approximately five weeks after the incident.  (ECF Nos. 2, 6, Ex. E, at 10).  Witness-1 stated he thought this conversation occurred the day after the incident.  (ECF Nos. 2, 6, Ex. E, at 10).  Witness-1 did not take Ms. Roe's allegation seriously and was not supportive, which caused Ms. Roe to hesitate before reporting the incident to anyone else.  (ECF Nos. 2, 6, Ex. E, at 10).

Sometime in early April of 2022, Ms. Roe then told Witness-2, a friend and student at the University, about the incident.  (ECF Nos. 2, 6, Ex. E, at 10).  Witness-2 confirmed for Ms. Roe

that the conduct constituted sexual assault.  (ECF Nos. 2, 6, Ex. E, at 10).  Then, on April 13, 2022, Ms. Roe told Witness-3 that Mr. Doe had sexually assaulted her. (ECF Nos. 2, 6, Ex. E, at 10). Witness-3 stated that Ms. Roe appeared very uncomfortable with sharing this information.  (ECF Nos. 2, 6, Ex. E, at 10).

On May 17, 2022, in the presence of Witness-2, Ms. Roe confronted Mr. Doe with the allegation that he had assaulted her.  (ECF Nos. 2, 6, Ex. E, at 10).  Mr. Doe apologized and stated that he did not remember the incident occurring that way.  (ECF Nos. 2, 6, Ex. E, at 10).  According to Witness-2 and Ms. Roe, Mr. Doe apologized and stated that he did not recall what had happened because he was intoxicated. (ECF Nos. 2, 6, Ex. E at 10; ECF Nos. 2, 4, Ex. B, at 12).

Ms. Roe stated that after this conversation she considered taking other steps to report the incident.  (ECF Nos. 2, 6, Ex. E, at 10).  She stated that Witness-1 and Witness-2 had reported the incident to Mr. Doe's fraternity, and Ms. Roe agreed to speak with the fraternity president regarding proceedings to remove Mr. Doe from the fraternity. (ECF Nos. 2, 6, Ex. E, at 11).

**Ms. Roe Files a Formal Complaint with the University**

In February of 2023, Ms. Roe contacted the University and filed a formal complaint against Mr. Doe.  (ECF Nos. 2, 6, Ex. E, at 11; Compl. ¶¶ 41-43).  On the same day, at the urging of her parents, Ms. Roe additionally reported the sexual assault to the police.  (ECF Nos. 2, 6, Ex. E, at 11; Compl. ¶¶ 44).  When asked about inconsistencies between the formal complaint and police report, Ms. Roe stated she was unsure of how much information to include and may have misremembered some of the details surrounding the incident.  (ECF Nos. 2, 6, Ex. E, at 11).  The University was not involved in any criminal proceedings that resulted from Ms. Roe's report to the police.  *See* Compl. ¶¶ 44-47.

### The University's Investigation

After receiving the formal complaint and serving notice of the complaint upon Mr. Doe, the University began its investigation.  (ECF Nos. 2, 4, Ex. B, at 3; Compl. ¶ 48).  The University's Policy on Sexual Assault and Other Sexual Misconduct ("Sexual Assault Policy") states that parties are entitled to participate in the investigation of a formal complaint, including by having an "opportunity to be heard through the process," "submit evidence, witness lists, and suggest specific questions to be posed to the other Party during the investigation," and "to review and provide written responses to draft and final investigation reports." Sexual Assault Policy, at XII.C. In addition, the University's Procedures for Investigating and Resolving Allegations of Sexual Harassment and Other Sexual Misconduct ("Sexual Misconduct Procedures") provides that an investigator will speak with both parties and other individuals who may have relevant information. Sexual Misconduct Procedures, at VI.C.5.  The policy states that "[n]o audio or video recording of any kind is permitted during such interviews."  Sexual Misconduct Procedures, at VI.C.5. In addition, the parties are given the opportunity to present witnesses and any other relevant evidence. Sexual Misconduct Procedures, at VI.C.5.

In accordance with these procedures, Mr. Doe was advised of his rights during the investigation and declined the opportunity to submit evidence, witness lists, respond to questions, or submit a response to the investigation reports. (ECF Nos. 2, 4, Ex. B, at 3-4, 10, 15).  The University assigned two investigators, Jamie Brennan and Rosanne Stafiej, to conduct the investigation.  (ECF Nos. 2, 4, Ex. B, at 1).  Ms. Brennan and Ms. Stafiej interviewed Ms. Roe, as well as the first three people Ms. Roe reported the sexual assault to, i.e. Witness-1, Witness-2, and Witness-3, two of whom were present at the fraternity event preceding the incident.  (ECF Nos. 2, 4, Ex. B, at 3-4; Compl. ¶¶ 50).  The interviews were not recorded, but notes were taken during

the interviews.  Compl. ¶ 50.  Ms. Brennan and Ms. Stafiej gathered additional evidence including photographs from the night of the incident and contemporaneous text messages.  (ECF Nos. 2, 3, Ex. A).

After completion of the final investigation report, Mr. Doe made a request from the assigned hearing officer to reopen the investigation to allow for the collection of new evidence.  (ECF Nos. 2, 6, Ex. E, at 2).  The hearing officer granted the request and accepted Mr. Doe's submission of additional records, including the police report Ms. Roe had filed regarding the incident.  (ECF Nos. 2, 6, Ex. E, at 2).

### The Disciplinary Proceeding

The University retained Alyssa-Rae McGinn from the firm of Dan Schorr, LLC, to serve as hearing officer for Mr. Doe's disciplinary proceeding.  (ECF Nos. 2, 6, Ex. E, at 2).  Ms. McGinn is Vice President of Dan Schorr, LLC, is certified by the Association of Title IX Administrators as a Civil Rights Investigator and Hearing Officer/Chair, and by the Federal Mediation and Conciliation Service as a Mediator, and she is a pre-approved Sexual Misconduct Investigator for the United Educators ProResponse Expert Services Benefit.  *See* https://danschorrllc.com/our_team/alyssa-rae-mcginn/ (last visited January 8, 2024).  Ms. McGinn has extensive experience conducting investigations of sexual misconduct at educational institutions and serving as hearing chair for matters brought under Title IX.  *Id*.; *see also* Declaration of Angela Nastase ("Nastase Decl."), attached hereto as Exhibit A.  To date, the University has retained Ms. McGinn on eleven occasions to serve as a hearing officer in disciplinary proceedings.  *See* Nastase Decl., Ex. A.

Under the Sexual Misconduct procedures, two days prior to the hearing, parties may object to the hearing officer "on the basis of demonstrated bias or conflict of interest for or against

Complainants or Respondents, generally, or for or against the individual Complainant or Respondent." Sexual Misconduct Procedures, at VI.D.5.b.v. Mr. Doe did not raise any such objections to Ms. McGinn serving as the hearing officer. (*See* ECF Nos. 2, 6, Ex. E, at 2).

According to the Sexual Misconduct Procedures, the hearing officer has "discretion to determine the structure of the Hearing and how questioning is conducted." Sexual Misconduct Procedures, at VI.D.3. In addition, the hearing officer may conduct the hearing in-person or virtually. Sexual Misconduct Procedures, at VI.D.5.b.xi. The hearing "is not bound by formal rules of evidence that apply to court proceedings." Sexual Misconduct Procedures, at VI.D.6.a. Each party's advisor has an opportunity to cross-examine the opposing party and any witnesses. Sexual Misconduct Procedures, at VI.D.6.e. Any information not provided during the investigation, including any witnesses not identified during the investigation, will generally be excluded from the hearing. Sexual Misconduct Procedures, at VI.D.6.g and h. The standard of proof for a determination of responsibility for violation of the Sexual Assault Policy is "Preponderance of the Evidence," Sexual Misconduct Procedures at VI.C.5.a, which means that "it is more likely than not that a Policy violation has occurred." Sexual Assault Policy at VII.p.

Mr. Doe's hearing took place in August of 2023 and spanned two days. (ECF Nos. 2, 6, Ex. E, at 3). During the hearing, testimony was elicited from Ms. Brennan, the investigator, Mr. Doe, Ms. Roe, and Witnesses 1-3. (ECF Nos. 2, 6, Ex. E, at 3). Throughout the hearing, Mr. Doe was represented by his attorney, Patrick Seidel, who conducted extensive cross-examination of all parties and witnesses. (ECF Nos. 2, 6, Ex. E, at 3, 12). Ms. McGinn weighed the evidence and determined that the burden of proof was met, i.e., it was more likely than not that Mr. Doe committed a "non-consensual sexual penetration," as defined by the policy. (ECF Nos. 2, 6, Ex. E, at 12). Ms. McGinn concluded that the conduct as alleged by Ms. Roe, that Mr. Doe penetrated

her while she was asleep, constituted a violation of the policy.  (ECF Nos. 2, 6, Ex. E, at 12).  To support this conclusion, Ms. McGinn relied on the fact that although Mr. Doe denied that he penetrated Ms. Roe while she was asleep, he did corroborate much of what Ms. Roe alleged, namely, that after engaging in sexual intercourse and falling asleep, there was further sexual contact, that he rubbed his penis against Ms. Roe's vagina, and that they were laying in the same position as described by Ms. Roe.  (ECF Nos. 2, 6, Ex. E, at 12).

Ms. McGinn found that Ms. Roe's description of the assaultive conduct was consistent each time she reported it, to Witnesses 1-3 and Mr. Doe, which was confirmed by witness testimony, and was consistent with the formal complaint and police report.  (ECF Nos. 2, 6, Ex. E, at 12).  Although Ms. McGinn noted some doubts about Ms. Roe's veracity and inconsistencies about some of the details surrounding the incident, these did not outweigh the consistent and detailed descriptions of the sexual assault itself.  (ECF Nos. 2, 6, Ex. E, at 12, 14).

In addition, Ms. McGinn highlighted evidence that undercut Mr. Doe's credibility, such as the testimony that when Mr. Doe first learned about the allegations, he responded by stating that he did not recall the events of that night because he was intoxicated.  (ECF Nos. 2, 6, Ex. E, at 14).  Although Mr. Doe denied saying this, both Ms. Roe and Witness-2 confirmed it.  (ECF Nos. 2, 6, Ex. E, at 14).  This is corroborated by Mr. Doe's testimony that he consumed 10 beers that night, as well as other evidence regarding his intoxication, and Ms. Roe's description of Mr. Doe's mumbling and blank stares.  (ECF Nos. 2, 6, Ex. E, at 14-15).

Ms. McGinn further considered possible motives Ms. Roe had to harm Mr. Doe, but found that there was no evidence to support any such motive.  (ECF Nos. 2, 6, Ex. E, at 12-13).  For instance, Ms. Roe described a measured approach to pursuing action against Mr. Doe based on a desire to be sure about her own understanding and feelings about the interaction before bringing a

charge as severe as sexual assault. (ECF Nos. 2, 6, Ex. E, at 13).  She further testified about the external factors that ultimately led her to make various reports, rather than her own "obsessing" or a vendetta against Mr. Doe, e.g. speaking with the fraternity president because others had already reported the conduct and proceedings were underway, and filing the police report at the urging of her parents. (ECF Nos. 2, 6, Ex. E, at 13).

Ultimately, when weighing all the evidence presented, Ms. McGinn concluded that it was more likely than not that Mr. Doe penetrated Ms. Roe while she was sleeping, in violation of the Sexual Assault Policy. (ECF Nos. 2, 6, Ex. E, at 15).  Based on this finding, Ms. McGinn sanctioned Mr. Doe to expulsion from the University based upon the severity of the violations, the impact on the complainant, and concerns over protecting the University community. (ECF Nos. 2, 6, Ex. E, at 15).  In particular, Ms. McGinn concluded that because Mr. Doe had penetrated Ms. Roe while she was sleeping, this violation of Ms. Roe's bodily integrity when she was incapacitated could be deemed violent and thus pose a threat to the community. (ECF Nos. 2, 6, Ex. E, at 15-16).

### Mr. Doe's Appeal of the Decision

Mr. Doe appealed Ms. McGinn's decision by submitting a 48-page appeal with 42 pages of additional exhibits. (ECF Nos. 2, 5, Ex. C).  He sought to overturn the decision on all four bases for appeal set forth in the Sexual Misconduct Procedures, including that there were procedural irregularities, based upon new evidence, that the hearing officer has a bias, and that the sanction was substantially disproportionate. (ECF Nos. 2, 5, Ex. C; Sexual Misconduct Procedures, at VI.D.9).  Under the Sexual Misconduct Procedures, an appeal involving a student respondent is reviewed by "a panel of trained Appellate Hearing Officers known as the University Senate Student Conduct Committee," who are tasked with affirming the determination, overturning the

determination, affirming the determination but modifying the sanction, or remanding to remedy procedural errors or bias, or consider new evidence.  Sexual Misconduct Procedures, at VI.D.9.

The appellate hearing officers (the "appellate board") for Mr. Doe's appeal consisted of one University staff member and two faculty members (ECF Nos. 2, 7, Ex. T, at 1).  After reviewing the record and meeting twice to consider Mr. Doe's appeal, the appellate board affirmed the determination that Mr. Doe was responsible for violating the Sexual Assault Policy, but reduced the expulsion to a one-year suspension.  (ECF Nos. 2, 7, Ex. T, at 4).  The appellate board concluded that there were no "procedural irregularities" as defined by the policy, the "new" evidence Mr. Doe submitted for consideration was not new but was available during the investigation and Mr. Doe failed to submit it, and there was no evidence of bias by the hearing officer.  (ECF Nos. 2, 7, Ex. T, at 4-8).

However, the appellate board concluded that although expulsion is a typical sanction for Mr. Doe's violation, the hearing officer did not analyze some of the factors that should be considered in determining a sanction, as set forth in the Sexual Misconduct Procedures. (ECF Nos. 2, 7, Ex. T, at 9).  These factors include the nature and degree of violence involved in the conduct, the impact of the conduct on the community, and the respondent's prior relevant misconduct. Sexual Misconduct Procedures at VI.C.8.c.  The appellate board concluded that, in their view, the incident did not pose a significant impact on the community, Mr. Doe had no prior history of misconduct, and the incident did not involve significant violence because it began as consensual, and Mr. Doe ceased non-consensual activity when pushed away.  As a result, the appellate board concluded that a one-year suspension, with continuance of a no-contact order prohibiting contact with Ms. Roe, and education regarding consent in sexual relationships would appropriately

"maintain a safe and respectful environment" and protect the University community.  (ECF Nos. 2, 7, Ex. T, at 9).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(a), a court may issue a preliminary injunction upon the requisite showing at a hearing.  A preliminary injunction seeks to "preserve[s] the status quo pending a final trial on the merits," and thus will stand in effect for an "indefinite duration." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999).  As such, it is "an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A plaintiff must make a clear showing of entitlement to such relief.  *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

To obtain preliminary injunctive relief, plaintiff must establish four factors: (1) that he is "likely to succeed on the merits;" (2) that he is "likely to suffer irreparable harm" absent injunctive relief; (3) "that the balance of equities tips in his favor;" and (4) that injunctive relief is in the "public interest."  Winter, 555 U.S. at 20; *see also WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).  Injunctive relief "should be nor more burdensome to the defendant than necessary," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994), and a court should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.

## ARGUMENT

### I.   PLAINTIFF HAS FAILED TO ESTABLISH THE LIKELIHOOD OF SUCCESS ON THE MERITS.

Injunctive relief should be denied because plaintiff cannot establish that his Title IX claim is likely to succeed on the merits.  In contradistinction with the plausibility standard applicable to a determination of the sufficiency of a pleading, to warrant issuance of this extraordinary relief,

plaintiff must make a clear showing that he is likely to succeed at trial in this matter, i.e., "'the burdens at the preliminary injunction stage track the burdens at trial.'" (citations omitted). *Doe v. Wake Forest Univ.*, No. 1:23-cv-001114, 2023 WL 2239475, at *4 (M.D.N.C. Feb. 27, 2023) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006)). In evaluating whether plaintiff has met this high bar, the "Court does not sit as a super-school disciplinary appeal board," and thus its task is not to decide if the university's "disciplinary decision in favor of Jane rather than John was 'correct,' but rather much more specifically to decide if the University violated any Federal law in its discipline of the Plaintiff." *Id.*

Title IX of the Education Amendments of 1972 provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. The Supreme Court has recognized a private right of action against fund recipients for Title IX violations committed by the fund recipients. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 639-40 (1999). Since the private right of action under Title IX is judicially implied, the United States Supreme Court has limited the right so that it comports with the goals of the Title IX statute. *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 284 (1998). As a result, a fund recipient may only be held liable under Title IX for its own misconduct and cannot be held vicariously liable for the misconduct of others. *Davis*, 526 U.S. at 640.

In considering Title IX claims like the one at bar, which seek to challenge student disciplinary decisions, the Fourth Circuit does not apply a "doctrinal framework" which categorizes the type of discrimination and sets forth the requirements to prove each category. *Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 235-36 (4th Cir. 2021). Instead, courts in this Circuit must weigh the evidence to determine if the defendant discriminated on the basis of

sex.  *Id*.  Critical to this analysis is that a plaintiff must establish "a causal link between the student's sex and the university's challenged disciplinary proceeding."  *Id*. at 236.  Importantly, "[n]ot just any causal link will suffice;" a plaintiff must establish "but-for" causation.  *Id*.

Nevertheless, the Fourth Circuit recognizes that the categories set forth by other Circuits may be considered as ways to show that a defendant discriminated on the basis of sex.  *Id*. (finding "no inherent problems with the erroneous outcome and selective enforcement theories" because, "[i]n fact, either theory, with sufficient facts, may suffice to state a plausible claim"); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019) ("All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student.").  One way in which a Title IX challenge is made to a university disciplinary proceeding is through the erroneous outcome theory.  "In an erroneous outcome case, 'the claim is that the plaintiff was innocent and wrongly found to have committed an offense' on the basis of gender bias."  *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 765 (D. Md. 2015) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

A plaintiff like Mr. Doe, who proceeds on an erroneous outcome theory, must "allege and prove that he 'was innocent and wrongly found to have committed an offense' and that there is a causal connection between the flawed outcome and sex bias."  *Frierson v. Shaw Univ.*, No. 5:21-CV-45-D, 2023 WL 3571924, at *4 (E.D.N.C. May 19, 2023) (quoting *Yusuf*, 35 F.3d at 715); *see also Doe v. Maryland*, No. CV ELH-20-1227, 2021 WL 1174707, at *22 (D. Md. Mar. 29, 2021) (quoting *Yusuf*, 35 F.3d at 715).  The first element requires a showing that the proceeding was "procedurally or otherwise flawed," and that the outcome was "erroneous," *Doe v. Salisbury*, 123 F. Supp. 3d 748 (D. Md. 2015).  This "'can be satisfied by (1) pointing to procedural flaws in the investigatory and adjudicative process, (2) identifying inconsistencies or errors in the findings, or

(3) challenging the overall sufficiency and reliability of the evidence.'" *Doe v. Maryland*, 2021 WL 1174707, at *22 *(quoting Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 607 (E.D. Va. 2019), *aff'd*, 832 F. App'x 802 (4th Cir. 2020)).  Although at the pleading stage this only requires a showing of "articulable doubt on the accuracy of the outcome of the proceeding," *Doe v. Maryland*, 2021 WL 1174707, at *22 (quoting *Yusuf*, 35 F.3d at 715), to warrant an injunction, plaintiff must show that he is likely to succeed in establishing this at trial. *Doe v. Wake Forest Univ.*, 2023 WL 2239475, at *4.

In addition to demonstrating that the proceeding was flawed and erroneous, plaintiff must also establish that the flaws and outcome were motivated and caused by gender bias.  To satisfy this element, "a plaintiff must do more than merely rely on 'a conclusory allegation of gender discrimination." *Doe v. Salisbury Univ.*, 123 F. Supp. 3d at 766 (quoting *Yusuf*, 35 F.3d at 715). Instead, a plaintiff must show "that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 185 (D.R.I. 2016) (citation omitted).  This requires "sufficiently particularized" facts, which may include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*  Such evidence must do more than merely show bias in favor of alleged victims. *Doe v. Maryland*, 2021 WL 1174707, at *29 (holding that "courts have repeatedly found that alleged bias in favor of victims and against those accused of misconduct is not evidence of gender bias.").  Importantly, those involved in a university's disciplinary process are "entitled to a presumption of honesty and integrity," and thus, anything short of "a showing of actual bias" will not suffice. *Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 256 (6th Cir. 2005); *see also Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250, 254 (8th Cir. 1985) ("With respect to the claim of bias, we

observe that the committee members are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven.").

As demonstrated below, plaintiff has failed to demonstrate the requisite showing that he is likely to succeed on both of these elements.

### A. The Disciplinary Proceeding Was Not Flawed and Did Not Result in an Erroneous Outcome.

Plaintiff has not demonstrated he is likely to succeed in establishing the disciplinary proceeding was flawed and that did not commit a sexual assault.  Plaintiff seeks to demonstrate his likelihood of success in two ways, i.e., by attacking the sufficiency and reliability of the evidence presented in the disciplinary proceeding, and pointing to what he believes were procedural flaws in the investigatory and adjudicative process.  Both of these strategies fail because they focus entirely on the investigation and disciplinary hearing.  Nowhere in plaintiff's motion for temporary restraining order and preliminary injunction does he attack the findings of the appellate board.  Only one paragraph in plaintiff's 153-paragraph complaint criticizes the appellate board, but merely complains that the appellate board affirmed Ms. McGinn's findings "[w]ithout reviewing the video recording of the hearing or a transcript."  Compl. ¶ 110.  However, there is no policy or procedural requirement that the recording of the hearing be reviewed on appeal.  Nor is there any policy provision which allows for *de novo* review.  To the contrary, the Sexual Misconduct Procedures sets forth the specific grounds upon which an appeal may be based.  Sexual Misconduct Procedures at VI.C. 9.a.  Importantly, under the University's Sexual Misconduct Procedures, "[t]he written decision by the Appellate Hearing Officer(s) is final and is not subject to further appeal."  Sexual Misconduct Procedures at VI.C. 9.c.viii.  Thus, despite plaintiff's numerous complaints about the earlier stages of the disciplinary process, he makes virtually no

16

challenge to the only disciplinary decision against him that was final and that ultimately resulted in his sanction.  Because he has failed to demonstrate that the appellate board's decision was flawed or erroneous, he cannot establish the likelihood of success.

Notwithstanding this failure, plaintiff's two lines of attack on the investigatory and adjudicatory process similarly fail to demonstrate that the disciplinary process was flawed and resulted in an erroneous outcome.  Plaintiff's reliance on a series of purported inconsistencies misconstrues the evidence and fails to show that the preponderance standard was not met.  (ECF No. 2, at 5-6).  For instance, Ms. Roe's statements that she felt scared or unsafe after the sexual assault, but stayed in the bed with Mr. Doe, and then later exited Mr. Doe's room but came back again.  (ECF No. 2, at 5-6).  Similarly, the fact that Ms. Roe knew the definitions of consent and sexual assault but did not apply them to her assault initially.  (ECF No. 2, at 5-6).  Critical to the analysis here is that these inconsistencies were raised during the hearing, both by plaintiff's counsel and the hearing officer, and Ms. Roe explained that she had difficulty processing what had occurred and thus did not make those associations in the immediate aftermath of the incident.  (ECF Nos. 2, 6, Ex. E, at 12-14).  When the hearing officer weighed all the evidence, including Ms. Roe's consistent description of the assault, Mr. Doe's corroboration of parts of that conduct, Mr. Doe's credibility issues, and other corroborating evidence, she determined that despite these inconsistencies, it was still more likely than not that plaintiff sexually assaulted Ms. Roe.  (ECF Nos. 2, 6, Ex. E, at 12-14).  The fact that plaintiff disagrees with this finding is understandable, but much more is required to show that the evidence was unreliable or insufficient.

Similarly deficient is plaintiff's argument that there were procedural flaws in the investigation and hearing.  He claims the investigators failed to interview relevant witnesses including members of Mr. Doe's fraternity and an "outcry" witness whom Ms. Roe allegedly told

about the incident.  (ECF No. 2, at 9-10).  As demonstrated above, plaintiff raised this precise argument in his appeal and the appellate board rejected it.  (ECF Nos. 2, 7, Ex. T, at 5).  Investigators are tasked with gathering evidence "sufficient to reach a determination regarding responsibility."  Sexual Misconduct Procedures, at VI.C.5.  The investigators, Ms. Brennan and Ms. Stafiej, did precisely that.  They interview Ms. Roe, as well as the first three people Ms. Roe reported the sexual assault to, i.e. Witness-1, Witness-2, and Witness-3, two of whom were present at the fraternity event preceding the incident and who had relevant information about the events leading up to the incident and shortly thereafter.  (ECF Nos. 2, 4, Ex. B, at 3-4; Compl. ¶¶ 50).  Ms. Brennan and Ms. Stafiej gathered additional evidence including photographs from the night of the incident and contemporaneous text messages.  (ECF Nos. 2, 3, Ex. A).  Then, after putting all of their findings into a report, gave Mr. Doe an opportunity to request witnesses or other evidence to be part of the investigation, but Mr. Doe did not avail himself of this opportunity.  (ECF Nos. 2, 4, Ex. B, at 4, 15).  His own failure does not support a finding that the investigation was flawed in any way.

Plaintiff's argument that there were procedural flaws in the hearing itself is equally unavailing.  Plaintiff claims that Ms. McGinn deviated from policy by questioning the parties herself.  However, as held by the appellate board, there is no provision in the policy prohibiting the hearing officer from conducting questioning.  In fact, "the hearing officer has "discretion to determine the structure of the Hearing and how questioning is conducted."  Sexual Misconduct Procedures, at VI.D.3.  Importantly, because Ms. McGinn questioned all parties and witnesses, and because Mr. Doe was represented by counsel during the proceeding and was able to conduct cross-examination, plaintiff has not shown that this impacted the ultimate decision in any way.  This is true as well for plaintiff's argument that Ms. McGinn inappropriately asked leading

questions.  The structure of the hearing is not bound by the formal procedural rules of a civil or criminal trial.  *See* Sexual Misconduct Procedures, at VI.D.6.a.

Contrary to plaintiff's assertion, Ms. McGinn's decision was sufficiently supported by the evidence presented.  She considered the testimony of Ms. Roe and Mr. Doe, as well as the three witnesses, and credited testimony that was corroborated or supported by other testimony or evidence.  She further considered facts that could discredit the witnesses, particularly Ms. Roe and Mr. Doe, such as inconsistencies in their statements.  She sought to further assess Ms. Roe's veracity by inquiring about any motives she had to lie, which, notably, she did not do for Mr. Doe.  *See Yusuf*, 35 F.3d at 715 (noting that a "motive to lie on the part of a complainant or witnesses" may support a finding that the outcome of the proceeding was erroneous).  Accordingly, plaintiff has failed to demonstrate the likelihood of establishing that there were procedural flaws which resulted in an erroneous outcome.

### B.       The Disciplinary Proceeding and Outcome Were Not Motivated by Gender Bias.

Although plaintiff has not established the likelihood that he will succeed in establishing that the disciplinary proceeding was flawed and resulted in an erroneous outcome, he has also failed to demonstrate that the proceeding and outcome were motivated by gender bias.  Plaintiff attempts to demonstrate gender bias by pointing to statements by University officials purportedly evidencing gender bias, and by pointing to the University's purported bias and external pressures on the University to render biased decisions.  (ECF No. 2-1, at 14-15).  Although this type of evidence may sometimes support a finding of bias, plaintiff has failed to show that the individuals or University were biased, that there were such external pressures on the University, and, perhaps most importantly, that the purported bias was a motivating factor in the decision to discipline him.  *See Doe v. Brown Univ.*, 166 F. Supp. 3d at 185.

Plaintiff incorrectly argues that Ms. McGinn has expressed gender bias in her public statements, social media posts, and a podcast to which she contributes.  (ECF No. 2-1, at 11).  However, even a cursory look at these statements, posts, and social media comments reveals that they fall far short in meeting his burden to demonstrate bias.  Specifically, plaintiff cites to a December 2022 statement where Ms. McGinn stated that increased numbers of sexual misconduct complaints "are often a good thing—it means survivors are feeling empowered to speak up."  (ECF No. 2-1, at 11).  This comment is facially gender-neutral and shows no bias in favor of women over men.  Plaintiff suggests that use of the term "survivor" presupposes that reports of misconduct are true.  (ECF No. 2-1, at 11).  While this claim is unsupported and should be rejected, even if it were true, at most it shows a bias in favor of complainants over respondents, but not gender bias.  *Doe v. Maryland*, No. 2021 WL 1174707, at *29 (holding that "courts have repeatedly found that alleged bias in favor of victims and against those accused of misconduct is not evidence of gender bias."); *see also Haley v. Virginia Com. Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (rejecting allegations which "at best reflect a bias against people accused of sexual harassment and in favor of victims and indicate nothing about gender discrimination.").

Similarly, plaintiff points to a podcast to which Ms. McGinn contributes, entitled "The Title IX and Civil Rights Podcast," and specifically to a comment that Title IX advisors come from different perspectives, including from the "perspective of respondent education, or men's education."  (ECF No. 2-1, at 11).  Plaintiff appears to suggest that mention of the phrase "men's education" alone somehow evidences bias.  He further suggests that mention of the "#MeToo movement" demonstrates bias.  However, courts have specifically rejected these types of references as evidence of bias.  *See Doe v. Fairfax Cnty. Sch. Bd.*, 403 F. Supp. 3d 508, 518 (E.D.

Va. 2019) (rejecting as evidence of bias Title IX training materials which mention "the '#MeToo Movement' and the accompanying media attention.").

In further support of this, plaintiff's counsel, Mr. Seidel, submitted a declaration attesting to what he heard Ms. McGinn say in an October 2022 podcast and a YouTube video. (ECF No. 2-5, at 4). Glaringly, despite Mr. Seidel's declaration, neither of these statements shows any bias whatsoever. The October 2022 statement merely described Ms. McGinn's background working in corporate fraud investigations and then providing safe sex and anti-discrimination training, and being able to "join" those two experiences when "the #MeToo movement started happening and suddenly everyone was paying a lot more attention to these issues," and she had a chance "to be an outside investigator but working in this area of anti-discrimination and combating sex and gender violence." (ECF No. 2-5, at 4). Ms. McGinn's background is hardly evidence of bias; neither is the fact that her work as an investigator in gender discrimination matters coincided with the #MeToo movement.

Similarly, Mr. Seidel attests to viewing to a YouTube video in which Ms. McGinn discusses that women had "been barred from fully engaging in educational spaces" until Title IX was passed, and that "the reason we handle sexual violence under Title IX is because sexual violence is a form of gender discrimination that impacts how a person can experience and engage in their education." (ECF No. 2-5, at 4-5). It's unclear how this uncontroversial statement about Title IX demonstrates any bias whatsoever.

Perhaps most glaringly, Mr. Seidel further cites Ms. McGinn's statement that she "really do[es] believe we need to ensure all students, teachers, and educational staff are not only protected from identity-based discrimination but affirmed and welcomed in their schools and workplaces." (ECF No. 2-5, at 5). This affirmative gender-neutral statement about ensuring "all students" are

not discriminated against should end the analysis, as it clearly demonstrates that Ms. McGinn does not have a gender bias.

Plaintiff's assertion that these statements show bias falls far short, and courts have appropriately rejected precisely these type of assertions.  The Sixth Circuit, for instance, plainly rejected as evidence of bias the fact that a member of an administrative hearing panel researches "feminist criminological theory," and was "affiliated with the Women's, Sexuality, and Gender Studies program and Miami University," or that another member researches "student alcohol consumption and sexual assault from the perspective of protecting females from males." *Doe v. Miami Univ.*, 882 F.3d 579, 593 fn. 6 (6th Cir. 2018).  "Merely being a feminist, being affiliated with a gender-studies program, or researching sexual assault does not support a reasonable inference than an individual is biased against men." *Id.*

Plaintiff makes a similarly deficient claim of bias by Ms. Brennan, one of the University's investigators, and Angela Nastase, the University's Title IX coordinator.  (ECF No. 2-1, at 13).  Plaintiff points to a comment Ms. Brennan and Ms. Nastase made thanking a speaker from the Association of Title IX Administrators for his "[g]reat session," and "fascinating" discussion.  (ECF No. 2-1, at 13).  Support for Title IX training can hardly be considered evidence of bias.  Although plaintiff critiques the substance of the training, which discussed a "man in a box" theory, such training is akin to research into a particular issue and therefore does not evidence bias.  *See Doe v. Miami Univ.*, 882 F.3d at 593 fn. 6.  Plaintiff also relies upon allegations in another lawsuit claiming Ms. Nastase was accused of gender bias favoring female students.  (ECF No. 2-1, at 14) (citing *Doe v. University of Maryland, College Park*, No. 8:22-cv-00872-PX).  Notably, the underlying disciplinary proceeding in that matter resulted in a finding that the male respondent was not responsible.  In any event, unproven allegations in a complaint are insufficient to meet

22

plaintiff's burden to show that he is likely to succeed in establishing bias by Ms. Nastase. *Doe v. Salisbury Univ.*, 123 F. Supp. 3d at 766 (quoting *Yusuf*, 35 F.3d at 715) (holding that "a plaintiff must do more than merely rely on 'a conclusory allegation of gender discrimination.'"). Moreover, since Ms. Nastase was not the investigator or hearing officer, did not serve on the appellate board, and there is no other evidence connecting her to the decisions to discipline plaintiff, this lawsuit certainly fails to demonstrate the requisite causation. *Cf. Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016) (holding that an investigator's bias could be deemed to influence a decision-maker's decision to sanction the respondent where the investigator's report advocated for disciplining the respondent).

The only individual comment that even comes close to suggesting bias is a social media post by Ms. Brennan in which she shared a "meme" created by someone else stating, in support of National Women's Day, "I think women are foolish to pretend they are equal to men, they are far superior and always been." (ECF No. 2-1, at 13). However, a comment like this from an investigator rather than a decision-maker, taken by itself, is insufficient even to meet the plausibility standard, let alone the likelihood of success. *See Doe v. Maryland*, 2021 WL 1174707, at *28 (discussing the deficiency of a pleading that "offers no statements by any of the relevant decisionmakers exhibiting anti-female bias or any other evidence of bias."). Importantly, even if such a statement showed bias, it still lacks particularized facts showing "a causal connection between the flawed outcome and gender bias." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

Plaintiff also attempts to demonstrate bias by stating that there are political or other external pressures on the University to find male respondents responsible for sexual misconduct. (ECF No. 2-1, at 15). He bases this on student surveys between 2020 and 2022 which reflect that a larger

23

percentage of students believed sexual assault is a problem at the University and that the University would not respond fairly.  (ECF No. 2-1, at 15).  He further cites a news article noting a disparity between the number of reports of sexual misconduct and the number of investigations the University conducted.  (ECF No. 2-1, at 15-16).  Finally, he points to the fact that the University has pending Title IX investigations with the Department of Education's Office for Civil Rights, which is more than other universities in Maryland.  (ECF No. 2-1, at 16).  This "evidence" falls far short of demonstrating that he is likely succeed in proving that his disciplinary proceeding was the result of gender bias.

Importantly, the surveys, news article, and Office for Civil Rights investigations fail to show gender bias because they exclusively refer to the University's response to any reports of sexual misconduct, not any particular gender, and thus do not demonstrate "patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.  Indeed, plaintiff concedes this when he says that he "expects discovery will show that all or nearly all the sexual assault cases handled by College Park involve a female complaint and male respondent."  (ECF No. 2-1, at 15).  However, courts have rejected as evidence of gender bias the fact that all or most of the sexual misconduct cases involve a male respondent.  *Doe v. Fairfax Cnty. Sch. Bd.*, 403 F. Supp. 3d at 518 (holding that although "Plaintiff points to the fact that almost all of the sexual-harassment cases appealed to the School Board since November 2010 have involved male-student aggressors, [] courts have rejected this kind of statistical evidence as sufficient to establish intentional gender discrimination."); *see also Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 929 (S.D. Iowa 2018), aff'd, 979 F.3d 1184 (8th Cir. 2020) (holding that "[c]ourts have declined to infer a gender-biased motive on the part of university officials from the disparity in gender among

those who are accused of sexual assault, noting that schools are not responsible for which students choose to report sexual misconduct.").

Moreover, to the extent this evidence demonstrates anything, it is that there is pressure on the University to be vigilant in its Title IX enforcement regardless of the gender of the parties involved. Indeed, courts have cautioned that this is in fact "prudent advice for school officials tasked with handling sexual harassment allegations, and nothing in them suggests that school officials should enforce the school's Title IX obligations discriminatorily against male students." *Doe v. Fairfax Cnty. Sch. Bd.*, 403 F. Supp. 3d at 518-19.

By contrast, cases where statistical evidence supported an inference of bias were far more particularized. In *Doe v. Miami University*, the plaintiff asserted that every male student at Miami University accused of sexual misconduct in a particular year was found responsible for the alleged violation. *Doe v. Miami Univ.*, 882 F.3d at 587. The court held that this specific allegation, considered with evidence of external pressures on the University, supported a reasonable inference of bias to overcome a motion to dismiss. *Id*. at 593. Furthermore, in *Doe v. Baum*, the court held that external pressures on the university to improve their response to female complainants did not give rise to a plausible inference of bias without other allegations demonstrating bias against males in the disciplinary proceeding at issue. *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). This allegation alone did not give rise to a plausible inference of bias to defeat a motion to dismiss, but was sufficient when considered with other evidence of bias against males in the disciplinary proceeding, such as discrediting all male witnesses. *Id*.

Generalized pressures and statistics are frequently held to be insufficient to show bias. In *Kashdan v. George Mason University*, the court held that "while pressure from the Department of Education or the general campus climate is relevant, it does not suffice by itself to plausibly allege

sex discrimination in a particular instance." *Kashdan v. George Mason Univ.*, 70 F.4th 694, 701 (4th Cir. 2023). Similarly, in *Doe v. Brown University*, the court cited examples of this type of evidence that may demonstrate bias, such as "evidence that women accused of other [university] rules violations are treated differently than men are." *Doe v. Brown*, 166 F. Supp. 3d at 187–88 (internal quotations and citations omitted). Indeed, "the best information for discerning whether alleged discrimination was based on the plaintiff's gender as opposed to his status as an accused student is … what are the overall outcomes of such cases and, more specifically, how have cases been handled in which the accused student is female and/or the alleged victim is male? *Id*.

Contrary to plaintiff's generalized assertions, University data clearly demonstrates that the University does not discriminate based upon gender in its treatment of sexual misconduct matters. As demonstrated in the attached declaration of Angela Nastase, data from July 1, 2022 to June 30, 2023 shows that there were 378 reports of sexual misconduct, 32 of which resulted in a formal complaint. Nastase Decl., Ex. A. Of those that resulted in a formal complaint, 12.4% involved a female complainant and a male respondent, and 11.1% involved a male complainant and a female respondent. Nastase Decl., Ex. A. In other words, the data demonstrates that the University treats male and female respondents equally with respect to reports of sexual misconduct.

Furthermore, between July 1, 2019 and the present, the University received a total of 67 formal complaints of sexual misconduct that fall under the University's Policy on Sexual Assault and Other Sexual Misconduct. Nastase Decl., Ex. A. Of those formal complaints, 87% involved male respondents; 8% involved female respondents, and 1% involved respondents with non-binary gender identification. Nastase Decl., Ex. A. To look at this data differently, 82.1% involved a female complainant against a male respondent; 7.5% involved a male complainant against a female respondent; 3% involved a male complainant against a male respondent; 4.5% involved a female

complainant against a female respondent; and other permutations accounted for approximately 3%.  Nastase Decl., Ex. A.  Based on these numbers alone, although a majority of sexual misconduct cases involved a female complainant against a male respondent, that certainly did not account for all of the cases and thus defeats plaintiff's reliance on an assumption that all cases involved a female complainant and a male respondent.

Most relevant to the question of bias is that the resolution of these formal complaints clearly demonstrates that there is no bias against male respondents in these proceedings.  In cases involving a female complainant and a male respondent, 30.9% resulted in a finding of responsible, and 56.4% resulted in dismissal or a finding of not responsible.  Nastase Decl., Ex. A.  In cases involving a male complainant and female respondent, 40% resulted in a finding of responsible, and 40% resulted in dismissal or a finding of not responsible.  Nastase Decl., Ex. A.  Looking only at formal complaints involving allegations of sexual assault or attempted sexual assault involving female complainants against male respondents, only 30.3% of male respondents were found responsible, while 66.7% of such complaints resulted in dismissal or a finding of not responsible.  Nastase Decl., Ex. A.  This data demonstrates that, contrary to plaintiff's unsupported assertions, male students are not treated differently than female students with respect to complaints of sexual misconduct.

In addition, to further undercut any claim of bias by Ms. McGinn in the disciplinary proceeding, out of the 12 cases Ms. McGinn has handled for the University, 9 involved a female complainant against a male respondent and Ms. McGinn found the respondent responsible in 66.7% of those cases.  Nastase Decl., Ex. A.  By contrast, the other 3 cases she handled involved a male complainant against a female respondent and Ms. McGinn found all three respondents responsible, i.e., 100%.  These numbers are consistent with the outcomes of Dan Schorr, another

hearing officer who has handled 15 cases falling under the University's sexual misconduct policy. Nastase Decl., Ex. A.  Based upon this conclusive evidence, plaintiff has not demonstrated that he is likely to succeed in establishing that the University's decision to discipline him was motivated by gender bias.

## II.   THE BALANCE OF EQUITIES WEIGHS AGAINST AN INJUNCTION.

Even if plaintiff could establish the likelihood of success on the merits, the injunction should still be denied because the balance of equities weighs against an injunction.  Although plaintiff argues that the University will only suffer temporary interference with its process and sanction if the injunction is granted, this overlooks the University's interests.  (ECF No. 2-1, at 19).  Granting the injunction "would immediately impair [the University's] ability to carry out a suspension enacted after its full disciplinary process that it believes protects [the complainant] and its broader community and ensures respect for its rules." *Doe v. Wake Forest Univ.*, 2023 WL 2239475, at *10.  The University has a significant interest in upholding and enforcing its student conduct policies, regardless of how far along the student is in an academic program or how achieving the student has been.  As the appellate board held in Mr. Doe's appellate proceeding, the suspension is needed to "maintain a safe and respectful environment conducive to working and learning," and further ensures "the protection of the University community" due to Mr. Doe's time away from campus.  (ECF Nos. 2, 7, Ex. T, at 9).  Accordingly, plaintiff has not demonstrated that that the balance of the equities favors granting the injunction.

## III.   PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

In addition, plaintiff cannot establish that will suffer irreparable harm if the injunction is denied.  Plaintiff must show that the harm he will face cannot be compensated by damages or other corrective relief. *Doe v. Wake Forest Univ.*, 2023 WL 2239475, at *8.  Indeed, "[m]ere injuries,

however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Plaintiff alleges that his reputation, education, and future career will be harmed if his education is delayed and he loses potential employment as a result. However, numerous courts have held that this is precisely the type of "economic harm that can be compensated by a monetary award so it is not 'irreparable.'" *Doe v. Wake Forest Univ.*, 2023 WL 2239475, at *9 (citing cases). Any gap in his resume as a result of his suspension could similarly be ameliorated, for instance, if plaintiff would be awarded equitable relief directing the University to grant him his degree as if earned prior to his suspension. *Id.* As a result, plaintiff has not demonstrated that he will suffer "irreparable harm" if the injunction is denied.

IV.   **GRANTING AN INJUNCTION IS AGAINST THE PUBLIC INTEREST.**

In addition to plaintiff's failure to demonstrate all of the other elements warranting issuance of an injunction, he has also failed to demonstrate that the injunction is in the public interest. To the contrary, there is a strong public interest against an injunction in this case. Specifically, because the University is a public institution, the public has an interest in ensuring that the University comports with its Title IX obligations and upholds and enforces its policies. Indeed, "[a]n injunction would likely discourage Title IX complainants from coming forward, placing the entire Title IX process at [the University] in doubt. . . . The public would not be benefited by an injunction." *Doe v. Bd of Trustees of Whitman Coll.*, No. 4:23-CV-05051-MKD, 2023 WL 3316893, at *11 (E.D. Wash. Apr. 25, 2023). Plaintiff argues that the public has an interest in ensuring that public institutions of higher education follow federal law and Title IX. (ECF No. 2-1, at 20). The University agrees with this, but by preventing the disciplinary process, including a sanction, from going into effect, plaintiff impedes that process. Thus, the very public interest

29

plaintiff identifies in fact weighs against the injunction he is seeking. Accordingly, the injunction

is not in the public interest and should be denied.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Ariel Lichterman

_____
ARIEL LICHTERMAN
Federal Bar No. 20850
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 17th Floor
Baltimore, Maryland 21202
alichterman@oag.state.md.us
(410) 576-6459
(410) 576-6437 (facsimile)

January 9, 2024                    Attorneys for Defendant University of
                                   Maryland, College Park

## CERTIFICATE OF SERVICE

I certify that, on this 9th day of January, 2024, the foregoing memorandum in opposition to motion for preliminary injunction was served by CM/ECF on all registered CMF users on the following:

> William Nelson Sinclair, Esq.
> Patrick Seidel, Esq.
> Todd W. Hesel, Esq.
> Silverman Thompson Slutkin White
> 400 East Pratt Street, Suite 900
> Baltimore, Maryland 21202
> bsinclair@mdattorney.com
> pseidel@silvermanthompson.com
> thesel@silvermanthompson.com

/s/ Ariel Lichterman

_____

Ariel Lichterman

31