IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JOHN DOE**, | * |
| *Plaintiff*, | * |
| v. | *   Civil No. RDB-23-03507 |
| **UNIVERSITY OF MARYLAND, COLLEGE PARK** | * |
| | * |
| *Defendant*. | |
| | * |

**REPLY IN FURTHER SUPPORT OF PLAINTIFF
JOHN DOE'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff John Doe ("Plaintiff"), through undersigned counsel, submits this reply in further support of his motion for a preliminary injunction (ECF No. 2) and states as follows:

**REPLY ARGUMENT**[1]

College Park acknowledges that a Plaintiff advancing an erroneous outcome theory under Title IX has multiple avenues of proof. (*See* ECF No. 23 at 19–20). "[C]asting articulable doubt on the accuracy of the outcome[] **is not a significant barrier**" and can be done by "(i) pointing to procedural flaws in the investigatory and adjudicative processes, (ii) noting inconsistencies or errors in the adjudicator's oral or written findings, or (iii) challenging the overall sufficiency and reliability of the evidence." *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018) (emphasis added). Similarly, the necessary causal connection between the flawed outcome and gender bias may be shown by a variety of evidence including: (i) "statements by members of the

---

[1] In this Reply, Doe focuses exclusively on the element of likelihood of success on the merits because the Court has already ruled in his favor on the other three factors. If the Court wishes to revisit any of those factors, counsel will be prepared to address them at the hearing.

disciplinary tribunal" and other "pertinent university officials," (ii) "patterns of decision-making" or (iii) "policies and procedures that are designed to reach gender-specific outcomes." *Id.* at 585.

Doe's opening memorandum details how evidence available at this early stage of the litigation satisfies each element in multiple ways. (*See* ECF No. 2-1 at 9–10). College Park's response provides no reason to either have confidence in the outcome of the disciplinary proceeding or to doubt the influence of gender bias in reaching that outcome.

College Park first argues that Doe cannot show an erroneous outcome because he does not "attack the findings of the appellate board." (ECF No. 23 at 21). But there is no requirement that he do so. Indeed, this portion of the brief cites no legal authority and cases cited elsewhere make no mention of the appeal process, let alone require that it be "attack[ed]." (*See id.* at 19–20 (quoting *Doe v. Maryland*, No. CV ELH-20-1227, 2021 WL 1174707, at *22 (D. Md. Mar. 29, 2021))). A plaintiff may show an erroneous outcome without reference to the appeal. *See, e.g.*, *Marymount Univ.*, 297 F. Supp. at 584 (concluding that plaintiff adequately alleged an erroneous outcome based on procedural irregularities and evidentiary deficiencies during the investigation and initial adjudication).

It is hardly surprising that College Park's appellate board affirmed the responsible finding given the extremely limited grounds on which an appeal may be based, (*see* ECF No. 2-6 at 35–36, § VI.D.9), and the appellate board's apparent failure to even review the video or a transcript of the hearing (*see* ECF No. 7 at 4 *sealed*). Despite these limitations, the appellate board *still found error* in the hearing officer's sanction of expulsion based on her unsupported findings that Doe engaged in a "violent act" and was likely to reoffend, and her failure to consider factors favorable to Doe. (*Id.* at 9). The appellate decision thus establishes the very erroneous outcome Doe must prove and also gives reason to believe the error was based on gender bias.

Turning to the inconsistencies in the evidence identified by Doe, College Park argues that they were "raised during the hearing" and that the hearing officer, McGinn, "determined that despite these inconsistencies, it was still more likely than not that plaintiff sexually assaulted Ms. Roe." (ECF No. 23 at 22). But that is Doe's point. McGinn was presented with various red flags in Roe's account—her return to Doe's bed after the alleged incident and her stay in Doe's room until nearly noon, to name a few—yet McGinn disregarded them to find Doe responsible, which is particularly problematic given the presumption of innocence that is supposed to attach here. College Park makes no attempt to unravel the logical knots that McGinn needed to twist to find Roe credible. The disconnect between the evidence and the decision is therefore grounds for finding an erroneous outcome. *See Marymount Univ.*, 297 F. Supp at 585 (finding that plaintiff adequately alleged erroneous outcome in part because "Roe's behavior immediately following the incident" was "inconsistent with her allegation").

Moving to the procedural flaws in the investigation, College Park defends the investigators as having "gather[ed] evidence 'sufficient to reach a determination regarding responsibility.'" (ECF No. 23 at 23). The investigators, however, were required to do more than collect the minimum evidence necessary to hold Doe responsible. College Park's sexual misconduct policies require investigators to conduct a "prompt, **thorough**, **fair**, and **impartial** investigation" that "objectively evaluat[es] **all inculpatory and exculpatory evidence**." (ECF No. 2-6 at 25, § VI.C.4 (emphasis added)). Investigators are also required to "gather **any available** physical evidence or documents, including prior statements by the Parties or witnesses, communications between the Parties, email messages, text messages, social media materials, and other records, as appropriate and available." (*Id.* at § VI.C.5.b (emphasis added)). That did not happen here; quite to the

3

contrary, the hearing revealed a shocking, unexplained failure by the investigators to comply with these policies, which was ignored by McGinn in reaching her decision.

On the first day of the hearing, Roe testified that she had photographs and text messages from the morning following the fraternity party that had not been provided to the investigators. As to photos, Roe explained that the investigators told her "to send any pictures you have from the night that's [sic] relevant" and that she had complied by sending those she "thought . . . were relevant." As to the missing text messages, which were exchanged with Witness-3 before Witness-3 picked Roe up from her stay with Doe, Roe similarly explained that "[t]his wasn't relevant." (Hrg. Day 1, Pt. 1 at 5:36:50–5:38:30, 5:47:50–5:48:50; Hrg. Day 1, Pt. 2 at 4:05–5:15).[2] Roe's testimony reveals that the investigators improperly allowed *her* to decide what evidence *she* believed was relevant instead of asking for all potentially relevant evidence and "objectively" evaluating it themselves. (*See also* Hr. Day 2 at 2:25:30–2:26:00 ("I decided to look more and think, oh, maybe I can do some investigating myself that the investigators didn't think to ask me about.")).

Testimony by Witnesses 1 and 3 revealed a similar lack of diligence and independent inquiry. Witness-1 admitted that he provided investigators with an incomplete record of his text messages with Doe that omitted his response to text messages Doe had sent him. Although the existence of at least one additional message was evident from the "text bubble" at the bottom of the messages Witness-1 disclosed (*see* ECF No. 3 at 53 *sealed*), the investigators did not follow up. As Witness-1 explained: "They [the investigators] didn't ask me for what I had said [to Doe].

---

[2] Doe cites to the video recording of the disciplinary hearing available to the parties. He will offer the video recording as an exhibit at the upcoming preliminary injunction hearing.

They asked me if I could send them screenshots of what I mentioned in the conversation with them. And I sent it to them, and they said thanks." (Hrg. Day 1, Pt. 2 at 2:52:40–2:52:51).

Witness-3, for her part, testified that when she was arranging to pick up Roe in the morning, she texted another friend to say that she "didn't want to make [Roe] wait there any longer" because Roe "seemed" "uncomfortable." Witness-3 also testified that she and Roe had "been texting a little bit" about Roe's night with Doe and that Roe "didn't really seem like she wanted to talk about [it]." Witness-3 did not provide these text messages to investigators because she "didn't know that [she] had" them until the day before the hearing when she "was kind of gathering [her] thoughts." (Hrg. Day 2 at 13:45–16:30). That explanation is questionable because the text thread Witness-3 provided included additional messages not disclosed (*see* ECF No. 3 at 53 \*sealed\*); regardless, this is yet another instance where the investigators failed to seek available evidence.

The importance of the undisclosed evidence was underscored on the second day of the hearing when, during follow-up questioning, Roe admitted that she determined based on the undisclosed photographs and text messages with Witness-3 that she had been picked up at 11:45 a.m. instead of 9:40 a.m., as she originally testified. Roe also described the undisclosed photos as two Snapchat "selfies" taken while she was waiting outside for Witness-3 to pick her up. (Hrg. Day 2 at 2:06:45–2:08:00, 2:24:35–2:26:00). In this "he said, she said" case, the investigator's failure to identify and collect the available, objective, contemporaneous evidence of Roe's statements and demeanor is inexcusable, particularly when the investigation stretched *well* beyond the 120 days specified by College Park's policy. (*See* Ex. ECF No. 2-6 at 16, § II).

College Park now faults Doe for not "avail[ing] himself of the opportunity" to submit additional evidence (ECF No. 23 at 23), but at the time of the investigation, Doe remained under the threat of criminal prosecution (ECF No. 3 at 39 \*sealed\*) and was thus advised to limit his

5

involvement. Equally important, Doe had no obligation to present evidence proving his innocence. Under College Park's policy, "[t]he burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility **remain with the University** and not with the [p]arties." (ECF No. 2-6 at 25, § VI.C.5.a (emphasis added)).

Equally if not more problematic were the procedural flaws and irregularities during the hearing. While College Park insists that McGinn was not prohibited from asking questions, the policy is clear that "[q]uestioning will be conducted directly, orally, and in real time **by the Party's Advisor only**." (Ex. D at 30 (Procedure VI.D.6.e (emphasis added)). Doe has already addressed how McGinn's questioning was biased toward Roe. (*See* ECF No. 2-1 at 25). Rather than repeat those points, Doe directs the Court to three additional procedural irregularities reflecting McGinn's bias.

First, under § VI(D)(6)(g) of the procedures (ECF No. 2-6 at 30), new information is not allowed during the hearing unless a party demonstrates that the information was not reasonably available at the time of the investigation or the evidence "has significant relevance to a material fact at issue." For evidence that was reasonably available during the investigation, the hearing officer has discretion to consider the information but may "draw a negative inference" from the party's delay. (*Id.*). The hearing officer also has discretion to reopen the investigation to receive new evidence. (*Id.*). McGinn applied this policy inconsistently to benefit Roe.

As detailed above, McGinn allowed Roe and two of her witnesses to describe key text messages and photos that were available at the time of the investigation but not provided to the investigators. In each instance, Roe and the witnesses were allowed to describe and rely on the undisclosed, previously available evidence and nothing in McGinn's written decision indicates that she drew any negative inferences from the belated disclosures. Yet McGinn never saw the

actual evidence being described and expressed no interest in exercising her discretion to obtain the evidence. In fact, when Witness-1 expressly offered to look for and provide his omitted text message(s), McGinn told him: "We're past the point of new evidence."[3] (Hrg. Day 1, Pt. 2 at 2:52:25–2:52:35).

Second, McGinn inconsistently applied the procedures governing sexual history evidence. Under § VI(D)(6)(j), (ECF No. 2-6 at 30–31), a complainant's sexual history is relevant to prove, *inter alia*, "whether consent was present." Doe testified that between the night of the alleged incident and the May 17 confrontation with Roe, a fraternity brother who was then dating Roe, told him that "Roe said that he [the fraternity brother] was better in bed than I was." This testimony was relevant to show that Doe's encounter with Roe was consensual, yet McGinn cut off this testimony, telling Doe: "We do need to just avoid talking [about sexual history]." (Hrg. Day 1, Pt. 2 at 1:03:50–1:05:10).

Conversely, McGinn allowed Witness-1 to testify that Doe was "impulsive," giving the example of a time when Witness-1 was "hanging out with a . . . friend" at the fraternity house and Doe "was with a girl in his room" and "just like walked out like butt naked." (Hrg. Day 1, Pt. 2 at 2:59:45–3:00:35). This testimony, however, did not fall within any of the permissible purposes in § VI(D)(6)(k) (ECF No. 2-6 at 31) for admitting evidence of a respondent's sexual history.

Third, McGinn selectively enforced § VI(D)(6)(m), (ECF No. 2-6 at 31), which states that the hearing officer "may not consider any questions or evidence about a student's history of mental

---

[3] McGinn also seemed to have little interest in the investigators' evidence gathering process. She asked investigator Jamie Brennan just six questions, none of which seriously probed her investigatory methods. After more vigorous cross-examination by Doe's advisor exposed Brennan's unjustified failures to obtain the police report and the omitted photographs and text messages, McGinn had no follow up. (Hrg. Pt. 1 at 21:30–46:40).

health counseling, treatment, or diagnosis, unless the student consents to providing that information for consideration." Roe told the investigators she did not report the incident to College Park "until thinking about the situation in therapy." (ECF No. 4 at 7 *sealed*). Roe also testified at the hearing that she suffered from "OCD," which "worsened tremendously" after the alleged sexual assault, and that the "trauma of the sexual assault" led to her diagnosis "with Tourette [Syndrome]." (Hrg. Day 1, Pt. 1 at 3:23:05–3:24:30). Later, however, after McGinn invited Doe to "speculate" as to Roe's motives, and Doe offered Roe's OCD as a possible explanation, McGinn "caution[ed]" Doe from commenting on Roe's mental health. (Hrg. Day 1, Pt. 2 at 1:06:45–1:09:00). Later still, when Doe's advisor asked Roe to consent to questioning about her mental health, McGinn incorrectly stated that the procedure required written consent, and made a "really strong note" that she would draw "no negative inference from a failure to consent." (Hrg. Day 2 at 3:06:50–3:08:41). Roe then predictably denied consent, thereby allowing her to inject her mental health into the case when it benefited her while dodging cross-examination on the subject without penalty.

In sum, standing alone, the pervasive procedural flaws in the investigatory and adjudicative processes are sufficient to satisfy the first element of Doe's erroneous-outcome claim.

The same procedural irregularities are also perhaps the best of evidence gender bias. As the Ninth Circuit has said, "at some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding." *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022); *see also Doe v. Tex. Christian Univ.*, 601 F. Supp. 3d 78, 88 (N.D. Tex. 2022) ("Procedural irregularities are particularly relevant when they consistently favor the complainant.").

But that is not Doe's only evidence of gender bias. As detailed in Doe's opening memorandum, he has compiled "statements by university officials evidencing gender bias," *Marymount University*, 297 F. Supp. 3d at 585, including statements by the hearing officer (McGinn), one of the two investigators (Brennan), and College Park's Title IX Coordinator (Nastase). College Park dismisses this evidence by imposing a nearly insurmountable standard. What College Park seems to demand are statements like Brennan's Facebook post, which *expressly* proclaim the superiority of one gender over another. (*See* ECF No. 23 at 28 (admitting that Brennan's Facebook post "comes close" to showing gender bias)). But even that is not enough for College Park if the statement does not also tie directly to the "flawed outcome." (*Id.* (citation omitted)). In reality, few (if any) plaintiffs in a pre-discovery posture will have statements by university administrators or contractors expressly proclaiming their gender bias *and* linking that bias to the disciplinary decision at issue. *See Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 187 (D.R.I. 2016) ("One particular challenge in these types of cases is that the best information for discerning whether alleged discrimination was based on the plaintiff's gender as opposed to his status as an accused student is generally in the possession of the defendant[.]"). Thankfully for those seeking redress under Title IX, that is not the standard.

"Statements by members of the disciplinary tribunal" and "statements by pertinent university officials" that "*tend* to show the influence of gender may all indicate gender bias" sufficient to obtain preliminary relief. *See Tex. Christian Univ.*, 601 F. Supp. 3d at 92 (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)) (emphasis added); *see also Marymount Univ.*, 297 F. Supp. 3d at 585 (recognizing same standard in pleading context). Stated differently, a court can infer gender bias from statements that are not expressly biased. And those inferences have added weight when the statements are combined with procedural irregularities favoring a

female complainant, like those Doe has shown here. *See Tex. Christian Univ.*, 601 F. Supp. 3d at 88 ("[S]everal circuits have held that multiple 'procedural irregularities,' when combined with other indicia, may support a finding of gender bias.").

Moreover, Doe's evidence stands unrebutted because College Park has not offered any affidavits disclaiming gender bias by the individuals involved in this case. *Cf. Doe v. Wake Forest Univ.*, No. 1:23-CV-00114, 2023 WL 2239475, at *7 (M.D.N.C. Feb. 27, 2023) ("[T]he University presented affidavits from both the Hearing and Appeals Officers . . . in which they directly deny any gender bias or any knowledge of the specific alleged "outside pressures" on the University to find in favor of female students in disciplinary proceedings.").

Instead, College Park offers an affidavit from Nastase identifying the gender breakdown and other data for sexual misconduct proceedings dating back to July 2019. Initially, Doe has reason to question the accuracy of this data. Reports published by OCRSM show a total of **89** formal complaints during the 2019–2022 period. *See* https://ocrsm.umd.edu/sexual-misconduct#annual-reports (last visted Jan. 10, 2024). The Nastase affidavit, however, mentions only **67** formal complaints from July 1, 2019 to present. (ECF No. 23-1, ¶ 4).

But even if Nastase's statistics are accurate, they confirm Doe's belief that the overwhelming majority of cases involve a female complainant and male respondent. College Park points to the 2022–2023 statistics as showing a roughly equal percentage of formal complaints involving male v. female (12.4%) and female v. male cases (11.1%), but those percentages refer to the number of initial reports that resulted in formal complaints. Of the cases in which formal complaints were filed, 28 out of 32 (87.5%) involved female complainants and male respondents. Beyond that, the statistics reveal little because they lump together dismissals and not responsible determinations and do not reveal anything about the facts of the cases.

In the end, the best (but not only) evidence of gender discrimination is what the investigators and McGinn did and said *in this case*. That evidence should carry the day regardless of the statistics.

## CONCLUSION

For the foregoing reasons and those stated in his opening memorandum, Doe respectfully requests that the Court grant his motion for a preliminary injunction.

Dated: January 11, 2024    Respectfully Submitted,

*/s/ Patrick R. Seidel*
Patrick R. Seidel, Esq. (#21801)
William N. Sinclair, Esq. (#28833)
Todd W. Hesel, Esq. (#21466)
Andrew M. Harvey, Esq. (#21925)
Silverman Thompson Slutkin & White, LLC
400 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 385-2225
pseidel@silvermanthompson.com
wsinclair@silvermanthompson.com
thesel@silvermanthompson.com
aharvey@silvermanthompson.com

*Attorneys for Plaintiff*