IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JOHN DOE**, | * |
| *Plaintiff*, | * |
| v. | *   Civil No. RDB-23-03507 |
| **UNIVERSITY OF MARYLAND, COLLEGE PARK**, *et al.* | * |
| | * |
| *Defendants*. | * |
| | * |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
JOHN DOE'S AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff John Doe ("Doe"), through undersigned counsel, submits this memorandum of law in support of his Amended Motion for a Preliminary Injunction and in support states as follows:

## I. INTRODUCTION

Doe previously moved for a preliminary injunction under Count I of his Complaint alleging that the disciplinary proceeding brought against him by Defendant University of Maryland, College Park ("College Park") violated Title IX's prohibition on gender discrimination. (ECF No. 2). The Court ruled that Doe had satisfied three of the four factors for injunctive relief, but it was unable to find that Doe was likely to succeed on the merits of his Title IX claim. Nonetheless, the Court raised grave concerns about the fairness of the College Park disciplinary proceeding, and in particular the effect of procedures that allowed Doe's accuser, Jane Roe ("Roe"), to introduce mental health evidence but prohibited Doe from addressing that evidence or using it in his defense. The Court thus granted Doe an opportunity to amend his complaint to add a due process claim and to submit a revised motion for injunctive relief based on that claim.

Doe now avails himself of that opportunity and requests that the Court enter a preliminary injunction under Count II of his contemporaneously filed Amended Complaint asserting a violation of his Fourteenth Amendment due process rights under 42 U.S.C. § 1983.  Procedural due process in university disciplinary proceedings includes the right to meaningfully contest adverse evidence.  College Park's procedures, both on their face and as applied by the hearing officer, Alyssa-Rae McGinn ("McGinn"), denied Doe this meaningful opportunity.  On the one hand, Roe was allowed to introduce mental health evidence to explain her delayed reporting and the "trauma" from the alleged sexual assault.  But on the other hand, Doe was admonished from citing Roe's mental health conditions to explain her motive for submitting a false report and Doe's advisor was prohibited from cross-examining Roe about her mental health issues without her consent, which she refused to give.  College Park's procedure thus led to a fundamentally unfair process where, in a serious, quasi-criminal case involving an alleged sexual assault, mental health evidence was allowed to show guilt but not innocence.  Doe is therefore likely to succeed on his due process claim and he should be granted a preliminary injunction on that basis.

## II. FACTUAL BACKGROUND

As the Court is already familiar with the circumstances of the College Park disciplinary proceeding leading to this lawsuit, which were detailed in Doe's Verified Complaint and his initial motion for preliminary injunction (both of which are incorporated here by reference), Doe focuses here only on those new facts alleged in his Verified Amended Complaint.

College Park's "Policy and Procedures on Sexual Harassment and Other Misconduct"[1] (ECF No. 2-6) allow a *party* to the proceeding to exclude mental health treatment records and related evidence regardless of its relevance.  Under Procedure § VI.D.6.l (ECF No. 2-6 at 31), a

---

[1] The document includes both "Policies" and "Procedures" divided into separate Roman numeral sections.  (*See* ECF No. 2-6 at 1–2).  Doe refers here to the "Procedures."

hearing officer cannot consider a party's mental health records unless the party gives written consent:

> The Hearing Officer *may not consider a Party's records* that are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in the professional's or paraprofessional's capacity, or assisting in that capacity, and which are made and maintained in connection with the provision of treatment to the Party, *unless the University obtains that Party's voluntary, written consent to provide that information for consideration*.

(emphasis added.)

Similarly, under Procedure § VI.D.6.m (ECF No. 2-6 at 31) a hearing officer may not consider questions or evidence about mental health unless the *student* consents:

> The Hearing Officer may not consider any questions or evidence about a student's history of mental health counseling, treatment, or diagnosis, unless the student consents to providing that information for consideration.

Here, Roe's delayed reporting of the alleged sexual assault was a critical issue bearing on her credibility. Roe initially told her friends only that she "hooked up" with Doe with no mention of a sexual assault. (ECF No. 4 (Final Investigative Report) at 7:11 *sealed*). She did not tell any of her friends she was sexually assaulted until more than a month later (*id.* at 6:18), she did not confront Doe with the accusation until two months later (*id.* at 8:15), and she did not report the alleged sexual assault to the police and College Park until a *year* later (*id.* at 1:8–12; *see also* ECF No. 3 (Appendices) at 3–5, 40–43). When explaining the delay to College Park investigators, Roe put her mental health treatment at issue, explaining that she "did not report the incident to [College Park] until thinking about the situation in therapy." (ECF No. 4 at 7:39 *sealed*).

Roe also discussed her mental health conditions during the disciplinary hearing to highlight the "trauma" she suffered from the alleged sexual assault. On cross-examination, Doe's advisor asked Roe about an online article she had written in which she mentioned having obsessive thoughts. *See* **Exhibit 1** at 97:1–99:2 (Hearing Day 1 Transcript Excerpts); *see also* Declaration

3

of John Doe ("Doe Decl.") at ¶ 4.  In response, Roe admitted that she had "OCD."  Ex. 1 at 99:5.  Roe further testified, that "after this trauma of the sexual assault, that's where I was diagnosed with Tourette [Syndrome].  And the OCD worsened tremendously.  And it's just something I have -- I struggle with, the OCD, just obsessive thoughts and not being able to get certain thoughts out of my head."  *Id.* at 99:10–14.

Later, during Doe's testimony, McGinn invited him to "speculate" as to why Roe might have wanted to harm him.  When Doe responded by referring to Roe's *own testimony* about having obsessive thoughts, McGinn admonished him for talking about Roe's mental health while *conceding its relevancy*:

> Q: Do you have any -- I'm going to ask you to speculate a little bit, so --
>
> A: Uh-huh.
>
> Q: -- do you -- and I'm asking you this because you just have more knowledge about the situation than I do.  Is there anything in your relationship with the complainant, your knowledge of the complainant, anything that could help explain why she might have wanted to harm you?
>
> A: Okay.  You're asking me to speculate.  If I could have a second to reach that speculation.  I -- I mean, I like -- the only thing I can really think of is the fact that I never messaged her again afterwards.  I think that could perhaps come off the wrong way, but that occurred after, obviously.  You know, I -- I think I -- like I really don't want to like suggest that this would cause something like lying about like the events that happened. But you know, like obsessing over the idea that it happened.  You know, she mentioned she has OCD.  It's possible that this is not something that she did intentionally to harm me, but rather something she convinced herself of.
>
> Q: *I do just want to again caution you from commenting on any party to -- or any witnesses' mental health*.  I know that it did come up and *it is relevant* to some degree.  But I think we just want to avoid talking about diagnoses, treatment, anything like that.
>
> So --
>
> A: My apologies.  I only want to give you a sufficient answer.

4

Ex. 1 at 223:4–224:1 (emphasis added.).

On the second day of the hearing, during final follow-up questioning of Roe by Doe's advisor, McGinn again interjected to preclude evidence of Roe's mental health treatment. When Doe's advisor asked for Roe's consent to question her about her mental health, McGinn referred to an unwritten "practice" of requiring written consent and then made a "really strong note" that she would draw no negative inference from Roe's refusal to consent. Roe then predictably withheld consent:

> [DOE'S ADVISOR]: [Roe], I just have a couple of more questions for you. Will you consent to answering questions about your history of mental health?
>
> [ROE'S ADVISOR]: Alyssa Rae, I --
>
> MS. McGINN: I don't know if -- I need to check the policy language on that. I --
>
> [DOE'S ADVISOR]: I've got it up. It's page 31, line M. It says that it is relevant -- it is irrelevant unless the student consent with providing the information.
>
> MS. McGINN: Right. But *I believe the University's practice is to get consent in writing* if that's going to be the case.
>
> [DOE'S ADVISOR]: Will you take a –- take a look at page 31. Because if you're going to bring up the records, they have to be in writing. But the questions are evidence. It has to be under consent.
>
> MS. McGINN: Right. I know that the University's practice is generally to get written consent, if that's going to be the case. But, [Roe], you can freely consent if you want. *I do want to make a really strong note here that I will draw no negative inference if you don't consent. It is completely voluntary and up to you if you would like that information to be considered as part of this case or not*.
>
> [ROE]: No, I don't consent to answering those questions.

**Exhibit 2** at 102:6–103:1 (Hearing Day 2 Transcript Excerpts) (emphasis added); *see also* Doe Decl. at ¶ 4.

When Doe's advisor then sought clarification on the type of mental health questioning to which Roe was refusing to consent, McGinn cut off the inquiry based on "the policy":

5

>[DOE'S ADVISOR]: There's -- I want to specifically ask you. There's three categories. Kayla, you will not consent to any questioning about your history of mental health counseling; is that correct?
>
>MS. McGINN: She has --- she's already said that she's not going to consent to evidence or questions about her mental health.
>
>[DOE'S ADVISOR]: Okay.
>
>MS. McGINN: As far as –- as far as that's prescribed by the policy, *I'm not going to allow that if she's not consented to it.*

*Id.* at 103:4–103:11 (emphasis added).

The College Park "policy" thus produced a one-sided result: Roe was allowed to cite her "therapy" as an explanation for her delayed reporting and to discuss the detrimental effects of the alleged sexual assault on her mental health, but Doe was precluded from testing those assertions or exploring Roe's mental health condition as a defense to the charge against him because Roe would not consent to examination relating to that evidence. McGinn's application of the policy further heightened the unfairness, because she made clear that Roe would suffer no negative inference from her refusal to consent even though Roe herself had opened the door to her mental health treatment.

McGinn's written determination reflected the one-sided presentation of the evidence. In finding Doe responsible, she noted his "suggest[ion]" that Roe may have filed the complaint "to resolve . . . feelings of obsession" but she found that this explanation was not "supported by the *available* evidence." (ECF No.6 at 13 *sealed* (emphasis added)). McGinn also found that Roe had "suffered significant *mental*, emotional, and physical disruptions as a result of [Doe's] behavior." (*Id.* at16 (emphasis added)).

The appeal decision confirmed that College Park's procedures allowed Roe to introduce mental health evidence to her benefit but then prohibited any questioning by Doe's advisor about

it. The appellate board, in rejecting Doe's complaint about the inability to present mental health evidence, noted that Procedure § VI.D.6.m required Roe's consent to the admission of the evidence and that she had refused to provide it. (ECF No. 7 (Appeal Decision) at 6 *sealed*).

### III.  STANDARD OF REVIEW

A preliminary injunction "preserves the status quo pending a final trial on the merits." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). To obtain a preliminary injunction, a plaintiff must establish four factors: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). The injunctive relief issued by a district court should "meet the exigencies of the particular case" and be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *See Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (citations and internal quotation marks omitted).

### IV.  ARGUMENT

Doe focuses on one factor—likelihood of success—because the Court has already decided the other three factors in his favor and there is no reason to revisit those rulings. Doe is likely to succeed on the merits of his due process claim because College Park's procedures on mental health evidence, both on their face and as applied by McGinn, produced a fundamentally unfair result in which Roe could offer mental health evidence to prove the charge but Doe could not offer or refute the same evidence to defend himself.

A. **DOE IS LIKELY TO SUCCEED ON THE MERITS OF HIS PROCEDURAL DUE PROCESS CLAIM.**

A procedural due process claim under the Fourteenth Amendment requires proof of three elements: "(1) a constitutionally cognizable life, liberty, or property interest; (2) a deprivation of that interest caused by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Todman v. Mayor & City Council of Baltimore*, 631 F. Supp. 3d 314, 327 (D. Md. 2022) (quoting *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013)). The undisputed evidence satisfies all three elements.

1. **Doe has a constitutionally protected interest in his continued enrollment at College Park.**

On the first element, the Supreme Court and Fourth Circuit have repeatedly assumed, without deciding, that students have a constitutionally protected liberty or property interest in continued university enrollment. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222–23 (1985); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 84–85 (1978); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 239 (4th Cir. 2021). For public high school students, however, the Supreme Court has squarely held that they possess a property interest protected by the Due Process Clause:

> The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, *must be exercised consistently with constitutional safeguards*. Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.

*Goss v. Lopez*, 419 U.S. 565, 574 (1975) (emphasis added).

As *Goss* further held, public school students subject to misconduct charges also have a constitutional protected liberty interest. The Court explained: "Where a person's good name,

8

reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the [Due Process] Clause must be satisfied." *Id.* at 574.

This Court and others have cited *Goss* as establishing that university students have protected property and liberty interests that cannot be deprived through disciplinary proceedings that fail to satisfy the minimum requirements of due process. *Doe v. Loyola Univ. of Md.*, No. CV ELH-20-1227, 2021 WL 1174707, at *21 (D. Md. Mar. 29, 2021) ("In the context of a disciplinary proceeding at a public university, the accused is also entitled to procedural due process."); *see also Doe v. Cummins*, 662 F. App'x 437, 445 (6th Cir. 2016) ("We have recognized that [due process] protections apply to higher education disciplinary decisions"); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) ("[W]e have held that the Due Process Clause is implicated by higher education disciplinary decisions."); *Gorman v. Univ. of R.I.*, 837 F.2d 7, 12 (1st Cir. 1988) ("[A] student facing expulsion or suspension from a public educational institution is entitled to the protections of due process."); *Doe v. Alger*, 228 F. Supp. 3d 713, 729 (W.D. Va. 2016) ("The court . . . concludes, as a matter of law, that Doe had a protected property interest in his continued enrollment.").

It is undisputed that Doe is "a student facing expulsion or suspension from a public educational institution," *Gorman*, 837 F.2d. at 12, whose "good name, reputation, honor, or integrity is at stake because of what the government is doing to him," *Goss*, 419 U.S. at 574. Accordingly, he was entitled to due process protections in the disciplinary proceeding against him.

**2.      Doe's suspension was the result of state action.**

On the second element, there is no question that Doe's suspension was the result of state action because College Park is a state university. *See, e.g.*, *Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 513 (D. Md. 2013) (listing Maryland's public universities).

9

3.  **College Park's procedures on mental health evidence denied Doe due process.**

On the third element, Doe was denied process because College Park's procedures allowed Doe to offer mental health evidence to establish Doe's guilt while precluding Doe from testing that evidence or using it to establish his innocence—in addition to all the other procedural problems as pled in Doe's Verified Complaint and identified in his initial motion for a preliminary injunction.

A student facing suspension or expulsion must, at the most basic level, "receive 'advance notice of the charges, a fair opportunity to be heard, and an impartial decision-maker.'" *Loyola*, 2021 WL 1174707, at *21 (quoting *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir. 1983)); *see also Cobb v. Rector & Visitors of Univ. of Va.*, 69 F. Supp. 2d 815, 828–29 (W.D. Va. 1999). The opportunity to be heard in this context includes an opportunity to present a defense. *Doe v. Va. Polytechnic Inst. & State Univ.*, 77 F.4th 231, 236 (4th Cir. 2023) (citing *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 159 (5th Cir. 1961)). An opportunity to present a defense includes an opportunity to respond to adverse evidence. *See Alger*, 228 F. Supp. 3d at 732.

In *Alger*, a student accused of sexual misconduct was denied due process because he had no meaningful opportunity to rebut new evidence presented by his accuser for the first time on appeal. The new evidence included a three-page statement from a clinical social worker describing the effects of alcohol consumption on a user of Prozac, offered to bolster the complainant's claim that the drug affected her level of intoxication. *Id.* at 731. The accused student had notice of the issue generally, but did not see the social worker's statement until after the appeal was decided. *Id.* This "procedural deficiency" denied the accused student due process because had he "known there was a licensed clinical social worker offering written testimony before the appeal board, he might have tried to submit additional materials of his own in response." *Id.* at 731–32.

The accused student was further denied due process because he lacked a meaningful opportunity to contest an additional statement by his accuser explaining the significance of a

10

voicemail message that allegedly established her intoxication. *See id.* at 732. Although the voicemail "was from at least 24 hours before the alleged assault," rather than the day of the assault, as Roe claimed, *id.* at 721–22, at least one member of the appeal board was not made aware of that discrepancy, *id.* at 732. "A fair process would have given Doe an opportunity to raise and emphasize this point." *Id.* at 732.

Here, Doe was similarly disadvantaged by College Park's fundamentally unfair procedures governing mental health evidence. In a case that hinged on the credibility of the parties, Roe was allowed to discuss mental evidence to bolster her credibility in two ways—first by referencing her "therapy" to explain her delayed reporting, and then by discussing the detrimental effects of the alleged sexual assault on her mental health. But Doe could not test these assertions because Roe neither gave written consent to use of her mental health records nor verbal consent to questioning about mental health treatment. The policy thus enabled Roe to use mental health evidence as sword to prove her accusation while at the same allowing her to shield that evidence from any adversarial testing by withholding her consent.

Moreover, McGinn's application of the policy exacerbated its unfairness. When Doe, in response to McGinn's invitation to speculate as to Roe's motives, cited Roe's *own testimony* about her obsessiveness, Doe was warned not to discuss mental health (despite McGinn's acknowledgement that it was relevant). Then, when Doe's advisor asked Roe to consent to questioning about her mental health, McGinn placed her finger on the scale by referring to an unwritten policy requiring written consent and making "a really strong note" that she would not draw a negative inference from Roe's refusal to consent. While McGinn refused to draw an inference against Roe, her decision held the lack of mental health evidence *against Doe*, finding that Doe's explanations for Roe's motive to harm him (which included her obsessiveness) were

11

not "supported by the available evidence." Of course, the evidence was not available because Roe and McGinn, aided by College Park's procedures, made it unavailable. "[W]hile it is established that procedural due process guarantees do not include any general requirement of reasonableness in a state agency's interpretation and application of its stated procedures, . . . there exists the possibility of an 'interpretation . . . so extreme as to be a violation of due process[.]'" *See Jones v. Bd. of Governors of Univ. of N.C.*, 704 F.2d 713, 717 (4th Cir. 1983) (citations omitted)). Such was McGinn's interpretation of the policy here.

College Park's treatment of mental health evidence was the most obvious procedural flaw with the proceeding, but it was not the only one. Doe's briefs in support of his initial motion for a preliminary injunction (ECF Nos. 2-1, 25) detail other procedural irregularities affecting the fairness of the proceeding and the impartiality (or lack thereof) of the decision maker, including but not limited to: the investigators' failure to collect highly relevant evidence available to them, McGinn's biased application of the procedures governing new evidence, and McGinn's inconsistent application of the procedures governing sexual history evidence. (*See, e.g.*, ECF No. 25 at 3–8). These and other procedural flaws detailed in previous briefings, which Doe incorporates here by reference, further establish the lack of due process in the proceeding against him.

In sum, although Doe was not owed a "full-dress judicial hearing," College Park was required to preserve "the rudiments of an adversary proceeding." *Dixon*, 294 F.2d at 159; *see also Va. Polytechnic Inst.*, 77 F.4th at 237 ("In cases involving suspension or expulsion from colleges and universities, we have drawn on the Fifth Circuit's decision in *Dixon*[.]"). College Park failed to do so when it prohibited Doe from challenging or even referring to critical evidence against him and committed the other procedural flaws highlighted above. Doe was found responsible for a

serious offense, with life altering consequences, in a proceeding that was fundamentally unfair. Doe is therefore likely to succeed on his due process claim.

**B.  THE COURT HAS ALREADY DECIDED THE OTHER FACTORS IN DOE'S FAVOR AND NOTHING HAS CHANGED.**

The Court has already ruled that Doe has satisfied the other three factors necessary for a preliminary injunction in that: he will be irreparably harmed if he does not have the opportunity to graduate this spring; the balance of equites weighs strongly in favor of injunctive relief; and the public has an interest in ensuring that a state university provides sufficient due process for accused students.  Premising an injunction on Doe's due process claim instead of his Title IX claim does nothing to change this. Accordingly, Doe has satisfied all four factors and the Court should issue a preliminary injunction.

## V.  CONCLUSION

For the foregoing reasons, Doe respectfully requests that this Court grant his motion and issue a preliminary injunction with the same terms as the temporary restraining order now in effect.[2]

Dated: January 16, 2024

Respectfully Submitted,

/s/ Patrick R. Seidel
Patrick R. Seidel, Esq. (#21801)
William N. Sinclair, Esq. (#28833)
Todd Hesel, Esq. (#21466)
Andrew M. Harvey, Esq. (#21925)
Silverman Thompson Slutkin & White, LLC
400 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 385-2225
pseidel@silvermanthompson.com
wsinclair@silvermanthompson.com
thesel@silvermanthompson.com
aharvey@silvermanthompson.com

*Attorneys for Plaintiff*

---

[2] The Court thus far has not required Doe to post a bond.  For the reasons previously stated (*see* ECF No. 2-1 at 24–25), Doe asks that the Court continue to waive the bond requirement.