IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **JOHN DOE**, | * | |
| *Plaintiff*, | * | |
| v. | * | Civil No. RDB-23-03507 |
| **UNIVERSITY OF MARYLAND, COLLEGE PARK**, *et al.* | * | |
| | * | |
| *Defendants*. | | |
| | * | |

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF HIS
AMENDED MOTION FOR A PRELIMINARY INJUNCTION**

John Doe ("Doe"), through undersigned counsel, files this Reply Memorandum in Support of his Amended Motion ("Motion") for a Preliminary Injunction and in support, states as follows:[1]

**INTRODUCTION**

College students across the United States expect to obtain a degree from the institution at which they are enrolled. Indeed, while there are certainly other benefits to attending college, earning a degree is the primary reason why students enroll in college. And colleges expect those same students to obtain a degree, so long as they pay their tuition and adhere to their rules and policies. That mutual expectation exists in this case too, reinforced by Maryland law and College

---

[1] Nastase has consolidated her opposition to Doe's Amended Motion for a Preliminary Injunction with a partial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Doe will respond separately to the motion to dismiss. As explained below, however, Doe has not just *alleged* sufficient facts to establish a due process claim but has presented sufficient *evidence* to show that he is likely to succeed on that claim. Doe has therefore necessarily satisfied the Rule 12(b)(6) plausibility standard. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, Nastase concedes that *Ex Parte Young* allows Doe to seek prospective injunctive relief from her, ECF No. 40-1 at 14, and case law is clear that the type of injunctive relief Doe seeks here qualifies as "prospective relief and thus [is] not barred by the Eleventh Amendment." *See, e.g.*, *Doe v. Citadel*, No. 2:21-CV-04198-DCN, 2022 WL 2806473, at *3 (D.S.C. July 18, 2022). Accordingly, there is no basis for dismissal under Rule 12(b)(6).

Park's policies and procedures, thus giving rise to protected property and liberty interests in continued enrollment at College Park.

But College Park failed to employ constitutionally adequate procedures when it decided to suspend Doe. Whether facially or as applied, College Park's procedures on mental health evidence violated Doe's due process rights by hindering his ability to present a meaningful defense. And indeed, the entirety of the proceedings, as detailed in the applicable pleadings and papers filed with the Court, and addressed during the two hearings, failed to adequately provide Doe "with the opportunity to 'respond, explain, and defend.'" *See* ECF No. 40-1 at 21 (quoting *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005)). For all those reasons, and those set forth here and to be advanced at a hearing on the Motion, Doe is likely to succeed on his claim that College Park denied him procedural due process.

## **ARGUMENT**

The parties agree on the standard governing the Motion and the Court has already determined that three of the four necessary elements to enter the requested relief have been met: Doe is likely to suffer irreparable harm absent an injunction, the balance of equities tips in his favor, and an injunction is in the public interest. Thus, all that remains for the Court to decide is whether Doe has shown that he is likely to succeed on his due process claim.

The parties also agree on the elements Doe must ultimately prove to succeed on that claim: "(1) a constitutionally cognizable life, liberty, or property interest; (2) a deprivation of that interest caused by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *See* ECF Nos. 29-2 at 8, 40-1 at 15. Nastase does not dispute the existence of state action, so Doe focuses only on elements (1) and (3).

I. **DOE HAS CONSTITUTIONALLY PROTECTED PROPERTY AND LIBERTY INTERESTS IN HIS CONTINUED ENROLLMENT AT COLLEGE PARK.**

The requirements of procedural due process apply to a "deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). The threshold question, then, is whether Doe has a protected liberty or property interest in his continued enrollment at College Park. *See, e.g., Doe v. Alger*, 175 F. Supp. 3d 646, 656–61 (W.D. Va. 2016) (evaluating whether student at public university had a liberty or property interest protected by the Due Process Clause).

As noted in Doe's opening brief, ECF No. 29-2 at 9, a significant number of federal courts—including this Court—have relied on *Goss v. Lopez*, 419 U.S. 565 (1975), to hold that public university students have such an interest (or both) in their continued enrollment, and so cannot be suspended or expelled without receiving adequate procedural due process. *See, e.g., Doe v. Pa. State Univ.*, 336 F. Supp. 3d 441, 446 n.50 (M.D. Pa. 2018) (noting the absence of any dispute that student "had a property interest in continuing his education at [a state university] and a liberty interest in his reputation" and providing supporting authorities).[2] As Judge Hollander succinctly explained in *Doe v. Loyola Univ. Md.*, "[i]n the context of a disciplinary proceeding at a public university, the accused is . . . entitled to procedural due process." No. CV ELH-20-1227, 2021 WL 1174707, at *21 (D. Md. Mar. 29, 2021) (citing *Goss*, among other authorities); *see also*

---

[2] On December 10, 1948, the United Nations General Assembly authored the Universal Declaration of Human Rights ("UDHR"). *See* UNITED NATIONS, https://www.un.org/sites/un2.un.org/files/2021/03/udhr.pdf (last visited Feb. 14, 2024). It was proclaimed "as a standard of achievements for all peoples and all nations" that "sets out . . . fundamental human rights to be universally protected." United Nations, https://www.un.org/en/about-us/universal-declaration-of-human-rights (last visited Feb. 14, 2024). The UDHR provides that "[e]veryone has the right to education." *Id.* While not binding legal precedent, it underscores the commonsensical notion that a student has a protected interest in continued enrollment at an educational institution, whether they are enrolled in primary or higher education.

*Doe v. Rector & Visitors of Univ. of Va.*, No. 3:19CV00038, 2019 WL 2718496, at *5 (W.D. Va. June 28, 2019) ("The suspension or expulsion of a student clearly implicates a protected property interest, and allegations of sexual assault may impugn a student's reputation and integrity, thus implicating a protected liberty interest.") (citations, internal quotation marks and brackets omitted).

This extension of *Goss* is hardly surprising or controversial. A college degree is a landmark achievement and a key stepping-stone to professional success, as it opens the door to a host of career opportunities not otherwise available. Illustrating the point, according to research by the Social Security Administration, "[m]en with bachelor's degrees earn approximately *$900,000 more* in median lifetime earnings than high school graduates," while "[w]omen with bachelor's degrees earn *$630,000* more." *Education and Lifetime Earnings*, Soc. Security Admin., https://www.ssa.gov/policy/docs/research-summaries/education-earnings.html (last visited Feb. 12, 2024) (emphasis added).

The benefits of a college degree do not stop there. Recent research shows that "Americans without a college education have a substantially shorter lifespan on average compared to those with a Bachelor of Arts degree, and the gap is widening." Micheal T. Nietzel, *Americans Without College Degrees Live Shorter Lives, Brookings Study Finds*, Forbes (Oct. 3, 2023, 9:15 AM), https://www.forbes.com/sites/michaeltnietzel/2023/10/03/americans-without-college-degrees-live-shorter-lives-brookings-study-finds/?sh=2a23944956ab. Given these and other widely recognized benefits of a college degree, and the general expectation that an enrolled university student will remain enrolled until graduation as long as the student remains in good standing and pays tuition, it is easy to see why courts have not hesitated to extend to public university students the same property interest recognized in *Goss*.

4

Likewise, there is no good reason to afford public high school students a protected liberty interest in their education while denying public university students that same protection. Just as with the high school students in *Goss*, charges of misconduct against a university student "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Goss*, 419 U.S. at 575. Thus, it is equally easy to see why courts have found that university students, no less than high school students, have a liberty interest in their education entitling them to due process protections.

Nastase avoids grappling with Judge Hollander's common-sense conclusion in *Loyola* (and other cases reaching the same conclusion) by narrowly focusing on the lack of "binding Supreme Court or Fourth Circuit precedent" recognizing "a constitutionally protected property interest in continued enrollment in a university." ECF No. 40-1 at 16. While true—and acknowledged in Doe's opening brief (ECF No. 29-2 at 8)—that fact can cut either way; that the Supreme Court and Fourth Circuit have assumed that such an interest exists could just as well mean that it does as well as it does not. It certainly presents no meaningful analysis (or, really, any analysis) from which this Court can draw any conclusions on the issue.

To the extent the Court believes the authorities already supplied by Doe are insufficient, and that a deeper analysis is necessary, that analysis can be found in *Doe v. Alger*, *supra*, 175 F. Supp. 3d at 658–61, and it leads to the same conclusion: that a protected property interest exists. In *Alger*, the court canvassed Supreme Court and Fourth Circuit precedent in assessing whether the plaintiff, a student at James Madison University suing the college on bases like those present here, had adequately pled[3] a protected property interest. The court acknowledged that one path

---

[3] Many, if not most, of the cases discussed by the parties in their briefing arise in the context of a motion to dismiss; the applicable standard in such cases is whether the plaintiff adequately pled their claim. But the issue of a property interest is being addressed here in the context of a

5

forward in deciding that issue was through *Goss*, which both parties have briefed and which involved a state statute providing a right to secondary education. But it also pointed to another path forward through *Perry v. Sinderman*, 408 U.S. 593 (1972), decided the same day as *Goss*.

In *Perry*, the plaintiff was a junior college professor who claimed he had a property right in continued employment even though there was no state statute providing as much and his contract did not provide for such a right. *Id.* at 599. The plaintiff argued that a *de facto* tenure policy existed, arising from rules and understandings officially promulgated by the college, which was sufficient to state a property interest. The Supreme Court agreed, holding that he should be "given an opportunity to prove the legitimacy of his claim of entitlement in light of the policies and practices of the institution." *Id.* at 603.

Here, both state law and "rules and understandings" exist that create a property interest in Doe's continued enrollment at College Park.

### A. Maryland Law Creates a Legitimate Claim of Entitlement to Public University Education.

Maryland law does not mandate a free college education or require university attendance. Thus, in that narrow respect, the Ohio laws at issue in *Goss* are distinguishable. But that does not end the inquiry. The Ohio laws in *Goss* gave the students a protected property interest because they allowed the students to "legitimate[ly] claim[] . . . entitlement to a public education." *Goss*, 419 U.S. at 573. Accordingly, a property interest in higher education may exist if state law has "created the basis for a similar claim of entitlement to an education in its state college system."

---

preliminary injunction motion, the standard for which is whether the moving party has shown evidence that would demonstrate the likelihood of success on the merits of their claim. Thus, the allegations in Doe's complaint are not at issue, notwithstanding College Park's argument about whether, *e.g.*, Doe adequately pled a property or liberty interest. That issue, if at all, will be addressed in the context of a motion to dismiss. At issue here is the evidence currently in Doe's possession, which is addressed in greater detail below.

*Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986).  In *Harris,* Colorado law did so by directing that the State's public universities "'shall be open . . . to all persons resident in this state' upon payment of a reasonable tuition fee." *Id.* (quoting COLO. REV. STAT. § 23–50–109 (1973)).

Maryland law creates a similar claim of entitlement.  The Education Article of the Maryland Code, Division III, covers higher education in Maryland.  Title 15, Subtitle 1, *mandates* that public universities accept qualified students from certain public high schools:

> (a) Each public institution of higher education *shall accept for admission* any graduate of an approved public high school:
>
>> (1) Who is certified by his high school principal, based on standards of the State Board of Education, as qualified to pursue a course of study at the institution; or
>>
>> (2) Who meets the admission standards of the institution.

Md. Code Ann., Educ. § 15–101(a) (emphasis added).

Title 10, subtitle 2, which codifies the Maryland Charter for Higher Education, enumerates the principles on which "[p]ublic higher education in Maryland should be based," including that "[p]ublic higher education should be accessible to *all* those who seek and qualify for admission." *Id.* at 10–202(2) (emphasis added).  The remainder of the subtitle reaffirms the State's commitment to providing widely accessible higher education.  Section 10–203 states, *inter alia*, that "[i]t is the goal of the State that public senior higher education institutions be funded at 100 percent of funding guidelines developed by the Maryland Higher Education commission."  Section 10–204 states, *inter alia*, that "[p]ublic institutions of higher education shall provide postsecondary education to students [and] teach and train students for careers and advance study."  Section 10–206 states, *inter alia*, that the "Governor and General Assembly shall . . . provide for the adequate financing of public higher education."  Finally, Section 10–209 states, *inter alia*, that the "University System of Maryland shall provide . . . a continuum of educational services."  The list goes on.

7

While these statutes are not precisely analogous to the Ohio laws in *Goss*, they do not need to be. Rather, the test remains, as Nastase notes, whether there is an "independent source" for the claimed property right beyond a mere "unilateral expectation of it" or "abstract need or desire for it." ECF No. 40-1 at 16 (citing *Equity in Athletics, Inc. v. Dept. of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011 and *Roth*, 408 U.S. at 577). Here, the above-cited statutes provide the necessary "independent source" and thus give rise to a protected property interest.

As for liberty interest, *Alger* states that a plaintiff must show "stigma plus," meaning a reputational injury (the stigma) accompanied by a state action that alters or extinguishes a statutory right. *See Alger*, 175 F. Supp. 3d at 660. Here, it cannot be seriously argued that accusations of rape do not amount to reputational injury or that state action altered or extinguished Doe's rights. Thus, the only relevant question is whether those rights arise from statute. Doe contends that, should the Court determine that the state statutes discussed *supra* give rise to a constitutionally protected property right, so too do they give rise to a constitutionally protected liberty interest.

## B. College Park's Policies and Procedures Create a Mutual Expectation in a Student's Continued Enrollment.

In *Perry*, the Supreme Court held that a plaintiff could ground the existence of a constitutionally protected property interest in "rules and understandings" giving rise to the same. 408 U.S. at 593. In *Alger*, the court rejected plaintiff's reliance on *Goss* because there was no state statute extending the right to a college education, but nonetheless denied defendant's motion to dismiss on the basis that Doe had alleged that James Madison University had "a system of expelling, suspending, or dismissing students only after a finding of cause and that his continued enrollment is therefore a protected property interest." 175 F. Supp. 3d at 658. The *Alger* court also approvingly cited *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157–58 (4th Cir. 1991), a case in which the Fourth Circuit confirmed that "mutual expectations may create an entitlement,"

8

especially where (as in that case) a license giving rise to the entitlement is renewable periodically simply on the payment of a fee and without additional action. 175 F. Supp. 3d at 657–58.

Just as in *Perry* and *Alger*, the "policies and practices of the institution" create an entitlement to continued education at College Park. The school's policies and procedures, available on its website,[4] detail in exacting degree the limited manner by which a student may be expelled or suspended.

For example, under College Park's Code of Student Conduct, a student can be suspended or expelled for committing "offenses against persons," "alcohol and other drug offenses," "property offenses," "community offenses," "offenses against university operations," and "other offenses." *See* Declaration of Patrick R. Seidel ¶ 3 (hereinafter "Seidel Decl."); *see also* **Exhibit A** to Seidel Decl. at 4–5. Pursuant to College Park's Code of Academic Integrity, a student can be suspended or expelled for engaging in cheating, fabrication, or plagiarism. *See* Seidel Decl. ¶ 4; *see also* **Exhibit B** to Seidel Decl. at 3–4. Finally, as has been examined at length in this matter, under College Park's Policy on Sexual Harassment and Other Sexual Misconduct, a student may be suspended or expelled for engaging in sexual harassment, sexual misconduct or retaliation. ECF No. 2-6 at 7–9.

Thus, like the circumstances in *Alger*, absent such offending conduct, it is the expectation of both College Park and the student that, assuming the student pays tuition when due, the student will remain enrolled until graduation. *See also Barnes v. Zaccari*, 669 F.3d 1295, 1304–05 (11th Cir. 2012) (finding that state university policy manual and code that allowed school to impose disciplinary sanctions only "for cause" gave student "a legitimate claim of entitlement to continued

---

[4] *See University Policies*, U. MD., https://academiccatalog.umd.edu/undergraduate/university-policies/#text (last visited Feb. 14, 2024).

enrollment").

In sum, through their policies, College Park has created a system of expelling, suspending, or dismissing students only after a finding of cause, which gives rise to a protected property interest in Doe's continued enrollment at College Park.[5]

## II.     COLLEGE PARK'S PROCEDURES WERE CONSTITUTIONALLY INADEQUATE.

Turning to the adequacy of the procedures afforded to Doe, Nastase concedes that due process in a university disciplinary proceeding includes providing the accused "with the opportunity to respond, explain, and defend.'" ECF No. 40-1 at 21 (quoting *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005)).  These protections are denied when, in a case like this one, involving a "severe sanction" and a "'he said/she said' dispute hinging on the credibility of" the parties, the disciplinary proceeding includes "important procedural shortcomings in exploring the critical issue of credibility."  *Doe v. Univ. of Conn.*, No. 3:20CV92 (MPS), 2020 WL 406356, at *5 (D. Conn. Jan. 23, 2020).

Here, there were multiple "important procedural shortcomings" bearing on credibility that Nastase cannot explain away.  The most important was College Park's treatment of mental health evidence.  As previously explained, ECF No. 29-2 at 3, long before any questioning by Doe's attorney, Roe injected her mental health treatment into the case by telling investigators that she "did not report the incident to [College Park] until thinking about the situation *in therapy*."  ECF

---

[5] Although this brief addresses Nastase's opposition to the preliminary injunction motion and not her motion to dismiss, Doe did not need to plead the existence of the Maryland laws and College Park policies and procedures discussed above to state a viable due process claim.  "On a motion to dismiss, a court may take judicial notice of matters of public record."  *Corbitt v. Balt. City Police Dep't*, No. CV RDB-20-3431, 2023 WL 3793997, at *3 n.5 (D. Md. June 2, 2023).  Such matters obviously include state statutes, and they also include the policies of state agencies. *See id.* (taking judicial notice of Baltimore City Police Department policies available on the Department's website).

No. 4 (Final Investigative Report) at 7:39 *sealed* (emphasis added).  This statement was critical to Roe's credibility because it purportedly explained her year-long delay in reporting the alleged sexual assault to authorities.  In evaluating whether Doe was given a sufficient opportunity to "respond, explain, and defend" against this evidence, it is instructive to review how federal courts treat evidence of mental health therapy.

Federal common law recognizes a "psychotherapist-patient privilege" under which "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure." *Richardson v. Sexual Assault/Spouse Abuse Res. Ctr., Inc.*, 764 F. Supp. 2d 736, 739 (D. Md. 2011).  A party asserting the privilege must show that the communications "were made (1) confidentially (2) between a licensed psychotherapist and her patient (3) in the course of diagnosis or treatment." *Id.*  (citation and internal quotation marks omitted).

Even if these criteria are met, "the privilege is impliedly waived by the patient *when the interests of fairness require waiver*, *such as when a plaintiff puts his or her mental condition at issue in the case* and other instances when the party attempts to use the privilege both as a shield and a sword." *Id.* (citation and internal quotation marks omitted) (emphasis added).  Thus, "a party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim and then shield the underlying communications from scrutiny by the opposing party." *Jacobs v. Conn. Cmty. Tech. Colls.*, 258 F.R.D. 192, 195 (D. Conn. 2009) (alteration, citation, and internal quotation marks omitted).  When a party puts her mental state at issue, the opposing party "has a right to conduct an inquiry into communications between psychotherapist and patient." *Id.*  In sum, the recognition of an implied waiver of the

psychotherapist-patient privilege is not some technical evidentiary rule; it is "a matter of fundamental fairness." *Laudicina v. City of Crystal Lake*, 328 F.R.D. 510, 513 (N.D. Ill. 2018).

College Park's procedures governing mental health evidence produced a fundamentally *unfair* outcome by barring any significant exploration of Roe's mental health treatment even after she opened the door to it.  Under the provision governing mental health records, Roe was permitted to reference her mental health treatment to explain her delayed reporting but also preclude any consideration of her mental health records by refusing to give "voluntary, written consent to provide that information for consideration." ECF No. 2-6 at 31, § VI.D.6.l *sealed*. More importantly, under the provision governing mental health questioning and evidence, ECF No. 2-6 at 31, § VI.D.6.m *sealed*, despite having put her mental health treatment at issue during the investigatory stage, Roe was permitted to shield herself from even being questioned about her mental health treatment by refusing to consent to such questioning,  ECF No. 31 at 103:1 *sealed*.[6]

Nastase defends the procedures by citing a federal regulation and Maryland law on which they are based, ECF No. 40-1 at 26–27, but that fact does not immunize the procedures from constitutional scrutiny and Nastase cites no authority to that effect.  To the extent Nastase's argument is intended to dissuade the Court from issuing a ruling that could call into question the constitutionality of a federal regulation or State law, it need not do so to grant Doe injunctive relief.

As just explained, federal law recognizes an implied waiver of the psychotherapist-patient privilege when a party puts her mental health at issue.  Applying that same principle here, when Roe referred to her therapy to explain her delayed report, she put her mental health at issue and, at

---

[6] In this Reply, for exhibits consisting of transcript excerpts, Doe cites to the page numbers on the transcripts instead of the CM/ECF header.

12

a minimum, impliedly consented to questioning on the subject in accordance with the procedure governing mental health evidence.  McGinn, however, interpreted the procedure as allowing Roe to continue to withhold consent (and suffer no adverse inference for doing so) despite putting her mental health at issue. ECF No. 31 at 103:7–11 *sealed*.  Thus, for Doe to prevail, the Court need only rule that he is likely to prove that McGinn applied the procedure on mental health evidence in an unconstitutional manner, not that the procedure itself is facially unconstitutional.

Nastase identifies three supposed "faulty assertions" underlying Doe's challenge to McGinn's application of that procedure, ECF No. 40-1 at 28–31, but it is Nastase who gets the facts wrong.  First, Nastase argues that Roe's reference to therapy "was not used to bolster [her] testimony but was made in response to questioning by Mr. Doe's attorney." *Id*. at 28 As already discussed, however, Roe first introduced evidence of her mental health therapy *at the investigatory stage*, not in response to questioning by Doe's lawyer.  Nastase also quotes a short passage from Roe's cross-examination as supposedly showing that Doe "was in fact permitted to inquire about Ms. Roe's mental health," but as Nastase concedes in the very next sentence, "Roe also made clear that she did not consent to discussion of her treatment." *Id.* at 29.  Doe was therefore denied any opportunity to ask about the "therapy" that prompted Roe to report him to authorities.

The second supposedly "faulty assertion" identified by Nastase is that McGinn did not "strike" from the record Doe's reference to Roe's "OCD" and obsessive thoughts as a possible reasons for her to make a false report. *Id.* at 30. The undisputed fact remains, however, that when Doe cited Roe's *own testimony* in response to McGinn's invitation to "speculate" about Roe's motives, McGinn "caution[ed]" him "from commenting on any party . . . or any witnesses' mental health." ECF No. 30 at 223:21–22 *sealed*.  Thus, McGinn was not simply "intend[ing] to guide" Doe, as Nastase argues, ECF No. 40-1 at 30; she was instead issuing a warning that even Roe's

13

own testimony about her mental health was out of bounds. This exchange only underscores McGinn's one-sided and unfair application of the procedure on mental health evidence.

The third "flawed assertion" is that even if McGinn incorrectly believed that Roe needed to consent in writing to questioning about her mental health, that mistake was harmless because Doe's attorney was allowed to ask for Roe's verbal consent. ECF No. 40-1 at 31. While this is yet another example of how McGinn misunderstood or misapplied the policy to Roe's benefit, the overriding point is not that McGinn was mistaken about the way in which Roe needed to consent, but rather her belief that Roe's consent was needed at all. Again, under principles of fundamental fairness at the heart of the Due Process Clause, Roe had at that point already (impliedly) consented by making her "therapy" an issue in this case. Nastase's three points thus fail to rehabilitate McGinn's unconstitutional application of the procedure on mental health evidence.

Nastase also suggests that because the Fourth Circuit does not recognize a due process right to cross-examination in university disciplinary proceedings, Doe's due process rights could not have been violated by limits on his cross-examination. *Id.* at 15–16. Regardless of whether Doe had a right to cross-examination, he indisputably had a right "to present his own defense against the charges." *Doe v. VA Polytechnic Inst. & State Univ.*, 77 F.4th 231, 237 (4th Cir. 2023) (alteration, citation, and internal quotation marks omitted). For that right to have any meaning in this case, Doe must have been afforded some opportunity to explore the "therapy" that prompted Roe to report him to authorities a year after their encounter. The only realistic way to do so was through access to Doe's records or questioning her on the subject. But College Park's procedures shut the door on both those options, and thus deprived Doe of the opportunity to present a meaningful defense. *Cf. Crane v. Kentucky,* 476 U.S. 683, 690 (1986) (observing that criminal

defendant's right to present a defense "would be an empty one if the State were permitted to exclude competent, reliable evidence . . . central to the defendant's claim of innocence").

Finally, while Doe will not rehash arguments from previous briefing, it bears repeating that College Park's treatment of mental health evidence was far from the only procedural flaw in this proceeding. College Park investigators failed in their obligation to collect available evidence and McGinn, in multiple ways, directed the presentation of evidence to favor Roe. *See* ECF No. 25 at 3–8.

## CONCLUSION

For the foregoing reasons, and those advanced in other relevant filings in this matter and at the hearings the Court has held to date, Doe respectfully requests that the Court grant his Motion and sign the proposed Order submitted as ECF No. 29-1.

Dated: February 14, 2024    Respectfully Submitted,

*/s/ Patrick R. Seidel*
Patrick R. Seidel, Esq. (#21801)
William N. Sinclair, Esq. (#28833)
Todd W. Hesel, Esq. (#21466)
Andrew M. Harvey, Esq. (#21925)
Silverman Thompson Slutkin & White, LLC
400 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 385-2225
pseidel@silvermanthompson.com
bsinclair@silvermanthompson.com
thesel@silvermanthompson.com
aharvey@silvermanthompson.com

*Attorneys for Plaintiff*